

_____
Honorable August B. Landis
United States Bankruptcy Judge

Entered on Docket
May 04, 2017

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

\* \* \* \* \* \*

| | | |
|---|---|---|
| In re: | ) | Case No. 14-11894-abl |
| | ) | |
| TJ PLAZA, LLC, | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | (Jointly Administered) |
| _____ | ) | |
| In re: | ) | Case No. 14-11895-abl |
| | ) | |
| DSWC, INC., | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | Hearing Dates: January 19 & 21 & 22, 2016 |
| _____ | ) | February 8 & 16, 2016 |

## MEMORANDUM OF DECISION REGARDING FINAL APPROVAL OF DISCLOSURE STATEMENTS AND CONFIRMATION OF CHAPTER 11 PLANS

Competing plans of reorganization, and their accompanying respective disclosure statements, were filed by Debtors TJ Plaza, LLC and DSWC, Inc. (collectively, "TJ Plaza" or "Debtors") on the one hand, and secured creditor U.S. Bank National Association, a National Banking Association Organized and Existing Under the Laws of the United States of America, Not in Its Individual Capacity But Solely in its Capacity as Trustee for the Registered Holders of Wachovia Bank Commercial Mortgage Trust, Commercial Mortgage Pass-Through Certificates, Series 2003-C6 ("US Bank") on the other.

The Court conducted an evidentiary hearing over five different days commencing on January 19, 2016, and concluding on February 16, 2016 (the "Confirmation Hearing"). Zachariah Larson of Larson & Zirzow, LLC, and Dimitri P. Dalacas of Flangas Dalacas Law

1

Group, appeared on behalf of TJ Plaza.  Robert R. Kinas, Mark E. Konrad, and Blakeley E. Griffith of Snell & Wilmer, L.L.P., appeared on behalf of US Bank.  Other appearances were noted on the record.

At the end of the Confirmation Hearing on February 16, 2016, the evidentiary record was closed.  The parties were afforded the opportunity to simultaneously file post-hearing briefs by March 4, 2016.  Briefs were timely filed and, at that point, all matters were taken under submission.

## I.    Overview

At the heart of the dispute between the parties is a 45,140-square-foot commercial retail shopping center located at 2101 South Decatur Boulevard in Las Vegas, Nevada, 89102 (the "Center").  TJ Plaza owns the Center.  US Bank holds a secured claim for which the Center serves as collateral.  When the loan underpinning US Bank's secured claim matured, TJ Plaza was unable to refinance or repay the outstanding loan balance.  US Bank commenced foreclosure proceedings.  TJ Plaza petitioned for relief under chapter 11 of the Bankruptcy Code.[1]  Confirmation of TJ Plaza's first proposed plan of reorganization was denied.  Thereafter TJ Plaza filed an amended plan of reorganization and US Bank filed a competing plan.  TJ Plaza's plan generally contemplates modification of its matured indebtedness to US Bank and continued ownership and operation of the Center.  US Bank's plan contemplates marketing and sale of the Center.  Each party claims that their reorganization plan should be confirmed.

## II.    The Evidentiary Record

The evidentiary record developed by the parties during the five days of the Confirmation Hearing is robust.  The Confirmation Hearing might well have taken more than five days but for the diligence of counsel for both parties in the pretrial process.

---

[1]11 U.S.C. §§ 101–1532 (hereafter, the "Bankruptcy Code").

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**A.    Exhibits**

Prior to the Confirmation Hearing, counsel for the parties met, conferred, and ultimately filed a joint exhibit list identifying two hundred twenty-five exhibits, the majority of which were admitted into evidence by stipulation on the first day of the Confirmation Hearing.[2]  Four more exhibits were added to the Joint Exhibit List during the course of the Confirmation Hearing and were admitted into evidence by stipulation.[3]  One additional exhibit was marked using the numbering sequence of the Joint Exhibit list, offered by US Bank in connection with witness testimony, and was admitted over TJ Plaza's objection.[4]

Counsel for US Bank, aware that certain exhibits it relied upon in support of its legal arguments would draw objection from counsel for TJ Plaza, also prepared an exhibit list separate and distinct from the Joint Exhibit List.[5]  The US Bank Exhibit List identified a total of

---

[2]See ECF No. 910-2, pp. 2-20 of 24 (the "Joint Exhibit List").  In this Memorandum, unless otherwise specified all references to "ECF No." are to the numbers assigned to the documents filed in the above-captioned jointly administered bankruptcy cases as they appear on the docket maintained by the Clerk of the Court.

Of the two hundred twenty-five exhibits identified in the Joint Exhibit List, one hundred eighty-nine were admitted into evidence by stipulation: Exhibits 1-43, 46-63, 66-72, 74-89, 95-107, 109-110, 114, 117-150, 156-157, 160-162, 164-173, 175-183, 186-189, 192-197, 199-204, 207, 211, and 213-225.

[3]Exhibit 226 was a placeholder on the Joint Exhibit List, and neither party marked a document using that exhibit number.  The documents added to the Joint Exhibit List and admitted into evidence by stipulation are Exhibit 227 (Disclosure Statement to Accompany Debtors' Second Amended Joint Chapter 11 Plan of Reorganization, ECF No. 690); Exhibit 228 (Debtors' Second Amended Joint Chapter 11 Plan of Reorganization, ECF No. 691); Exhibit 229 (Amendment to Debtors' Joint Second Amended Chapter 11 Plan of Reorganization, ECF No. 754); and Exhibit 230 (Stipulated Facts for Evidentiary Hearing, ECF No. 913).

[4]Specifically, Exhibit 231 is an updated rate chart sheet identified and referred to by US Bank's feasibility and interest rate expert, Jack Brungardt, in the course of his testimony at the Confirmation Hearing.

[5]See ECF No. 910-1, pp. 21-24 of 24 (the "US Bank Exhibit List").

thirty-four such documents.[6]  Three of those exhibits were admitted by stipulation.[7]

During the course of the Confirmation Hearing, nine additional exhibits identified in the Joint Exhibit List,[8] and six additional exhibits identified in the US Bank Exhibit List,[9] were offered by the parties and admitted into evidence.

**B.    Stipulated Facts[10]**

TJ Plaza and US Bank stipulated to the following facts and agreed that no related evidence pertinent thereto would be required during the course of the Confirmation Hearing.

On or about July 9, 2003, TJ Plaza executed a Promissory Note ("Note")[11] in favor of Wachovia Bank, National Association ("Original Lender") through which TJ Plaza promised to pay Original Lender, or its assignee, the principal sum of $5,100,000.00, together with interest as set forth therein.  On or about July 9, 2003, TJ Plaza executed a Deed of Trust, Security Agreement and Fixture Filing ("Deed of Trust")[12] in favor of Original Lender to secure, among other things, payment and performance of all the indebtedness and obligations under the Note, Deed of Trust, and other loan documents.[13]  The Deed of Trust relates to certain real and

---

[6]The US Bank Exhibit List identified Exhibits A through HH, inclusive.

[7]Exhibit R (First Amended Disclosure Statement Describing the Plan of Reorganization Proposed by Secured Creditor, ECF No. 896); Exhibit S (First Amended Plan of Reorganization Proposed by Secured Creditor, ECF No. 895); and Exhibit BB (Ballot Summary For Plan of Reorganization Proposed by Secured Creditor, ECF No. 804).

[8]Joint Exhibit List: Exhibits 64-65, 151-153, 158-159, 198, and 210.

[9]US Bank Exhibit List: Exhibits I, J, O, Y, Z, and AA.

[10]Exhibit 230; ECF No. 913.

[11]Exhibit 2.

[12]Exhibit 3.

[13]The Stipulated Facts for Evidentiary Hearing expressly states, "Nothing herein is intended or should be construed as altering or amended [sic] the loan and security documents referenced herein, and except as explicitly set forth herein, the Parties reserve all rights and

personal property described more specifically therein as the "Trust Property" (hereinafter the "Real Property Collateral"), which includes an interest in that certain retail center located in Clark County, Nevada, commonly known as Trader Joe's Plaza and located at 2101 South Decatur Boulevard, Las Vegas, Nevada, 89102 (the "Property").  In particular, the interest conveyed in the Deed of Trust includes what the Deed of Trust termed Trust Property–which included, among others, the Premises, Improvements, Leases, Rents and Profits (as those terms are defined in the Deed of Trust), and all other property interests related thereto.  The Deed of Trust was duly recorded with the Clark County Recorder on July 10, 2003, as Instrument No. 20030710-02674.

On or about July 9, 2003, TJ Plaza executed an "Assignment of Leases and Rents" ("Assignment of L&R"),[14] which assigned to the Original Lender (subject to terms therein) an interest in what the Assignment of L&R termed Leases and Rents related to the Real Property Collateral.  The Assignment of L&R was duly recorded with the Clark County Recorder on July 10, 2003, as Instrument No. 20030710-02675.

Pursuant to the terms of the Deed of Trust, the Deed of Trust operated as a security agreement pursuant to the Uniform Commercial Code ("UCC") for any of the items specified as part of the personal property collateral identified therein.  Certain UCC Financing Statements (the "Financing Statements")[15] related to the Real Property Collateral were filed.

As of July 9, 2003, TJ Plaza agreed to that certain "Escrow Agreement for Tenant

---

remedies with respect thereto."  See Exhibit 230, ECF No. 913 at n.1.  For clarity and the avoidance of doubt, the Court does not construe the Stipulated Facts for Evidentiary Hearing as altering or amending the loan and security documents and simply considers the parties' stipulation to be a part of the evidentiary record.

[14]Exhibit 4.

[15]Exhibit 5.

Rollover" (the "Escrow Agreement"),[16] which relates to the establishment of an escrow account for certain funds to be held in escrow and be used for reimbursement of tenant improvement costs and up-front leasing commissions necessary to retain or replace Trader Joe's Company ("Trader Joe's"), an existing tenant at the Real Property Collateral.[17]

By and through the Deed of Trust and the Financing Statements, and subject to the terms and conditions therein, US Bank has a properly perfected lien in, on, and to the Real Property Collateral and personal property related thereto.  Pursuant to Sections 4.6 and 4.32 of the Deed of Trust it was understood and agreed to by TJ Plaza that Original Lender had the right to assign or transfer its rights under the Note, Deed of Trust, and others of the Loan Documents.  On or about August 13, 2003, Original Lender assigned its interest in the Loan and Loan Documents to Wells Fargo Bank Minnesota, N.A., as Trustee for the Registered Holders of Wachovia Bank Commercial Mortgage Trust, Commercial Mortgage Pass-Through Certificates, Series 2003-C6 ("Assignee #1") pursuant to the "Assignment of Deed of Trust, Security Agreement and Fixture Filing and Assignment of Leases and Rents," recorded with the Clark County Recorder on December 30, 2003.

On or about March 31, 2009, Assignee #1 assigned its interest in the Loan and Loan Documents to Bank of America, N.A., as Trustee for the Registered Holders of Wachovia Bank Commercial Mortgage Trust, Commercial Mortgage Pass-Through Certificates, Series 2003-C6 ("Assignee #2") pursuant to the "Assignment of Deed of Trust, Fixture Filing and Security Agreement and Assignment of Assignment of Leases and Rents" recorded with the Clark County Recorder on June 5, 2009.  Thereafter, Assignee #2 assigned its interest in the Loan and

---

[16]Exhibit 6.

[17]The Note, Deed of Trust, Assignment of L&R, Financing Statements, Escrow Agreement, and all other loan and security documents related to the Loan are collectively referenced herein as the "Loan Documents."  The parties' Stipulated Facts for Evidentiary Hearing references them as same.  See Exhibit 230, ECF No. 913.

Loan Documents to US Bank pursuant to the "Assignment of Deed of Trust, Fixture Filing and Security Agreement and Assignment of Assignment of Leases and Rents" recorded with the Clark County Recorder, respectively, on October 18, 2013, and October 21, 2013.

Under Section 2.1(a) of the Deed of Trust an "Event of Default" includes, without limitation, when TJ Plaza fails to pay any money due to US Bank under the Note.  As of the Confirmation Hearing, the principal amount due under the Note is $4,289,897.90.  TJ Plaza does not dispute that US Bank is entitled to that amount.  The contract rate of interest is 5.58% under the Note.  The amount of interest which had accrued at the contract rate from May 11, 2013, to January 31, 2016, is $661,609.50.  TJ Plaza does not dispute that US Bank is entitled to that amount.

Pursuant to Section 2.3 of the Note, the default rate of interest is four percent in excess of the contract rate.  Notwithstanding the foregoing, TJ Plaza disputes that such amount is allowable and/or enforceable on any and all applicable grounds, and TJ Plaza reserves all rights and remedies to object to such amount.

Pursuant to Section 2.5 of the Note, US Bank is entitled to reasonable attorney fees and costs of collection.[18]  Notwithstanding the foregoing, TJ Plaza disputes that certain fees and costs allegedly incurred by US Bank are reasonable within the meaning of 11 U.S.C. § 506(b), disputes that such amounts may be allowable on any and all applicable grounds, and reserves all rights and remedies to object to the allowance and payment of such amounts.

On March 21, 2014 (the "Petition Date"), TJ Plaza filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code.

### C.    Witness Testimony

Counsel for the parties also prepared and filed a joint list of witnesses expected to testify

---

[18]Section 1.20 of the Deed of Trust also provides that US Bank is entitled to reasonable attorney fees and costs of collection.

at the Confirmation Hearing.[19]  A total of nine witnesses were identified in the parties' Joint Witness List.  Eight of them testified at the Confirmation Hearing after counsel for the parties presented their opening statements.[20]

### 1.    Jeffrey S. Susa–Debtors' Managing Member

Jeffrey S. Susa ("Mr. Susa") was TJ Plaza's first witness, and his testimony spanned the first two days of the Confirmation Hearing.  He testified that he had been generally involved in the commercial real estate market for thirty-seven years in various capacities, in California and Nevada.  He was first licensed to sell real estate in California in 1979 and obtained a real estate broker license there in 1981.  He obtained a Nevada real estate broker's license in 1989, and he obtained a property management certificate in 2000.

Mr. Susa testified that, in 2000, he shifted his primary business focus to managing commercial real estate properties in Nevada.  He began providing management services for TJ Plaza in 2007.  In 2008 he became the managing member of Real Estate Asset Management ("RAM") and continued providing management services for TJ Plaza through RAM.

Mr. Susa stated that, in addition to the management services it provided for TJ Plaza, RAM also provided management services for entities operating other commercial real estate projects that experienced substantial financial difficulty.  He testified that the financial difficulties encountered by several other RAM clients required resolution through chapter 11 bankruptcy proceedings[21] or through consensual creditor workout arrangements.  The amount of

---

[19]See ECF No. 900, pp. 2-4 of 5 (the "Joint Witness List").

[20]Marilee Tully was identified as the ninth potential witness, but neither party opted to call her to testify at the Confirmation Hearing.  As detailed below, the deposition testimony of Douglas Yokomizo, the Vice President - Real Estate for Trader Joe's, was also read into evidence in the course of the Confirmation Hearing.  Exhibit 211.

[21]Mr. Susa specifically identified In re Windmill Durango Office, LLC (Bankr. D. Nev. Ch. 11 Case No. 10-25594) ("Windmill Durango"); In re Windmill Durango Office II, LLC (Bankr. D. Nev. Ch. 11 Case No. 13-16523) ("Windmill Durango II"); In re SRP Plaza, L.P.

secured debt at issue in those cases ranged from $7 million to $19 million.  Mr. Susa testified

that in four of those matters, RAM's client sought relief under chapter 11 of the Bankruptcy

Code and successfully confirmed a plan of reorganization,[22] with the balance of the matters

having been resolved via consensual creditor workout agreements.

        With respect to RAM's management efforts for TJ Plaza, Susa testified that the Center

was a mature commercial center.  He indicated that the Center benefitted from two privileged

liquor licenses, both of which were being used by existing tenants, as well as a billboard which

generated an income stream for the Center in addition to the income generated by tenant leases.

Asked to describe the tenant occupancy situation in the Center, Mr. Susa stated that there were

three vacant spaces available for lease.[23]  He stated that, in 2015, the Center was approximately

sixty percent occupied and forty percent vacant.  He testified further that, at the time of the

Confirmation Hearing, the Center was approximately seventy-six percent occupied and twenty-

four percent vacant as the result of various lease agreements and extensions.[24]  He also stated

_____

(Bankr. D. Nev. Ch. 11 Case No. 15-12127) ("SRP Plaza"); In re Sahara Towne Square, LLC
(Bankr. D. Nev. Ch. 11 Case No. 12-12537) ("Sahara TS"); In re CBS I, LLC, (Bankr. D. Nev.
Ch. 11 Case No. 12-16833) ("CBS I").

    [22]Mr. Susa testified that chapter 11 reorganization plans were confirmed for debtors
managed by RAM in the Windmill Durango, SRP Plaza, Sahara TS, and CBS I cases.  See id.

    [23]Mr. Susa testified that the three vacant spaces had previously been leased to a
restaurant, a Russian market, and an antique trader.

    [24]Mr. Susa testified that a new seven-year lease had been entered into with Mango Tango,
pursuant to which the tenant paid between one hundred fifty thousand and two hundred fifty
thousand dollars to refurbish a kitchen/bar area.  In exchange for those improvements, the tenant
received a reduced rent rate for the leasehold.  The tenant also agreed to pay $65,000.00 down,
plus additional installment payments, in exchange for one of the privileged liquor licenses
associated with the Center.  He also explained that Dotty's, an existing tenant conducting
bar/restaurant operations with gaming available for patrons, had signed a five-year extension at
an increased rental rate.  He stated that another existing tenant, a bakery, had also signed a
seven-year lease extension but at a rent rate $200.00-per-month lower than that tenant's prior
lease–thereby allowing TJ Plaza to avoid incurring tenant improvement costs attendant to the
leased premises.  Mr. Susa testified that the reduced rent for the bakery effectively neutralized

that, with one exception,[25] the tenants in the Center were current on their lease payment obligations. Mr. Susa explained that the remaining twenty-four percent vacancy in the Center was being actively marketed for lease, but he noted that bankruptcy proceedings had made it difficult to sign new tenants for the Center.

As to the physical condition of the Center, Mr. Susa testified that the last significant remodeling work was performed in 2011. That remodeling work was undertaken at the request of Trader Joe's, the largest tenant at the Center. Mr. Susa explained that Trader Joe's requested the 2011 renovation work to bring the Trader Joe's leasehold at the Center into line with the current space standards for the Trader Joe's store brand. He stated that the 2011 renovation work extended beyond the Trader Joe's leasehold and provided a general facelift for the entire Center. He testified that, contemporaneously with the 2011 renovation, Trader Joe's requested four five-year lease extension options from TJ Plaza. He also testified that the 2011 remodeling work was more expensive than originally planned, as it required the installation of a sprinkler system throughout the Center to satisfy current City of Las Vegas building codes. The sprinkler system installation cost approximately eight hundred thousand dollars.

Asked about the history of the secured Loan held by US Bank, Mr. Susa testified that the Loan was originally taken out in August 2003. The original principal amount was $5.1 million dollars, accruing interest at 5.58%, amortized over a thirty-year period, with a ten-year balloon payment. He testified that he had experience negotiating workouts of roughly fifty commercial mortgage loans with terms similar to the Loan held by US Bank that was secured

the increased rental income generated by the Dotty's lease extension.

[25]Mr. Susa identified The Nail Lady as the only tenant in the Center who was in arrears on lease payment obligations. He testified that the arrearage was approximately $8,000.00, and the tenant had agreed to pay $800.00 per month in addition to regular lease payments until the arrearage was resolved.

by the Center. He also explained that Loan was at the low end of the REMIC[26] range, stating

that, in his experience, rates on REMICs varied between 3.57% and 5%.

 As to why TJ Plaza had sought bankruptcy protection, Mr. Susa explained that TJ Plaza

had made all of the $29,213.74 monthly principal and interest payments required under the

terms of the commercial mortgage loan held by US Bank. When the loan matured in 2013,

though, US Bank would not extend or revise the terms of the loan.[27] He explained that TJ Plaza

was also unable to locate another lender willing to provide take-out financing for the matured

US Bank Loan. Mr. Susa explained that, in addition to general difficulties that existed in the

Las Vegas commercial lending market in 2013, the yield maintenance premium provisions[28]

contained in the loan documents held by US Bank made the sale or refinancing of the Center

prohibitively expensive and therefore untenable.[29] As a result, US Bank declared the loan in

---

[26]REMIC is an acronym for "real estate mortgage investment conduit." A REMIC is typically an entity that holds a pool of real estate mortgages, and "securitizes" the mortgage obligations by marketing multiple classes of interests in the REMIC to investors. See generally 26 U.S.C. § 860D(a) and 26 C.F.R. § 1.860D-1.

[27]Mr. Susa did not suggest, though, that there were any provisions in the loan documents held by US Bank which required US Bank to renegotiate or extend the loan terms at maturity based upon TJ Plaza's payment history.

[28]In general terms, a "yield maintenance premium" is a fee payable to a lender by a borrower when the borrower pays off the relevant loan prior to maturity. The purpose of a yield maintenance premium is to ensure that the lender receives all of the interest income it expected to receive under the terms of the relevant loan regardless of when the loan is repaid. In layman's terms, and from the perspective of the borrower, it is a prepayment penalty. See UIP Ltd., L.L.C. v. Lincoln Nat'l Life Ins. Co., 2009 WL 4497233, *5 (D. Ariz. 2009) ("Yield maintenance prepayment provisions are 'nothing new.' . . . Their purpose is to compensate the lender for any loss on return when the borrower opts to prepay the loan during a time when the market rate is lower than the contract rate of return. . . . The intended goal of a yield maintenance formula is to produce a prepayment premium, which, together with the amount prepaid, allows the lender to earn the same yield on reinvestment as it would have if the borrower had not prepaid and had made all scheduled payments over the life of the loan.' (internal citations omitted)).

[29]Mr. Susa did not offer any explanation as to how or why the yield maintenance premium provision in the original mortgage loan documents held by US Bank–a fee imposed if

default when TJ Plaza proved unable to make the required balloon payment. Mr. Susa explained that bankruptcy protection was TJ Plaza's only viable financial option at that point in time.

Mr. Susa also testified as to his understanding of how TJ Plaza's reorganization plan would address the matured, secured loan held by US Bank. He explained that, through its reorganization plan, TJ Plaza proposed to provide US Bank a $5.1 million note accruing 4.53% interest annually, amortized over thirty years with a balloon payment equal to the unpaid balance of the loan after ten years. He stated that, in addition to reducing the interest rate by 1.05%, TJ Plaza's plan would eliminate the yield maintenance premium imposed under the original matured loan with US Bank. According to Mr. Susa, the net effect of the loan terms proposed in the TJ Plaza Plan would be to repay US Bank the full amount of the principal and contractual interest rate under the matured loan over the term of the plan. He stated that TJ Plaza would continue to impound funds for taxes, insurance, and a replacement reserve in keeping with the original loan terms. Mr. Susa also explained that, under its plan, TJ Plaza would establish a reserve fund for future capital improvements and future tenant improvement obligations related to the Center.[30] He also noted that US Bank would retain, and be fully secured through, its existing first Deed of Trust on the Center.

After reviewing a payoff history statement regarding the matured loan held by US

the loan was paid off early–would have a chilling impact on a sale or refinancing transaction for the Center under the terms of the matured US Bank Loan. If such a provision were contained in TJ Plaza's plan, though, a yield maintenance premium payment obligation would arise upon a post-confirmation sale or refinance of the Center.

[30]Mr. Susa explained that TJ Plaza would establish the tenant improvement and capital improvement reserve fund by setting aside between $1,000.00 and $2,000.00 each month during the first two years of the plan, increasing those monthly payments to between $2,000.00 and $5,000.00 per month over the remainder of the ten-year plan term.

Bank,[31] Mr. Susa testified that the unpaid principal balance of that loan as of January 31, 2016, was $4,289,897.90.  He stated that the monthly principal and interest payment required under the loan held by US Bank was $29,213.74.  He testified further that, from the inception of the loan held by US Bank through its maturity date, TJ Plaza had never missed a required principal and interest payment.  Mr. Susa noted that the monthly $29,213.74 principal and interest installment payment under the matured loan held by US Bank was more than the amount of the monthly payments called for under TJ Plaza's plan.  He explained that TJ Plaza's plan provided for interest-only payments of approximately $19,000.00 per month to US Bank over the first two years.  He stated that the lower interest-only payments over the first two years of the plan would allow TJ Plaza to build up its reserves for use in connection with the Center's continued operations, and any expenses incurred if and when the three vacant spaces in the Center were leased in the future.

Mr. Susa acknowledged that, while the TJ Plaza Plan required payments roughly equal to the principal and interest obligations under the matured loan held by US Bank, the plan did not provide for cure of about $1.14 million in additional payment obligations attributable to TJ Plaza's failure to repay the outstanding balance of the Loan upon maturity.[32]  Mr. Susa testified that, rather than providing for a cure of those additional post-maturity charges, the TJ Plaza Plan simply provided that the matured US Bank Loan would be deemed to be current upon confirmation.

---

[31]Exhibit 222.

[32]See Exhibit 222.  More particularly, Mr. Susa noted that the January 31, 2016, payoff statement prepared by US Bank included $459,495.73 in default interest charges accrued at 9.58% annually (four percent over the original contract interest rate), a separate $216,332.32 late fee equal to five percent of the unpaid and outstanding principal at maturity, and US Bank's claimed $878,089.07 in attorney fees.  Mr. Susa also testified that the attorney fees line item in the payoff statement was more than the amount of attorney fees incurred by the lenders and borrowers–combined–in the four chapter 11 cases he had participated in where plans were confirmed.  See notes 21 and 22, supra.

When queried further about TJ Plaza's payment history under the US Bank Loan, Mr. Susa testified that the payments made by TJ Plaza from the inception of that loan through the Confirmation Hearing totaled $4,757,390.01.[33]  He reiterated that, from the inception of the US Bank Loan until the loan matured ten years later, TJ Plaza had made all required principal, interest, insurance, reserve, impound, and tax payments.  He also stated that TJ Plaza had made post-bankruptcy payments in connection with the US Bank Loan totaling $309,019.92.  He also testified that the average monthly payment TJ Plaza had made on the US Bank Loan from the inception of the loan to the Confirmation Hearing was $31,928.79.  He also stated that during the ten-year time period from the inception of the US Bank Loan through its maturity date, the average monthly payment was $37,697.00.  Mr. Susa believed that, given TJ Plaza's payment history under the US Bank Loan both pre- and post-petition, TJ Plaza was capable of making the payments provided for under the terms of TJ Plaza's proposed chapter 11 plan.[34]

Mr. Susa also provided testimony as to the history of TJ Plaza's landlord-tenant relationship with Trader Joe's.  He explained that Trader Joe's was the anchor tenant in the Center and had been a tenant there for over twenty years.  The space occupied by Trader Joe's is approximately 27.8% of the Center's total square footage.  Mr. Susa said that Trader Joe's lease expired in 2011.  Mr. Susa reiterated that lease negotiations between TJ Plaza and Trader Joe's in 2011 resulted in significant renovations to the Center and Trader Joe's leasehold.  TJ Plaza also agreed that Trader Joe's would have the option to exercise four five-year extensions, the first of which had expired in October 2015.  Mr. Susa stated that, after the first lease extension expired in October 2015, Trader Joe's had not signed another lease extension and was

---

[33]See generally Exhibit 207, ECF No. 897-1, pp. 2-4 of 4.  Mr. Susa also stated that one hundred forty-nine months had elapsed from the inception of the US Bank Loan to the date of the onset of the Confirmation Hearing.

[34]Mr. Susa reiterated that TJ Plaza's plan provided for interest-only payments of approximately $19,000.00 per month for the first two years, followed by monthly payments of about $26,000.00 per month.

currently a month-to-month tenant as a result.  He stated that he did not believe that Trader

Joe's would sign an extension or a new lease until they were certain who the landlord at the

Center would be in the future.  He also said that Trader Joe's was current on lease payments as

if a lease extension had been signed, Trader Joe's had not provided any notice that they

intended to move out of the Center, and he believed Trader Joe's would have advised him if

they intended to leave the Center.  Mr. Susa stated that it would take about six to nine months

for Trader Joe's to open a new store elsewhere, and, if they did vacate the Center, TJ Plaza

would use that time to locate a tenant to lease the space Trader Joe's occupied in the Center.  He

also testified that, because Trader Joe's had not signed a lease extension, TJ Plaza was actively

searching for a replacement tenant if Trader Joe's were to leave the Center unexpectedly.  Mr.

Susa stated that, while anything is possible in a landlord-tenant relationship, he did not believe

Trader Joe's intended to close their business on thirty days' notice to TJ Plaza.  He noted that

the mayor of the City of Las Vegas was focused on redevelopment of the "Decatur Corridor"

where the Center is located, office buildings were newly opened across the street from the

Center, and a road improvement project that was underway would be completed in the near term

and provide better access to the Center.  He also testified that, if Trader Joe's were to vacate the

Center, he believed he could find a replacement anchor tenant in about six to seven months,

albeit at a slightly lower rental rate.  In that event, Mr. Susa stated that he believed TJ Plaza

could still make the payments contemplated by its reorganization plan by discounting lease

rates in the vacant spaces within the Center.[35]

       Mr. Susa conceded that Trader Joe's had recently expressed some concerns related to

their leasehold and the Center's operations in general.  TJ Plaza had addressed concerns as to

parking lot striping by agreeing to re-stripe the lot every four months.  He noted that there had

---

[35]Mr. Susa did not offer an explanation as to whether the discounted lease rate strategy
for filling the vacant space in the Center had already been implemented, and if no, why not.

1  been some sewer backup and leaky roof issues in the Trader Joe's space that had been

2  addressed and repaired.  Mr. Susa stated, though, that Trader Joe's had never alerted him to

3  problems attendant to vagrants, gangs, or other safety issues at the Center.

4      Asked about the income generated for TJ Plaza through the Center's operations, Mr.

5  Susa testified that the monthly gross revenue from the Center was $59,848.00.  He explained

6  that confirmation of TJ Plaza's plan would eliminate legal fees of approximately $7,500.00 per

7  month, eliminate chapter 11 quarterly fees of $1,475.00 per month, and reduce certain tenant

8  improvement and capital improvement expenses.[36]  He stated that, even if the expense

9  reductions were not realized in full TJ Plaza could still make the payments required under its

10  plan without difficulty.

11      Mr. Susa was also questioned about the income and expense projections offered as

12  evidence in support of confirmation of TJ Plaza's reorganization plan.[37]  He testified that the

13  income projections were conservative, as they did not assume that the then-vacant space in the

14  Center would be leased during the ten-year plan term.  He also explained that rental income

15  projections were consistent with the terms of existing leases, and projected common area

16  maintenance ("CAM") increases were capped at $0.40 per square foot.  He testified that, when

17  the payment obligations under the TJ Plaza Plan are analyzed in light of those income

18  projections, TJ Plaza would operate in a positive cash flow position during the entire ten-year

19  plan term.

20      Mr. Susa testified that TJ Plaza's expense projections were conservative as well.  He

21  stated that the expense projections included a management fee of five percent.  He testified that

22  the projections incorporated a two percent expense increase across-the-board in 2017 and

23

24  _____

25  [36]The expenses referenced by Mr. Susa were among those addressed in a budget
regarding TJ Plaza's Court-approved use of cash collateral.  See Exhibit 89.

26  [37]See generally Exhibit 203.

additional increases in subsequent years.  He also stated that the expense projections included a $24,194.59 plan payment but did not contemplate application of any existing funds in TJ Plaza's debtor-in-possession account to reduce the projected expense amounts.

Asked about the ten-year balloon payment due to US Bank under TJ Plaza's plan, Mr. Susa testified that he expected the amount of the balloon payment to be approximately $4.1 million.  He stated that, by the end of the ten-year plan term (if not sooner), a sale of the Center would generate enough to fully repay US Bank.  He also expected that refinancing would be a viable option then, as more money would likely be available in the Las Vegas commercial real estate lending market as stability returned to that market over time.

Mr. Susa also offered testimony comparing the leasing income levels at the Center in May 2004[38] and in December 2015.[39]  He acknowledged that the Center had been fully leased in 2004 and currently had a twenty-four percent vacancy rate; he did not dispute that tenant occupancy at the Center had declined during the term of the US Bank Loan.  He stated that, in May 2004, the Center generated gross rental income of $54,685.42 and CAM charges of $11,953.65, for a total gross income figure of $66,639.07.  He explained that, in December 2015, the Center generated gross rental income of $49,974.30 plus CAM charges totaling $59,848.40.  He calculated the decline in the gross income stream generated by the Center over the term of the US Bank Loan to be $6,790.67, or just over ten percent of the gross income generated by the Center at the time it was fully leased in 2004.  Mr. Susa stated that, between 2004 and December 2015, commercial real estate per square foot rental rates had risen in the Las Vegas market.  He stated that the rise in rental rates explained why gross income at the Center had declined by only ten percent when the Center's occupancy rate had dropped by twenty-four percent over that same time period.  He also said that the increased rental rates

---

[38] See Exhibit 117.

[39] See Exhibit 214.

resulted in decreased risk of default for US Bank if the TJ Plaza Plan were confirmed.

Mr. Susa was next asked about a claim against TJ Plaza originally held by the City of Las Vegas.  The claim was for sewer services provided at the Center by the City of Las Vegas and had been purchased by US Bank during the pendency of TJ Plaza's chapter 11 bankruptcy case.[40]  Mr. Susa explained that the Sewer Claim had always been treated separately from

_____

[40]Herein referenced as the "Sewer Claim."  After US Bank purchased the Sewer Claim, the Sewer Claim became the subject of an ongoing dispute between the parties.  The unsecured creditor pool in this case is small, both in the number of creditors and the total amount of unsecured debt.  Thus while the amount of the Sewer Claim is relatively modest its impact on the confirmation calculus is not.  Both the proper characterization and classification of the Sewer Claim are issues that have been, and continue to be, hotly contested by the parties.

In December 2014, this Court held that the Sewer Claim was comprised of a secured claim in the amount of $3,335.86 and a priority unsecured claim in the amount of $10,727.65.  In considering TJ Plaza's original plan of reorganization, this Court had concluded that the unsecured portion of the Sewer Claim was a priority unsecured debt and entered an order on December 17, 2014, striking a ballot US Bank had modified and cast (ostensibly as a general unsecured creditor) for those reasons.  The ballot was also stricken because US Bank had acquired the Sewer Claim after the Record Date fixed by the Court to identify creditors entitled to cast ballots related to plan confirmation.  See ECF No. 487; see also ECF No. 484.

US Bank appealed from the decision striking that ballot, seeking review by the United States District Court for the District of Nevada (the "District Court").  While that appeal was pending, this Court entered its May 26, 2015, order denying confirmation of TJ Plaza's first plan of reorganization.  Confirmation of TJ Plaza's first reorganization plan was denied on grounds unrelated to the issue under review by the District Court and was without prejudice to TJ Plaza's ability to file another plan.  See Exhibit 188.

On August 26, 2015, TJ Plaza filed a Second Amended Plan of Reorganization.  See Exhibit 227, ECF No. 690.  The District Court subsequently resolved US Bank's appeal by holding that: (a) the priority status of the Sewer Claim was lost upon assignment from the City of Las Vegas to US Bank; (b) as a result, the Sewer Claim was a general unsecured claim in its entirety; but (c) US Bank's ballot as a general unsecured creditor was properly stricken in connection with TJ Plaza's original reorganization plan because US Bank did not hold the Sewer Claim on the Record Date.  See US Bank Nat'l Ass'n v. TJ Plaza, LLC, District Court Case No. 2:14-cv-02226-GMN (D. Nev. Sept. 28, 2015) (District Court ECF No. 17).

On October 1, 2015, TJ Plaza filed a notice of appeal to the Ninth Circuit Court of Appeals ("Circuit Court") challenging the District Court's determination that the Sewer Claim lost its priority status upon assignment to US Bank and was a general unsecured claim.  No stay pending appeal was sought or obtained by TJ Plaza, and that appeal pended before the Circuit Court until recently.  See TJ Plaza, LLC, v. U.S. Bank Nat'l Ass'n, Circuit Court Case Nos. 15-16968 and 15-16969.

Thereafter TJ Plaza filed an amendment to their Second Amended Plan of

general unsecured creditors, noting that TJ Plaza's plan provided to pay that claim in full.  He

testified that the reason for classifying the Sewer Claim separately from the general unsecured

creditor class and paying it in full was to avoid the potential for any problems with obtaining

permits from the City of Las Vegas if sewer-related repairs or upgrades were required at the

Center.  He also noted that TJ Plaza desired to pay off the Sewer Claim in order to avoid

continued litigation costs attendant related to it.  He also testified TJ Plaza's debtor-in-

possession bank account held sufficient sums to pay the Sewer Claim as well as all other sums

due at confirmation of TJ Plaza's plan.

---

Reorganization, which provided for separate classification of the Sewer Claim (to Class 6) from claims held by other general unsecured creditors (in Class 4).  See Exhibit 229, ECF No. 754.  A week later, US Bank filed a Motion For Allowance of Claim for Voting Purposes ("Allowance Motion") (ECF No. 769).  On November 20, 2015, the Allowance Motion was granted in part and denied in part by this Court.  See ECF No. 824 (the "Allowance Order").

In accordance with FED. R. BANKR. P. 3018(a) and the District Court's ruling on appeal–and because the issue of the timeliness of US Bank's acquisition of the Sewer Claim was effectively mooted by new deadlines for casting ballots related to TJ Plaza's amended plan–the Allowance Order temporarily allowed the Sewer Claim as a general unsecured claim in the amount of $14,063.51 solely and exclusively for voting purposes.  The Allowance Order expressly provided that allowance of the Sewer Claim for voting purposes was without prejudice to TJ Plaza's right to raise and litigate at confirmation whether classification of the Sewer Claim separate from the general unsecured claims was permissible under 11 U.S.C. § 1122.  See Allowance Order, ECF No. 824.

Whether the Sewer Claim lost its priority status upon assignment from the City of Las Vegas to US Bank was decided by the Circuit Court on April 24, 2017, in an unpublished memorandum affirming the District Court.  See Circuit Court Case Nos. 15-16968 and 15-16969 at ECF No. 34; see TJ Plaza, LLC v. U.S. Bank Nat'l Ass'n, 2017 WL 1433327 (9th Cir. Apr. 24, 2017).

In connection with its ruling, and pursuant to Federal Rules of Evidence 201(b) and (c) and 1101(a) and (b), the Court takes judicial notice of the official court docket available through PACER in the District Court case of US Bank Nat'l Ass'n v. TJ Plaza, LLC, District Court Case No. 2:14-cv-02226-GMN.

In connection with its ruling, and pursuant to Federal Rules of Evidence 201(b) and (c) and 1101(a) and (b), the Court takes judicial notice of the official court docket available through PACER in the Circuit Court Case Nos. 15-16968 and 15-16969.

In connection with its ruling, and pursuant to Federal Rules of Evidence 201(b) and (c) and 1101(a) and (b), the Court takes judicial notice of the official court docket available through PACER in the jointly administered bankruptcy cases In re TJ Plaza, LLC and In re DSWC, Inc., Bankr. D. Nev. Case Nos. 14-11894 and 14-11895, respectively.

Mr. Susa then testified about his experience in the purchase and sale of commercial real estate similar to the Center.  He stated that he had been involved in over fifty such transactions.  He discussed the capitalization rate[41] used by purchasers in deciding to purchase commercial real estate like the Center.  He testified that, with the Center generating operating income of approximately six hundred thousand dollars per year without consideration of CAM income, the applicable Cap Rate would be approximately 7.0%, yielding an expected sale price of approximately $8 million.  He testified that it would take about six to nine months to market the Center and obtain an offer approximating that amount.  The Center could be sold more quickly, but not as quickly as thirty to ninety days; it would take a minimum of one hundred eighty days or so to generate a reasonable sale price for the Center.

On cross-examination, Mr. Susa acknowledged that only two of the seven other chapter 11 cases filed by RAM's clients involved loans that remained unpaid after maturity.  He stated that the loans negotiated in the chapter 11 cases filed by RAM's other clients did not contain a default interest rate provision similar to the terms of the US Bank Loan but did contain yield maintenance and late fee provisions like those in the US Bank Loan Documents.

Mr. Susa confirmed that the vacancy rate in the Center was approximately twenty-four percent, as three of the spaces available for lease were vacant.  He stated that the tenant in one of the vacant spaces had paid rent until the principal experienced a heart attack in November 2015, and the tenant had not paid since then.  He also said that a tenant who had rented the other two vacant spaces in the Center had filed for bankruptcy relief two or three times and had not paid rent in over three years.

Mr. Susa reiterated that TJ Plaza had recently signed three leases, one with a new tenant

---

[41]The capitalization rate was referred to throughout the Confirmation Hearing as the "Cap Rate."  The Cap Rate is a formula commonly used to evaluate the expected rate of return on a real estate investment property.  In general terms, the Cap Rate is a ratio of the net operating income generated by a commercial real estate property to the value of the property itself.

(Mango Tango) and two with existing tenants in the Center (referenced in his testimony as Dotty's and The Bakery). He also reaffirmed that Trader Joe's was a month-to-month tenant. He conceded it was preferable to have tenants with signed leases in a commercial location like the Center because leases provided more stability and certainty as to expected lease income–so long as the tenant did not file bankruptcy or abandon the leasehold.

Asked whether he had ever previously approached a bank to make a commercial real estate loan where the anchor tenant of the relevant property was month-to-month, Mr. Susa answered in the negative. He acknowledged, too, that in a commercial real estate context lenders typically require a current list of leases in determining whether to make a loan.

Mr. Susa reiterated that he was taking steps to market the Trader Joe's space in the Center. He acknowledged, though, that he did not have in hand any lease proposals related to that space. He agreed that if he found a tenant for the Trader Joe's space, Trader Joe's could opt to issue a notice to terminate its tenancy at the Center.

Asked about the remodeling work at the Center in 2011, Mr. Susa acknowledged that about eight hundred thousand dollars of the related cost was paid using loans, obtained by TJ Plaza's parent company, from third-party lenders. He confirmed that the Center did not serve as collateral for the loans obtained by TJ Plaza's parent company, and the third-party lenders did not hold a deed of trust encumbering the Center.

Mr. Susa testified that he personally participated in the negotiation of the US Bank Loan collateralized by the Center. He acknowledged that the terms of the US Bank Loan he had negotiated included yield maintenance, default interest, late fees, and attorney fees provisions. He also said that as, to the twelve-to-fifteen similar REMIC loans in which he had been involved, some but not all contained loan-to-value covenants, default interest provisions, late fee provisions, and impound provisions for tenant improvements and capital improvements.

Mr. Susa reaffirmed that interest-only payments of approximately nineteen thousand dollars per month were to be made to US Bank for the first two years of TJ Plaza's proposed

plan.  He also confirmed that, during that same two-year period, TJ Plaza would be capable of making plan payments of as much as thirty-one thousand dollars per month.  He acknowledged that, while late fees and default interest due under the US Bank Loan Documents would be deemed current under TJ Plaza's proposed plan, the US Bank Loan remained in default because it had matured and remained unpaid.  He noted that the US Bank Loan Documents provided for the lender's recovery of reasonable attorney fees upon default.  He stated that late fees, default interest, and reasonable attorney fees would be paid by TJ Plaza if the Court required such payments through its confirmation order.

Asked whether it was probable that Trader Joe's would leave the Center, Mr. Susa reaffirmed that Trader Joe's occupied its space on a month-to-month basis.  He conceded that, as a month-to-month tenant, Trader Joe's could terminate its tenancy at any time.  He also acknowledged that he was aware Trader Joe's was looking at other store location options and could make a business decision to terminate its month-to-month tenancy.  He further stated Trader Joe's was always considering potential store locations in the Las Vegas valley–thus he did not take that to mean they were likely close their store at the Center.

Mr. Susa was asked whether TJ Plaza would have to incur tenant improvement costs to land another tenant if TJ Plaza left the Center.  He was not certain, as a replacement tenant might be willing to cover the cost of building out the Trader Joe's space in exchange for lower rent, much like the recent lease agreement reached with Mango Tango.  He conceded that such an arrangement could require a negotiated period of rent-free occupancy and/or a reduced per-square-foot lease rate for the anchor tenant location within the Center, both of which would reduce the gross rental income generated by the Center.

Mr. Susa confirmed that he was the managing member of RAM and testified that RAM was not obligated to provide funding for the Center if there was a cash flow shortage during the term of the TJ Plaza Plan.  Mr. Susa was a guarantor of the US Bank Loan, along with two other general partners in RAM.  He suggested that the two other general partners in RAM would

provide funding to cover a cash flow shortfall for TJ Plaza but conceded that neither he nor the other two general partners in RAM had signed any agreement obligating them to do so.  He pointed out that TJ Plaza's plan allowed for subordinate financing secured by the Center but acknowledged there were no subordinate financing arrangements in existence.  He again testified that it was not TJ Plaza's intent to further encumber the Center for the benefit of the third party lenders who had loaned money to TJ Plaza's parent company to fund the 2011 renovation of the Center.  Since August 2015, Mr. Susa had not approached any lender seeking either subordinate financing or a loan to completely pay off the US Bank Loan.  He had not pursued either of those avenues because he did not believe any new lender would consider them while TJ Plaza's bankruptcy was pending.

 With respect to the $4.35 million balloon payment required by TJ Plaza's plan, Mr. Susa testified that the loan-to-value ratio of the Center would be attractive to a lender at the end of the ten-year plan term.  In reaching that conclusion, he stated that he believed the value of the Center was approximately $8 million, and the loan balance due at that point would only be about $5.1 million.  Asked whether any subordinate financing TJ Plaza obtained during the plan term would have a negative impact on the Center's loan-to-value ratio, he explained that it would not, so long as the junior lienholder agreed to subordinate its lien to the lien of the new mortgage lender.

Mr. Susa was asked whether there were any issues with the City of Las Vegas attendant to the Mango Tango lease.  He testified that there were some issues related to the plumbing in the kitchen area, and as to connections to the City of Las Vegas's sewers.  He stated that, while there were resultant holdups regarding Mango Tango's building permit and certificate of occupancy, the tenant was able to resolve those issues.  He represented there were no issues regarding obtaining required permits from the City of Las Vegas in connection with the leases signed by Dotty's and The Bakery.

Mr. Susa acknowledged that he was the representative of TJ Plaza who authorized the

filing of TJ Plaza's plan (as amended through the time of the Confirmation Hearing). He knew that in order to confirm TJ Plaza's amended plan at least one impaired class of creditors would have to vote to accept the plan. He stated that he knew the Sewer Claim had been separately classified as a Class 6 Claim prior to the Confirmation Hearing but also noted that TJ Plaza had always separately classified the Sewer Claim. He acknowledged that, in addition to purchasing the Sewer Claim, US Bank had also purchased three of the eight unsecured claims comprising Class 4 under TJ Plaza's amended plan. Mr. Susa said it was his understanding that if the Sewer Claim had not been classified separately, and had instead been included in Class 4 as a general unsecured claim, Class 4 would have voted to reject TJ Plaza's amended plan. He said it was also his understanding that separately classifying the Sewer Claim as a Class 6 claim would result in Class 4 general unsecured creditors voting to accept TJ Plaza's amended plan–despite US Bank's claim acquisitions.

Mr. Susa reaffirmed that there were various reasons why the Sewer Claim had been separately classified as a Class 6 claim, rather than a Class 4 general unsecured claim. He explained that separate classification would allow TJ Plaza to pay the claim in full at confirmation, thereby avoiding any potential for problems in obtaining tenant improvement permits from the City of Las Vegas, and/or City of Las Vegas sewer connection permits at the Center. He stated another concern was that if the Sewer Claim was not paid promptly and in full, the City of Las Vegas might require deposits from tenants at the Center in connection with sewer and other services. He also conceded, though, that he knew US Bank had purchased the Sewer Claim from the City of Las Vegas and in exchange had paid the City of Las Vegas in full. He also stated that he was aware of the significance of the Sewer Claim, since it potentially afforded US Bank a blocking position as to acceptance of TJ Plaza's amended plan by the Class 4 general unsecured creditor class.

Mr. Susa's cross-examination continued on the second day of the Confirmation Hearing. He acknowledged that, during calendar year 2015, TJ Plaza had made only two monthly

payments on the balance owed under the US Bank Loan that exceeded $20,000.00.[42]  He

conceded that the monthly payment schedule submitted by TJ Plaza in support of confirmation

of its plan[43] assumed a starting loan balance of $5.1 million, an interest rate of 4.53%, a thirty-

year amortization, and a term of ten years.  He reaffirmed that TJ Plaza's plan provided for

monthly interest-only payments of $19,252.50 for two years, followed by monthly principal and

interest payments of $25,931.94 for the balance of the ten-year plan term, with a balloon

payment of $4,338,466.40 at the end of the plan term.  He agreed that the monthly payment

schedule did not contain any interest-only payments calculated at a higher starting loan balance

or at a higher interest rate.  He also stated that the schedule did not contain any principal and

interest calculations during years three through ten of the plan term using different assumptions

(i.e., a higher initial loan balance or interest rate).  He acknowledged that the same assumptions

had been used in creating TJ Plaza's income and expense projections,[44] and no expense

projections had been made using any other assumptions.

    Mr. Susa was next asked about TJ Plaza's total projected landlord expenses and tenant

expenses for the Center during February 2016.  He acknowledged that the total landlord

expenses and tenant expenses projected for the Center during that month was $54,407.02.  He

was then directed to the total income projected by TJ Plaza for the Center in February 2016 and

agreed that the projected income for that month was $51,539.10.  Asked to compare TJ Plaza's

projected income and projected expenses for the Center during February 2016, Mr. Susa

conceded that projected expenses exceeded projected income.

    Mr. Susa was then questioned regarding CAM charges generated through the operation

of the Center.  He stated that TJ Plaza could not assess CAM charges in excess of the terms of

---

[42]See generally Exhibit 207; see also ECF No. 897-1, p. 2 of 4.

[43]Exhibit 202.

[44]Exhibit 203.

the tenants' lease agreements.  He stated that, while the CAM charges were assessed to offset the expense of maintaining the common areas at the Center, the related income was deposited into TJ Plaza's general account along with lease income, and the balance in the general account was used to pay the operating expenses of the Center.

Asked about the importance of Trader Joe's continued tenancy at the Center to the Center's financial viability, Mr. Susa reaffirmed that Trader Joe's is a month-to-month tenant. He also agreed that all of Trader TJ Plaza's income and expense projections assumed that Trader Joe's would remain a tenant at the Center for the full ten-year duration of the Plan, notwithstanding its status as a month-to-month tenant.  He conceded, though, that if Trader Joe's did leave the Center, this would reduce the Center's projected monthly income figures by over twenty thousand dollars in the absence of a replacement tenant.

Mr. Susa was then questioned about the provisions of TJ Plaza's proposed plan.[45]  He acknowledged that US Bank had asserted that a maturity default occurred under the terms of the US Bank Loan Documents.  He testified that TJ Plaza's proposed plan provided that the maturity default would be cured if the plan was confirmed, even though the original loan balance of $5.1 million was less than the six-plus million dollar amount of the secured claim filed by US Bank.  He stated that, while US Bank would retain its lien on the Center to secure payment of the loan contemplated by TJ Plaza's plan, the plan provided TJ Plaza the ability to obtain financing secured by the Center, subordinate in priority to US Bank's first lien, without US Bank's consent.  He stated that TJ Plaza had no present intention to use subordinate financing secured by the Center to pay off the entities that had loaned money to TJ Plaza's parent company in connection with the 2011 remodeling of the Center.  He admitted, though, that TJ Plaza could well need to utilize financing secured by a junior lien on the Center to meet unanticipated operational expenses, including additional improvements to the Trader Joe's

---

[45]Exhibit 228, ECF No. 691.

leasehold if requested, at some point during the ten-year term of the Plan.

Mr. Susa acknowledged that TJ Plaza's plan modified some of the impound and reserve requirements imposed by the US Bank Loan Documents.  He stated that TJ Plaza would continue to make the $387.50 monthly replacement reserve payment to US Bank during the plan term.  Regarding capital expense reserves, though, Mr. Susa acknowledged that the reserve funds would be retained by TJ Plaza under the terms of the plan instead of being remitted to US Bank as required under the terms of the original US Bank Loan Documents.

Mr. Susa testified that TJ Plaza's proposed plan purported to cure all prebankruptcy defaults under the terms of the original US Bank Loan Documents.  He also acknowledged, though, that TJ Plaza's plan did not propose to pay the balloon payment due at maturity under the terms of the original US Bank Loan Documents.

Mr. Susa was next asked about the setoff provisions of TJ Plaza's proposed plan.  He testified that TJ Plaza did not intend to setoff against any amounts paid by TJ Plaza to US Bank under the proposed plan.  He also stated that TJ Plaza did not plan to delay distributions to US Bank, based upon an objection TJ Plaza had filed regarding US Bank's claim lodged in the case.

On redirect, Mr. Susa corrected his testimony regarding the terms of the loans involved in the four chapter 11 cases he had been involved in on behalf of other RAM clients where plans had been confirmed.  He acknowledged that the loans negotiated in those other cases actually did contain default interest and late payment penalty provisions in addition to yield maintenance premium provisions.  He clarified, though, that no default interest, late payment charges or yield maintenance premiums were paid in those cases at the time of plan confirmation.

Mr. Susa testified that, in one of those cases,[46] the commercial property had a vacancy

---

[46]The CBS I case.

rate of thirty percent at the time of confirmation in 2013, which had declined to approximately ten percent in the year after confirmation.  He indicated it was easier for RAM to obtain leases after plan confirmation, as tenants have more certainty as to the management of the relevant property.  He testified that, in another of those cases,[47] the anchor tenant lease was expiring, and the tenant left post-confirmation.  He testified that RAM was able to lease the anchor tenant space to Dollar Tree for a twenty-year term, and the client was still performing under the terms of the confirmed plan.  As a result, he believed that TJ Plaza would be able to meet the payment obligations under its proposed plan even if Trader Joe's were to terminate its month-to-month tenancy.

Mr. Susa reiterated that he believed TJ Plaza could afford plan payments up to thirty-one thousand dollars per month and was aware the plan required only nineteen thousand dollars-per-month interest payments during the first two years of the plan term.  He stated that the reason for the differential was to enable TJ Plaza to meet expenses attendant to leasing up the vacant space in the Center and meet any unexpected operational expenses as they occurred.

Mr. Susa also testified that with respect to any additional capital needs experienced at the Center, his business partners in RAM would be able to meet those needs as they arose.  He testified that his partners had made capital contributions for other RAM clients totaling over two hundred thousand dollars.  He testified that his partners in RAM could do the same for TJ Plaza if necessary.  He stated that he did not think the need for a capital infusion would arise, though, because no capital call had ever been made to enable TJ Plaza to meet a monthly debt payment during the years that he had been involved with the Center's management, or at any time during the term of the US Bank Loan.

As to claims for sewer services rendered by the City of Las Vegas, Mr. Susa testified that such claims existed in two of the four chapter 11 cases he had been involved in where plans

---

[47]The Sahara TS case.

had been confirmed.[48]  He testified that, in those cases, the plans were confirmed even though the City of Las Vegas's claims for unpaid sewer services were classified separately.  He reiterated the business reasons he believed warranted separate classification of the Sewer Claim in the TJ Plaza case.  He stated that, in light of the vacancy rate at the Center and the status of existing tenants, he wanted to avoid any delays in building permits, sewer connect fees, or any other issues that would slow down occupancy for future tenants, or negatively impact the business operations of existing tenants.  He also stated that separate classification would do much to eliminate the legal fees attendant to litigation over the Sewer Claim in the TJ Plaza case.

Mr. Susa was next asked to review the January 31, 2016, payoff statement referenced previously in his testimony.[49]  Ultimately, he testified that the TJ Plaza Plan as proposed would repay US Bank for all principal and interest at the non-default rate under the terms of the US Bank Loan, as well as $429,446.00 of US Bank's attorney fees.

Returning to the monthly payments made by TJ Plaza to US Bank during 2015, Mr. Susa pointed out that, while some of those payments did not exceed twenty thousand dollars, TJ Plaza had always met its obligations to make adequate protection payments to US Bank under the Court's cash collateral order.  He also noted that the monthly payments shown as having been made to US Bank prior to October 2015 did not include rent income received from new tenant Mango Tango; increased rental income generated by Trader Joe's as it paid rent under its month-to-month tenancy at the higher rate called out in its second (but unsigned) five-year lease extension with TJ Plaza; or increased rental income generated by the renegotiated lease with Dotty's.

Mr. Susa also testified that TJ Plaza's expense projections included reserves for legal

[48]The CBS I and SRP Plaza cases.

[49]Exhibit 222.

expenses of nearly twenty thousand dollars per month that would not have to continue post-confirmation.  He noted that the projections also did not take into account the nearly one hundred seventy-two thousand dollars in TJ Plaza's debtor-in-possession account at the end of 2015.  He testified that, in light of those facts, along with the elimination of United States Trustee fees and in light of TJ Plaza's payment history, he remained confident that TJ Plaza could meet all the payment obligations required under the terms of its plan if the plan were confirmed.

Asked whether junior lien financing would pose any risk to US Bank's first lien position, Mr. Susa answered in the negative.  He stated that the value of the Center provided enough of an equity cushion for US Bank to eliminate any risk to its secured position attributable to subordinate financing secured by the Center.

## 2.    Glenn Anderson–Debtors' Real Estate Valuation Expert[50]

Glenn Anderson of Anderson Valuation Group presented expert testimony as to the value of the Center.  He testified that he had been retained by TJ Plaza in early 2014 to prepare an appraisal of the value of the Center.  He stated that he holds certified general appraisal licenses in Nevada, Utah, and Arizona, and he is a member of the Appraisal Institute.  He explained that he holds MAI,[51] SRA,[52] and GRS[53] designations from the Appraisal Institute.  He

[50]Mr. Anderson's expert qualifications under FED. R. EVID. 702, underpinning his opinion testimony as to the value of the Center, were not contested at the Confirmation Hearing.  His full curriculum vitae is appended to his written report.  See Exhibit 151.

[51]Member of the Appraisal Institute.  The MAI designation is held by appraisers experienced in the valuation and evaluation of commercial, industrial, residential, and other types of properties and advise clients on real estate investment decisions.

[52]Senior Residential Appraiser.  The SRA designation is held by appraisers experienced in the valuation of single-family homes, townhomes, and residential income properties of up to and including four units.

[53]General Review Specialist.  The GRS designation is held by Appraisal Institute members with the skills and knowledge required to handle the due diligence and risk

explained that he was also serving as President for the Nevada Appraisal Commission and had contributed to the drafting of the USPAP.[54]

Mr. Anderson testified that he had performed about a dozen appraisals for US Bank in the three years prior to his testimony and was on the US Bank approved appraiser list. He stated that, in preparing his opinions regarding the value of the Center, he used the same methodologies he used when he had previously prepared appraisals for US Bank. More particularly, he said he followed USPAP guidelines in developing his opinions regarding the value of the Center. He testified as to the documents he reviewed in developing his opinions regarding the value of the Center. Those documents included architectural drawings, a rent roll, and historical income and expense information for the Center provided by TJ Plaza.

Mr. Anderson's testimony as to the value of the Center was consistent with the text of his written Appraisal Report dated September 21, 2015,[55] as supplemented on November 9, 2015.[56] He provided opinion testimony as to the value of the Center under different valuation methods and using varying assumptions, including the extraordinary assumption that Trader Joe's would in fact renew its lease at the Center. He testified that, assuming that Trader Joe's would renew its lease was consistent with USPAP guidelines.

First, Mr. Anderson opined that the stabilized value of the Center was $7,945,000. He explained that, in rendering that opinion he had assumed the stabilized occupancy rate for the Center was ninety percent, and it would take twelve months for the Center to reach that occupancy level from its existing occupancy rate of seventy-four percent.

management needs of their employers and clients.

[54]Uniform Standards of Professional Appraisal Practice. USPAP is published and maintained by the Appraisal Standards Board of The Appraisal Foundation, a non-governmental entity charged by Congress with promulgating national appraisal standards.

[55]Exhibit 151.

[56]Exhibit 152.

Next, Mr. Anderson testified that, in his opinion, the current "as is" fair market value of the Center was $7,675,000. He stated that his opinion regarding the current "as is" fair market value of the Center was the stabilized value of the Center less estimated lost income, leasing commission expenses, and the cost of tenant improvements related to the vacant space at the Center, as well as an entrepreneur incentive to take on the task of bringing the Center up to stabilized value. Asked about the fair market value in the event that Trader Joe's were to vacate the Center, Mr. Anderson referred to the November 9, 2015, supplement to his appraisal report.[57] He stated that, if Trader Joe's were to vacate the Center, its fair market value would be $6,885,000. He noted that he had driven by the Center two days earlier in preparation for his testimony, and Trader Joe's had not vacated its leased space at the Center.

In further discussion of the November 9, 2015, supplement to his appraisal report, Mr. Anderson explained that the supplement documented his opinion as to the value of the Center under two different scenarios. First, the supplement contained Mr. Anderson's opinion of the value of the Center, assuming that the Center was stabilized, and assuming a different tenant occupied the space presently occupied by Trader Joe's. Second, the supplement contained his opinion of the "as is" market value assuming that Trader Joe's had vacated its leased space at the Center. He testified that he had not discerned any visual evidence that Trader Joe's had a present intent to vacate its space at the Center.

Mr. Anderson next explained the valuation approaches he had used in reaching his opinion that the stabilized fair market value of the Center was $7,945,000, as set forth in his September 21, 2015, appraisal report.[58] He testified that he had utilized the income

---

[57]Exhibit 152.

[58]Exhibit 151.

capitalization and sales comparison approaches to valuation in reaching that opinion.[59]  He explained the methodology underpinning each approach and stated that, in his opinion, the income capitalization approach was better suited to appraising the value of commercial properties than the sales comparison approach.  Mr. Anderson said that the sales comparison approach was just that: a comparison of prices paid recently for commercial properties with characteristics similar to the property being appraised to establish the value a buyer would be willing to pay to purchase it.  He noted that, while the income capitalization and sales comparison approaches were distinct, there is some overlap between them.  He stated that was true because the buyers involved in the sales used for comparative purposes factored expected income from the properties they purchased into the sales prices they agreed to pay.[60]

Mr. Anderson then stated his opinion as to the value of the Center under both the income capitalization approach and the sales comparison approach.  He stated that, under the income capitalization approach, it was his opinion that the stabilized value of the Center was $7,945,000.[61]  He testified that, under the sales comparison approach, utilizing data collected from six commercial property sales in the Las Vegas valley, he was of the opinion that the value of the Center was $7,900,000.[62]

Mr. Anderson was then questioned as to how he reached his opinion that the current "as is" fair market value of the Center was $7,675,000.[63]  He testified that he first reduced the stabilized value of the Center to reflect annualized lost rental income due to the sixteen percent

[59]Mr. Anderson also testified that he had considered, but did not utilize, the cost approach to valuation of the Center in reaching his opinion.  He explained that, because the Center had been built in 1979, most investors were unlikely to consider cost as a valuation criteria.

[60]See generally Exhibit 151, pp. 78-102.

[61]See also Exhibit 151, p. 102.

[62]See also Exhibit 151, pp. 103-115.

[63]See also Exhibit 151, pp. 118-120.

differential between the stabilized occupancy rate (90%) and the actual occupancy rate (74%).[64] He stated that he next reduced the stabilized value of the Center by lost CAM income due to the differential between the stabilized and actual occupancy rates.[65] Mr. Anderson then stated that he reduced the stabilized value of the Center by estimated costs for leasing the space needed to bring the Center's current 74% occupancy rate up to the stabilized 90% occupancy rate,[66] and to cover related tenant improvement expenses.[67] Finally, he testified that the stabilized value of the Center needed to be reduced by an entrepreneurial incentive (i.e., profit motive) to undertake the leasing and tenant improvement efforts needed to reach the 90% stabilized occupancy rate at the Center.[68] He stated that, in his opinion, when the stabilized value of the Center was reduced by those amounts, the $7,675,000 remainder was an accurate representation of the "as is" fair market value of the Center.[69]

After stating his opinions regarding the value of the Center under the income capital approach and the sales comparable approach, Mr. Anderson was asked about the general condition of the commercial real estate market in the Las Vegas valley. He stated that the Las Vegas retail rental market had improved over the year prior to the Confirmation Hearing. He noted that population in the Las Vegas valley had been increasing, unemployment had been declining, and that absorption of previously vacant space in retail commercial centers was

---

[64]The reduction for annualized lost rent was $75,732.00. See Exhibit 151, p. 120.

[65]The reduction for annualized lost CAM income was $22,720.00. See Exhibit 151, p. 120.

[66]The reduction for such leasing expenses was $9,087.00. See Exhibit 151, p. 120.

[67]The reduction for tenant improvement costs was $108,250.00. See Exhibit 151, p. 120.

[68]The reduction for the entrepreneurial incentive was $53,947.00. See Exhibit 151, p. 120.

[69]Mr. Anderson's calculation of the $7,675,000 "as is" fair market value of the Center can be seen by referring to Exhibit 151, p. 120.

occurring.  He noted that the average Las Vegas retail rental rate had climbed to $1.66 per square foot per month, higher than the rental rates in Las Vegas in 2013.  He testified he expected rental rates to continue to climb going forward.

Asked about the condition of the commercial real estate in the area near the Center, Mr. Anderson testified that the Center was situated in a mature area, where gentrification efforts were underway.  He noted that commercial space at the nearby Sahara Pavilion North and South were recovering, and automobile dealerships near the Center were undergoing renovations as well.  He said that the high traffic volume on Decatur Boulevard was beneficial to the value of the Center.

In preparing his opinions, Mr. Anderson testified that he had personally walked the property, entered various leased spaces, and drove through the neighborhood surrounding the Center.  He stated that the Center was generally in average to good condition and had benefitted from the remodeling work performed in 2011.  He noted that the average expected economic life for retail malls like the Center was between fifty and sixty years, and the Center had an expected remaining economic life of about thirty years.

Mr. Anderson was then questioned about his opinion that the "as is" fair market value of the Center would be $6,885,000 if Trader Joe's vacated its leased space.[70]  He began with his prior opinion that the stabilized "as is" fair market value of the Center with Trader Joe's in place as a month-to-month tenant was $7,650,000.  He stated that the occupancy rate of the Center upon Trader Joe's departure would drop to 48.15%.  He said that he assumed it would take a period of twelve months to lease the end cap space currently occupied by Trader Joe's at the Center.  Using that assumption, Mr. Anderson testified that he then reduced the $7,650,000 "as is" fair market value of the Center for lost rent and CAM income due to the increased vacancy created by the Trader Joe's departure, related leasing expenses, costs of tenant

[70] See also Exhibit 152, p. 5.

35

improvements upon locating a new tenant for the Trader Joe's space, and an entrepreneurial incentive to take on the leasing and tenant improvement work.[71]  He stated that, in his opinion, when the current stabilized "as is" fair market value of the Center was reduced by those sums, the $6,885,000 remainder was an accurate representation of the "as is" fair market value of the Center.[72]

Mr. Anderson was then asked to comment on a December 4, 2015, appraisal report as to the value of the Center prepared by Colliers International Valuation & Advisory Services ("Colliers").[73]  He stated that he had reviewed the Colliers appraisal, took issue with various components of it, and had prepared a rebuttal report[74] summarizing the concerns he had noted in his review.  He said that his rebuttal report had been prepared in a manner consistent with controlling USPAP standards.

Mr. Anderson opined that the valuation of the Center reflected in the Colliers appraisal was below what he considered to be an accurate market level.  He testified that the economic rental rate utilized by Colliers for the anchor tenant space at end cap of the Center was too low, and that error was magnified through the income capitalization approach calculations.[75]  As a

---

[71]The calculations underpinning Mr. Anderson's opinion of the "as is" fair market value of the Center after Trader Joe's departure are set forth in the November 9, 2015, supplement to his appraisal report.  See Exhibit 152, pp. 4-5.

[72]The November 9, 2015, supplement to Mr. Anderson's appraisal report also contained a valuation of the Center assuming a replacement tenant for the Trader Joe's space was presently available.  That valuation figure–developed using the income capitalization approach, a slightly lower rental rate for the Trader Joe's space; an annual net operating income figure of $556,581.00; and a Cap Rate of 7.25%–was $7,675,000.  Mr. Anderson did not address this opinion in the course of his direct examination.

[73]Exhibit I.

[74]Exhibit 198.

[75]More particularly, Mr. Anderson pointed out that the Colliers appraisal report utilized an economic rental rate of $0.83 per square foot per month for the end cap space at the Center. He noted that Trader Joe's was currently paying $1.64 per square foot per month under its

result, according to Mr. Anderson, the valuation of the Center set forth in the Colliers appraisal was significantly understated.  He also took issue with the regional analysis in the Colliers appraisal; an error in reporting the acreage of the Center as 2.40 acres instead of the Center's 3.06 acre actual footprint; an error through which the Center's frontage footage on Decatur Boulevard and O'Bannon Drive was reversed; overstatement of the assessment taxation of the Center, reporting the tax rate as 4.0833% ($40,040.00 annually) rather than the actual rate of 3.2782% ($31,888.16 annually); understatement of the current occupancy level of the Center as 48.2% by improperly assuming that Trader Joe's had vacated its space; using improper comparable sales in its valuation calculations; and inappropriate use of a Cap Rate of between 8.0% and 8.8% was inconsistent with current market conditions related to the Center, which supported a Cap Rate of 7.25%.[76]

Mr. Anderson closed his direct testimony by reiterating his opinions as to the value of the Center.  He confirmed that, in his opinion, if Trader Joe's remains a tenant at the Center, the "as is" fair market value of the Center is $7,675,000.  He also stated that if Trader Joe's opted to vacate its leased space, the "as is" fair market value of the Center is $6,885,000.

On cross-examination by counsel for US Bank, Mr. Anderson acknowledged that he had prepared and reviewed a number of appraisal reports regarding the Center, dated between February 2014 and November 2015, in connection with his valuation opinions.[77]  He was asked

---

month-to-month tenancy.  He stated that Mango Tango was paying $1.00 per square foot per month for its end cap space at the Center in "rough" condition, and was paying its own tenant improvements in that space in exchange for reduced rent.  Mr. Anderson opined that a more accurate economic rental rate for vacant end cap space at the Center was $1.35 per square foot per month.

[76]Mr. Anderson's testimony as to the issues he identified in the Colliers appraisal report was largely consistent with the content of his written rebuttal report.  See Exhibit 198, pp. 5-18.

[77]See Exhibit 13 (original Anderson report, with "as is" fair market value $6,610,000); see Exhibit 86 (a supplemental Anderson report, with "as is" fair market value $6,820,000); see Exhibit I (Colliers report, with "as is" fair market value $6,600,000); see Exhibit 151 (a second

to focus on the "as is" fair market value of the Center as shown in the appraisal reports he had

prepared and/or reviewed.  Mr. Anderson acknowledged that the majority of the appraisal

reports did not include the extraordinary assumption that Trader Joe's had renewed its lease,

and set the "as is" fair market value of the Center between $6,600,000 and $6,885,000.  Mr.

Anderson agreed that the only appraisal report that set the value of the Center at a higher "as is"

fair market level was his September 21, 2015, appraisal report, in which he had made the

extraordinary assumption that Trader Joe's would renew its lease and set the "as is" fair market

value of the Center at $7,675,000.

Mr. Anderson acknowledged that Trader Joe's was an important tenant at the Center.

He agreed that Trader Joe's was the primary and anchor tenant at the Center, and as such, had a

positive impact on the Center.  He noted that Trader Joe's pays the highest amount of monthly

rent, pays the highest level of gross CAM charges, and occupies the largest leasehold in the

Center.  Mr. Anderson also acknowledged that if Trader Joe's vacated its leasehold, the

occupancy rate at the Center would fall below fifty percent.  He conceded that as a result of

those factors, renewal of the Trader Joe's lease was an important consideration in the context of

the Center's appraised value.  He also agreed that a reasonable buyer would consider Trader

Joe's renewal decision important in deciding whether to acquire the Center.  When asked

whether the values set forth in his appraisals of the Center were calculated assuming that Trader

Joe's was a month-to-month tenant, Anderson stated that the impact of Trader Joe's status as a

month-to-month tenant at the Center was difficult to incorporate into, or address through, the

appraisal calculus.  He stated that either Trader Joe's was a tenant paying rent at the Center, or

it was not.  He also pointed out that he had calculated the "as is" fair market value of the Center

to be $7,675,000 assuming Trader Joe's continued to pay monthly rent, and to be $6,885,000 if

supplemental Anderson  report, with "as is" fair market value $7,675,000); and see Exhibit 152
(a third supplemental Anderson report, with "as is" fair market value $6,885,000).

they vacated their leased space at the Center.  He also pointed out that at the time of his

testimony, Trader Joe's was still present in the Center and paying rent.  When directed to his

prior deposition testimony for review Mr. Anderson acknowledged that he had never prepared

an appraisal report that specifically characterized Trader Joe's as a month-to-month tenant.  Mr.

Anderson also acknowledged that during deposition testimony he had been shown various

emails between Trader Joe's and TJ Plaza suggesting that the Trader Joe's intention was not to

renew its lease at the Center.  He also acknowledged that if Trader Joe's did not intend to

remain a month-to-month tenant at the Center, the $6,885,000 figure, which assumed that

Trader Joe's had vacated the Center, would probably be the closest approximation of the

Center's value given Trader Joe's status as a month-to-month tenant.

 Mr. Anderson was next questioned about the Applied Analysis data he had referred to as

support for his prior testimony regarding absorption rates and general retail real estate market

conditions in the Las Vegas valley.[78]  He acknowledged that his initial appraisal report stated

that rental rates in Las Vegas had increased sharply to $1.66 by 2014 and conceded that the

increase was largely attributable to the opening of a new retail mall in Summerlin near the Red

Rock Casino Resort & Spa.  He conceded that the new mall was significantly larger than, and

readily distinguishable from, the Center.  He said that because so much new square footage at

such high rates resulted from the opening of the new mall, the impact was to skew the rental

rate data for the Las Vegas valley upward.  He also noted that the new mall in Summerlin also

included a Trader Joe's location.  He also testified that another 200,000-square-foot retail mall

was poised to open at Durango and Interstate 215 in the near future.

 Mr. Anderson was then questioned about the replacement rental rates that could be

expected at the Center if Trader Joe's were to vacate its leasehold.  He reiterated that, while

Trader Joe's was actually paying $1.50 per square foot per month at the time of his appraisal

---

[78]Exhibit 151, pp. 30-31.

report and was currently paying $1.64 per square foot per month under its month-to-month tenancy at the Center, he assumed the replacement rental rate would only be about $1.35 per square foot per month.  He acknowledged that he had failed to include the most recent Trader Joe's lease in the expert witness files tendered to US Bank's counsel in connection with his deposition testimony prior to the Confirmation Hearing.

In reviewing his November 2015 appraisal supplement,[79] Mr. Anderson acknowledged that he had calculated lost rent at the rate of $1.35 per square foot per month replacement rental rate, although the rent required under Trader Joe's most recent lease was $1.50 per square foot per month, and Trader Joe's was actually paying $1.64 per square foot per month under its month-to-month tenancy.  He explained that the $1.35 per square foot per month replacement rental rate used in his lost rent calculation was consistent with what the fair market rent would be for vacant space in the Center, particularly in light of the improvements already made to the space presently occupied by Trader Joe's.  He confirmed that it would take twelve months to find a new tenant if it became necessary to replace Trader Joe's, and that the amount of lost rent each month related to the Trader Joe's space at the $1.35 per square foot per month replacement rental rate would be $16,980.30 until a replacement tenant was found.  He also acknowledged that, even after a replacement tenant was found, the resultant income stream at the replacement tenant rate ($1.35 per square foot per month) would be ten percent less than what Trader Joe's had paid under its last expired lease ($1.50 per square foot per month) and significantly less than what Trader Joe's was currently paying under its month-to-month tenancy ($1.64 per square foot per month).  He also confirmed there would be other significant costs attendant to obtaining a replacement anchor tenant if Trader Joe's left the Center, including a tenant

[79]Exhibit 152.

improvement allowance of $125,780.00 and lost CAM income of $45,281.00.[80]

Mr. Anderson clarified that, while he was an authorized appraiser for US Bank National Association in its capacity as a bank, he was not an authorized appraiser for US Bank in its capacity as Trustee for the Registered Holders of Wachovia Bank Commercial Mortgage Trust. He agreed that in the September 28, 2014, appraisal report he prepared regarding the Center, the forecasted time frame for stabilization of the Center was twenty-four months.[81]  He acknowledged that in his September 21, 2015, appraisal report, he projected a twelve-month time frame for stabilization of the Center.  He also noted that the two reports were prepared approximately twelve months apart, but he conceded that he had not focused on changes in absorption rates in the Las Vegas valley during the twelve month period between the two reports.  He also conceded that the presently vacant space in the Center had not been absorbed during the twelve month period between the two reports.

Mr. Anderson recalled that he had previously testified that the Colliers appraisal report[82] contained an error in the reported size of the Center.  He acknowledged that neither the income capitalization calculus, nor the "as is" fair market value analysis, were predicated upon the size of the Center.  He acknowledged, too, that Colliers issued an errata correcting the error as to the acreage of the Center.

Mr. Anderson then reviewed his prior deposition testimony and various email communications regarding the Trader Joe's intent to remain as a tenant at the Center.[83]  He stated that the lack of a Trader Joe's commitment to extend its tenancy under its existing lease

---

[80]Mr. Anderson's testimony on this topic was consistent with the November 2015 supplement to his appraisal report.  See Exhibit 152, p. 5.

[81]Exhibit 86, p. 77.

[82]Exhibit I.

[83]See Exhibit 211.

extension options made it such that the $6,885,000 "as is" fair market value opinion he had developed was probably closest to accurate given the current status of the Center. He testified that Trader Joe's was not likely to remain as a month-to-month tenant for five years, but they could well remain at the Center for an extended period of time under their existing month-to-month tenancy.

On redirect examination, Mr. Anderson first referred to his appraisal report dated February 27, 2014,[84] and observed that the stabilized value of the Center reflected in that report was $7,310,000. He stated that, after the February 27, 2014, report was issued, an additional 9,137 square feet of vacant space at the Center had been leased. He said that the additional leases increased the value of the Center under the income capitalization approach as shown in his subsequent appraisal reports. He testified that the additional leases, combined with an improved Cap Rate for the Center,[85] supported the $7,650,000 "as is" fair market value of the Center set forth in his appraisal report dated September 21, 2015.

Mr. Anderson was then referred to his appraisal report supplement dated November 9, 2015.[86] He confirmed that the stabilized value of the Center according to the supplement was $7,675,000, and that after discounts totaling $790,000, the "as is" fair market value of the Center was $6,885,000 assuming that Trader Joe's had vacated the Center and was no longer paying rent.[87] He stated that the value of the Center was higher if Trader Joe's continued to pay rent in connection with its leased space at the Center. He reiterated that Trader Joe's was

---

[84]Exhibit 13.

[85]Mr. Anderson testified that he had used an 8.00% Cap Rate in preparing his February 2014 appraisal report. Exhibit 13, p. 106. He stated that, due to improvements in the Las Vegas retail rental market, he used a 7.25% Cap Rate in preparing his appraisal report dated September 21, 2015. Exhibit 151, pp. 100-102. He also explained that a lower Cap Rate yields a higher valuation figure under the income capitalization approach.

[86]Exhibit 152.

[87]Exhibit 152, p. 5.

actually paying rent at the rate of $1.64 per square foot per month, Trader Joe's had not vacated the Center, and that his report assumed that Trader Joe's was paying only $1.50 per square foot per month.

Mr. Anderson then reviewed the Applied Analysis data incorporated into his appraisal report.[88] He stated that the Applied Analysis data was not enough, standing alone, to accurately assess the value of the Center. He stated that the Applied Analysis information was simply a single data point among many which must be considered in the valuation process. He also noted that the Applied Analysis data regarding the average retail rental rate in the Las Vegas valley as of February 2015 was $1.55 per square foot per month. He noted that $1.55 per square foot per month rate was higher than the rate he had employed in his appraisal report.

Mr. Anderson was then asked to revisit his prior deposition testimony. He noted that, while he was concerned about the emails suggesting that Trader Joe's might opt not to execute a lease extension, those concerns would not change his opinion that the "as is" fair market value of the Center in the event of Trader Joe's departure would be $6,885,000. He reiterated once again that Trader Joe's had not left the Center and there were no outward signs that Trader Joe's had the present intention to leave the Center. He said that, in his opinion, if Trader Joe's intended to leave the Center, steps would be taken to alert their customers and notify their employees. He testified that he was unaware of any such alerts or notifications.

Mr. Anderson testified that in his experience, it was not uncommon for month-to-month tenants to remain in place for an extended period of time, sometimes even years. Revisiting his prior deposition testimony once more, he also noted that it was not unusual for a vacating tenant to remain in place while the landlord marketed the space to be vacated, which reduces lost rental income and the expenses attendant to locating a replacement tenant. He also stated that, in his experience, anchor tenants sometimes use the expiration of a lease and refusal to

---

[88]Exhibit 151, pp. 74-75.

immediately renew upon expiration as a negotiating tactic to rework the terms of their existing lease.

### 3.    Deposition Testimony of Douglas Yokomizo, Vice President - Real Estate for Trader Joe's

Mr. Yokomizo's deposition testimony was read into the record.  The related transcript was admitted into evidence without objection.[89]  As a result, the Court did not have the opportunity to evaluate Mr. Yokomizo's credibility.  As relevant to the issues before the Court for resolution, his testimony generally established that Trader Joe's had not signed an extension of its lease at the Center; was currently leasing its space on a month-to-month basis; had some concerns about safety and security at the Center; and had made no final decision whether it would sign a lease extension or vacate the Center in the future.

### 4.    Dr. Kenneth Wiles–Debtors' Interest Rate Expert[90]

Dr. Wiles testified that he had been retained by TJ Plaza through his business, Acceleron Group, LLC, and had prepared a series of written reports setting forth his opinion regarding the appropriate interest rate to be paid to US Bank under TJ Plaza's chapter 11 plan.[91]  He testified generally about the methodology he employed in preparing his written reports, and in a manner consistent with the reports themselves.  He stated that his written reports detailed the analytical process he employed in reaching his opinions; that he applied reliable and generally acceptable

---

[89]Exhibit 211.

[90]Dr. Wiles' expert qualifications under FED. R. EVID. 702, underpinning his opinion testimony as to appropriate interest rates and the feasibility of TJ Plaza's plan, were not contested at the Confirmation Hearing.

[91]Written reports prepared by Dr. Wiles were admitted into evidence as follows: Original report (Exhibit 64); a supplemental report (Exhibit 65); a second supplemental report (Exhibit 124); a third supplemental report (Exhibit 153); an update identified as Exhibit 5 in the course of his December 21, 2015, deposition (see Exhibit 210); and a final update dated January 21, 2016 (Exhibit 231).  A curriculum vitae detailing Dr. Wiles' expert credentials is attached as Exhibit B to his original report.  See Exhibit 64.

guidelines, principals and methods to the facts of the TJ Plaza case in reaching his opinions; and that each report reflected his interest rate opinion as of the date of the report.

Dr. Wiles explained that in reaching his interest rate opinions, his primary data sources were readily available market interest rates which, in his experience, were typically involved in commercial loan transactions. He stated that he utilized the formula approach to interest rate calculations. He explained that the formula approach begins with a risk-free base rate, and that certain risk premiums are then added to the base rate to determine an appropriate overall interest rate given prevailing market conditions. He stated that the risk premiums are intended to capture the default risk of the borrower, inflation risk, and the time value of money over the term of the relevant loan transaction.

Asked about the terms of the US Bank Loan when it was originated in 2003, Dr. Wiles testified that the original interest rate was 5.58% annually. He stated that the US Bank Loan Documents did not spell out how that interest rate was calculated; i.e., there was no disclosure of the base rate, nor any related risk premiums utilized in reaching the 5.58% annual interest rate incorporated into the US Bank Loan. He observed that substantially all interest rates had declined after the US Bank Loan was entered into in 2003.[92]

Dr. Wiles testified that he was familiar with the United States Supreme Court's <u>Till</u> decision[93] and had considered that decision in preparing his opinions. He noted that, pursuant to the <u>Till</u> decision, the formula approach was the most appropriate method for determining the appropriate interest rate to be paid to US Bank under TJ Plaza's chapter 11 plan. Dr. Wiles stated that the formula approach adopted in <u>Till</u> begins with a base rate, defined as the Prime

[92]By way of example, Dr. Wiles testified that the Prime Rate was 4.00% in mid-2003, had dropped to 3.25% in 2008, and rose to its then-current level of 3.50% in December 2015. He also noted that the London Interbank Offered Rate ("LIBOR") rate, a rate at which large banks offer short term loans to one another, was 1.11% as of July 9, 2003, but had since declined to its current 0.43% level.

[93]<u>Till v. SCS Credit Corp.</u>, 541 U.S. 465 (2004).

Rate.  He indicated that under Till's formula approach, the base rate is then adjusted upward in the form of risk premiums to address the time value of money, inflation risk, and risk of default considering the filing of the Debtors' bankruptcy cases.  He stated that, while the Till decision allows a court flexibility in assessing the appropriate risk premium over the Prime Rate in a particular case, the Supreme Court noted that courts had generally approved risk premiums in the 1.00 to 3.00% range.[94]  He opined that the formula approach works best in an efficient market setting, and that the commercial lending market in Las Vegas was not truly an efficient market.

Asked how banks typically reached an interest rate determination in a commercial loan setting, Dr. Wiles testified that, while banks do use a formula approach, they often employ a formula slightly different from the one adopted in Till.  He testified that banks often use the thirty-day LIBOR rate as the base rate, then add risk premiums consistent with the borrower's risk profile to establish a short term interest rate.  He stated that borrowers are then afforded the opportunity to either let the interest rate float with the base rate or enter into a swap agreement which effectively converts and locks the short term interest rate into a longer term interest rate.  He testified that the interest rates set under swap agreements were of varying durations between five and fifteen years and captured time value of money and opportunity costs to the lender while the pertinent loan remained unpaid.

Dr. Wiles was then asked what effect a decline in the Prime Rate would have on the risk premium range employed in the Till decision.  He stated that, in his opinion, in order for the risk premium to appropriately correspond to prevailing market rates, a reduction in the Prime Rate

---

[94] See Till, 541 U.S. at 480 ("We do not decide the proper scale for the risk adjustment, as the issue is not before us.  The Bankruptcy Court in this case approved a risk adjustment of 1.5%, . . . and other courts have generally approved adjustments of 1% to 3%[.]" (internal citations omitted)).

would warrant a proportional narrowing of the risk premium range.[95]

Dr. Wiles testified that, although the Prime Rate does not change often, it is not an entirely risk free interest rate. He stated that there is no effective way to determine the amount of risk inherent in the Prime Rate, though, because the rate is not tied to loans of any particular duration.

As to the appropriate rate of interest to be paid to US Bank under TJ Plaza's chapter 11 plan, Dr. Wiles explained that in reaching his opinion as set forth in his original October 13, 2014, report he had considered three different approaches: (1) a formula approach consistent with Till; (2) a formula approach with a reduction in the risk premium range proportional to the reduction in the Prime Rate over the duration of the US Bank Loan (from 4.00% to 3.50%); and (3) a thirty-day LIBOR-based estimate.[96] After his original October 13, 2014, report was issued, Dr. Wiles became aware that the ten-year U.S. Treasury rate might have been utilized in setting the 5.58% interest rate set under the terms of the US Bank Loan Documents when they were executed in 2004.[97] As a result, in each of the supplemental written reports and updates that followed, Dr. Wiles applied a fourth approach predicated upon ten-year U.S. Treasury rates

---

[95]Dr. Wiles opined that if a Prime Rate of 4.00% required a 1.00% to 3.00% risk premium range, the risk premium range was 0.25 to 0.75 of the Prime Rate itself. By way of example, he suggested that a decline in the Prime Rate to 1.00% would warrant a proportional narrowing of the risk premium range to between 0.25% (1.0% x 0.25) and 0.75% (1.0% x 0.75). By extrapolation, a Prime Rate of 3.5% would yield a risk premium range between 0.875% (3.5% x 0.25) and 2.625% (3.5% x 0.75). No data was offered to demonstrate whether or why a reduction in the Prime Rate required an entirely proportional reduction in the risk premium range referenced in the Till decision.

[96]The analytics underpinning each of these methodologies are detailed in Dr. Wiles' original October 13, 2014, report. Each methodology is summarized in tabular form within that report as well. See generally Exhibit 64.

[97]See Exhibit 65, p. 1.

47

as the base rate.[98]  Ultimately, Dr. Wiles stated that, in his opinion, the appropriate interest rate

was 4.53%.  He stated that additional factors validated his interest rate calculations.  He noted

first that the value of the Center exceeded the anticipated loan amount by a significant amount,

affording US Bank a sizeable equity cushion at the inception of the loan.  He also noted that

tenant occupancy rates had climbed between the date of his original report in October 2014 and

his testimony in January 2016, with a resultant positive impact on the Center's cash flow

estimates.  He noted that, in addition to a favorable loan-to-value ratio, TJ Plaza's performance

under the terms of the US Bank Loan through maturity was excellent, as no pre-maturity

payments had been missed.  Dr. Wiles stated that in light of all of the facts he believed that a

$5.1 million to $5.3 million loan at 4.53% amortized over thirty years with a ten-year balloon

would be attractive to lenders interested in acquiring US Bank's position as a senior secured

lender.

　　　　Dr. Wiles was then asked if he had reviewed a written report prepared by MCA

Financial Group dated December 4, 2015.[99]  He indicated that he had done so and believed that

his 4.53% interest rate opinion was more appropriate than the 6.75% interest rate opinion set

forth in the MCA report for a variety of reasons.  Specifically, Dr. Wiles observed that the

MCA report relied upon the Prime Rate without reduction for the various risk premium

components inherently encompassed within that rate.  He asserted that the MCA report focused

too heavily upon duration risk and not on current market conditions or market rates.  He

contended that the 6.75% interest rate reflected in the MCA report was too high, both because

the Prime Rate was not reduced by the duration risk inherent in it and because the MCA report

included a 1.50% duration risk premium component, effectively "double dipping" as to the

---

[98]See Exhibits 65, 124, 153, 210, and 231.  Each methodology is summarized in tabular form within those written supplements and updates.

[99]Exhibit J.

duration risk premium component in the interest rate calculus.  He also asserted that the 6.75%

interest rate referenced in the MCA report was too high in view of current interest rates on

commercial loans.  He pointed out that the 6.75% interest rate even exceeded the rate that

would result from adding the high end of the Till risk premium range to the existing Prime

Rate.[100]  Ultimately, Dr. Wiles opined that a 6.75% interest rate was too high in view of current

market conditions and TJ Plaza's overall risk portfolio.

On cross-examination, Dr. Wiles was first directed to the most recent update to his

written report.[101]  He reaffirmed his prior testimony and agreed that there is no effective way to

break out distinct risk premiums inherent in the Prime Rate.  He acknowledged that the formula

approach to interest rate calculations adopted by the Supreme Court in Till simply used the

Prime Rate as the base rate and then added specific risk premiums in the range of 1.00% to

3.00% to the Prime Rate to determine whether a proposed interest rate on a cramdown loan was

adequate in the plan confirmation calculus.  He conceded that his calculations based upon the

thirty-day LIBOR rate resulted in an interest rate (2.64%) below the existing Prime Rate

(3.50%).  He also acknowledged that his calculations based upon the ten-year U.S. Treasury

rate resulted in an interest rate (3.88%) that was only 0.38% above the existing Prime Rate, and

that Till contemplated risk premiums over the Prime Rate in a range between 1.00% and 3.00%.

He agreed that his interest rate calculations did not contain adjustments to address the fact that

the borrower at issue, TJ Plaza, had sought bankruptcy relief.  Challenged about the fact that his

most recent update did not set a specific interest rate under Till's formula approach, Dr. Wiles

responded that the Till calculus did not mandate a specific interest rate but instead allowed

courts to assess the adequacy of interest rates in a range of 1.00% to 3.00% above the Prime

---

[100]In simplest terms, if the Prime Rate of 3.50% is increased by a 3.00% risk premium,
the resultant rate would be 6.50%, a rate 0.25% lower than the rate reflected in the MCA report.

[101]Exhibit 231.

Rate under the facts of a particular case.  He reiterated that, in his opinion, a 4.53% interest rate was adequate for the cramdown loan contemplated under the TJ Plaza Plan under all the facts of the case.  He noted that a 4.53% interest rate was within the 1.00% to 3.00% range above the existing 3.50% Prime Rate but acknowledged that it was well below the 5.50% average within that range.  He agreed that his original written report[102] did not suggest a specific rate under the Till formula, either.

Asked about the scope of his expert opinions, Dr. Wiles confirmed that he was not going to provide opinion testimony as to the feasibility of the TJ Plaza Plan.  He acknowledged that he had accepted information from TJ Plaza and other expert witnesses without separate investigation, including income and expense projections for the Center, and the value of the Center itself.  He agreed that he had not prepared a liquidation analysis related to the Center.

When questioned about the content of his November 23, 2015, written report,[103] Dr. Wiles stated that the only amortization schedules he had prepared assumed a 4.53% interest rate, a $5.1 million loan, a thirty-year amortization, and a balloon payment after ten years.  He confirmed that in preparing the report and related amortization schedules he had accepted income and expense information received from TJ Plaza, and he accepted Mr. Anderson's report regarding the Center's value, without independent verification.  He observed that he had no basis upon which to disagree with the calculations and opinions contained in Mr. Anderson's report.

As to the potential for a future refinancing of the loan contemplated by the TJ Plaza Plan, Dr. Wiles confirmed that, in his opinion, other lenders would take a favorable view of a refinancing opportunity.  He reiterated that his opinion in that regard was predicated in part upon the existence of a considerable equity cushion, debt-to-equity and loan-to-value ratios, and

---

[102]Exhibit 64.

[103]Exhibit 153.

income and expense forecasts for the Center.  He acknowledged that his opinion regarding the

potential for a future refinancing transaction hinged on the accuracy of Mr. Anderson's opinion

as to the value of the Center, and the accuracy of TJ Plaza's income and expense projections

related to the Center.  He confirmed that he had provided interest rate testimony in other

bankruptcy cases, noting that, while the facts of the cases vary, the methodology he employed

in reaching his opinions regarding adequate interest rates for cramdown loans was the same.

On redirect examination, Dr. Wiles stated that, in his opinion, a commercial loan to TJ

Plaza secured by the Center was neither more nor less risky than when the US Bank Loan was

made in 2003.  He clarified that, while he expressed no opinion as to the feasibility of the TJ

Plaza Plan as a whole, he was of the opinion it would be feasible to refinance the secured debt

contemplated by that plan.  He stated that, in his opinion, it was highly likely that the debt could

be refinanced if the plan was confirmed, and he stated his opinion would not change even if TJ

Plaza had missed one payment under the terms of the US Bank Loan prior to maturity.  He

confirmed that, in his opinion, an interest rate of 4.53% was adequate in the plan confirmation

calculus, and that the 6.75% interest rate contemplated by the MCA report was too high and not

consistent with current market conditions and the facts of the case.

### 5.    Robert E. Dietrich–US Bank's Real Estate Valuation Expert

Mr. Dietrich was the first witness called to testify in US Bank's case in chief, and he

presented expert opinion testimony regarding the value of the Center.[104]  Mr. Dietrich said that

he had been involved in the real estate business as an appraiser since approximately 1974 and in

the State of Nevada periodically since 1978.  He stated that he holds a Bachelor of Science in

Finance and Real Estate from the University of Arizona.  He indicated that he holds an MAI

---

[104]Mr. Dietrich's expert qualifications under FED. R. EVID. 702, underpinning his opinion
testimony as to the value of the Center, were not contested at the Confirmation Hearing.  A copy
of his curriculum vitae is attached to his initial written report.  See Exhibit I.

designation through the Appraisal Institute, as well as a CCIM designation[105] issued by the

CCIM Institute.  He testified that he is currently employed as the National Specialty Practice

Leader for Colliers and had worked for Colliers since early 2014.  Prior to joining Colliers he

had been employed by Navigant Consulting, Inc.; FMV Opinions, Inc.; and KPMG.  Mr.

Dietrich said that he had previously testified in nearly seventy court cases, including

approximately thirty bankruptcy proceedings.  He said that he had appraised over one hundred

mall properties.  He stated that he was certified to perform appraisals in about fifteen states and

had appraised properties in approximately thirty states.

     Mr. Dietrich's testimony as to the value of the Center was generally consistent with the

text of his written Appraisal Report dated December 4, 2015,[106] and a related errata to that

report.[107]  He provided opinion testimony as to the value of the Center under different valuation

methods and using varying assumptions.  He indicated that he had inspected the Center on

November 16, 2015, and had subsequently returned to the Center once prior to his testimony.

He testified that the errata was issued to correctly reflect the land area of the Center, as his

original report mistakenly reflected the Center's building area (2.40 acres) rather than its total

land area (3.06 acres).  He explained that the error in his original report regarding the total land

area of the Center did not impact either the income approach or the sales comparison approach

he employed in reaching his opinion as to the value of the Center.  Mr. Dietrich stated that, if he

had employed the cost approach to valuation, the error as to the total land area of the Center

would have had an impact; however, he had not employed the cost approach in developing his

valuation opinions.

---

[105]Certified Commercial Investment Member.  The CCIM designation denotes expertise in the disciplines of commercial and investment real estate.

[106]Exhibit I.

[107]Exhibit O.

Mr. Dietrich explained that in preparing his valuation opinions and written reports he had reviewed TJ Plaza's financial statements, income and expense statements, tenant leases, and the rent roll for the Center. He also noted that he had reviewed various emails sent by Trader Joe's personnel related to the Center's business operations. He stated that the information he had reviewed provided an adequate basis to develop accurate opinions regarding the value of the Center.

Asked about his overall impression of the Center, Mr. Dietrich characterized it as a small, mature retail mall in a mature, stable neighborhood. He noted that there had been some recent improvements to neighborhood businesses. He said that Trader Joe's was a junior anchor tenant in a mall the size of the Center.[108] He noted that Trader Joe's was a good draw for customers at the Center. Overall, he characterized Trader Joe's as a solid tenant with good credit. Mr. Dietrich stated that he had reviewed the Trader Joe's lease. Based upon that review, he said that he was aware that Trader Joe's lease had expired and that Trader Joe's was currently holding over as a month-to-month tenant.

Referring to his original written report,[109] Mr. Dietrich summarized various valuation issues related to the Center. Among those issues was the vacancy rate and the fact that Trader Joe's–the Center's largest and its junior anchor tenant–was a holdover tenant on a month-to-month basis. Mr. Dietrich stated it was his belief that probably buyers for the Center were not institutional investors but smaller investment groups and individual investors. He said that the status of the Trader Joe's lease would be considered a particularly important issue by smaller investors in deciding whether to purchase the Center at some point in the future. He explained that, in developing his opinions he considered the value of the Center if Trader Joe's remained a

---

[108]Mr. Dietrich defined the term "junior anchor tenant" to mean a tenant with a leasehold space of between 8,000 and 15,000 square feet in a mall the size of the Center.

[109]Exhibit I.

tenant, the value of the Center if Trader Joe's left, and ultimately, an appropriate reconciliation of those two values.

Mr. Dietrich stated that, in analyzing the Trader Joe's tenancy and its impact upon the value of the Center, he had reviewed the lease itself, the deposition testimony of Douglas Yokomizo, and various emails from Trader Joe's personnel, including their real estate manager, related to their store in the Center. Based upon that review, Mr. Dietrich stated that it was his impression that Trader Joe's did not intend to remain in the Center. He noted that the concerns expressed by Trader Joe's personnel regarding the leasehold at the Center included vagrancy, maintenance issues such as roof leaks and parking lot striping, trash in common areas resulting from the operations of a night club tenant, and generalized security concerns. He indicated that he believed that TJ Plaza management had worked to address those issues but was uncertain as to how successful those efforts had been. Mr. Dietrich testified that he believed his opinions regarding the value of the Center adequately addressed the holdover status of Trader Joe's tenancy and properly accounted for both the probability of renewal and risk of non-renewal.

Asked about his original appraisal report,[110] Mr. Dietrich testified that the report and the opinions regarding the value of the Center therein were developed using accepted appraisal approaches for commercial properties. He noted that his rebuttal report contained excerpts from THE APPRAISAL OF REAL ESTATE (APPRAISAL INSTITUTE, 14th ed. 2013), a sixty-year-old treatise published by the Appraisal Institute, which he viewed as a primary reference source for appraising commercial real estate.[111] He stated that those excerpts provided useful guidance as to how to address lease renewal issues in appraising the value of commercial real estate.

Mr. Dietrich explained that he had employed two approaches in reaching his opinion as to the value of the Center: the income capitalization approach and the Sales Comparison

---

[110]Exhibit I.

[111]See Exhibit AA, p. 8.

54

approach.  He stated that, after the value of the Center was established under each of those

approaches, the values were reconciled to establish a final opinion of the Center's value.  He

testified that, in his opinion the value of the Center under the income capitalization approach

was $6,600,000; under the Sales Comparison approach the Center's value was $6,030,000; and

that the reconciliation process yielded an "as is" value for the Center of $6,600,000 as of

December 4, 2015–the date of his original report.

Mr. Dietrich explained that a potential buyer would most likely utilize the income

capitalization approach in deciding whether to purchase the Center.  He explained that the

income approach focused on the net income generated by the Center without debt service on a

stabilized basis, adjusted for any items that are not stabilized.  He said that the analytical

process under the income approach began with evaluation of contract rent figures under existing

leases at the Center, followed by evaluation of vacant spaces to establish what market rent

would be for such spaces and how long it would take to lease them, and then subtraction of

commissions and carrying costs to reach a stabilized net income stream.  He explained that,

once the stabilized net income stream for the Center was established, it was capitalized to set a

gross value figure, and that gross value was then reduced by lease up costs to set the final "as

is" market value of the Center.

Mr. Dietrich explained that he employed the income approach calculus twice in reaching

his ultimate opinion as to the Center's value.  The first time, he assumed that Trader Joe's

would renew their lease at market rates–as opposed to the rates called out in their unexercised

lease extension options–which yielded a $7,080,000 "as is" market value for the Center.[112]  The

second time, he assumed that Trader Joe's vacated the Center, which yielded a $6,170,000 "as

is" market value for the Center.[113]  He then performed a reconciliation of those two values and

---

[112]See Exhibit I, p. 71.

[113]See Exhibit I, p. 70.

reached a reconciled value for the Center of $6,600,000 under the income capitalization approach.[114]  Mr. Dietrich's initial report shows that in his income capitalization approach calculations, he applied capitalization rates of between 6.50% assuming Trader Joe's remained a tenant and 7.00% assuming Trader Joe's vacated the Center.

Asked about his opinion of the value of the Center using the sales comparison approach, Mr. Dietrich testified that the sales comparison approach first involves looking at comparable properties that have sold in the market area recently.  He noted that, while finding comparable properties is not troublesome in valuing residential properties, it is very difficult in the commercial real estate context because the location and size of such properties, as well as their tenant mixes, tend to be unique.  That said, Mr. Dietrich explained that he selected recently sold commercial properties that were similar in size and age to the Center and in a market area with a similar tenant mix.  He indicated that larger and newer centers were not helpful in assessing value, as their anchor tenants tended to be much larger and pay different market rental rates than retail centers in more mature areas of the Las Vegas valley.

Mr. Dietrich testified that his opinion of the value of the Center under the sales comparison approach was summarized well in his original report.  He explained that he had considered five comparable sales[115] and had made adjustments to bring them more in line with the properties of the Center itself from an appraisal standpoint.[116]  Based upon the data captured in his original report he stated that, in his opinion, the value of the Center as established under the sales comparison approach was $6,030,000.[117]

Next, Mr. Dietrich acknowledged that a third approach, known generally as the cost

---

[114]See Exhibit I, p. 73.

[115]See Exhibit I, p. 82.

[116]See Exhibit I, p. 84.

[117]Id.

approach, existed in appraising the value of real estate.  He stated that he had not employed the

cost approach in reaching his opinion as to the value of the Center because, while useful in

analyzing newer commercial retail centers, the cost approach loses its relevance when the

subject property is older, has accrued depreciation, and has leases in place at rates above and

below market levels.  He indicated that the cost approach would not be relevant unless the

purchaser intended to redevelop the property being appraised.

Asked to explain how he reached his final opinion as to the value of the Center, Mr.

Dietrich said that he had reconciled the values rendered under the income capitalization

approach and the sales comparison approach.  He stated that, in the reconciliation process he

placed most of the analytical weight on the value established through the income capitalization

approach.  He explained that weighting was appropriate since most buyers would evaluate their

interest in the Center using the income capitalization approach, with the sales comparison

approach essentially providing a check of reasonableness for a property like the Center.  Based

upon that reconciliation, Mr. Dietrich stated that, in his opinion the "as is" market value of the

Center was $6,600,000.[118]  He also stated that he believed that opinion was developed in a

manner consistent with applicable USPAP standards.

Mr. Dietrich was then asked about a report he had prepared[119] after having reviewed the

valuation reports prepared by TJ Plaza's valuation expert, Mr. Anderson.[120]  He explained that

the observations in his review report focused on three areas of Mr. Anderson's valuation

analysis: the impact of the Trader Joe's lease on the Center's value; certain data used by Mr.

Anderson in preparing his opinions; and the valuation analysis itself.

As to the Trader Joe's lease, Mr. Dietrich took issue with the "extraordinary

[118]Exhibit I, p. 85.

[119]Exhibit AA.

[120]Exhibit 151.

assumption" that Trader Joe's would not vacate the Center woven into Mr. Anderson's September 21, 2015, report.  Mr. Dietrich stated that the facts indicated that Trader Joe's had an intent to vacate the Center and that Mr. Anderson should therefore have characterized his assumption that Trader Joe's would not vacate as a "hypothetical condition."  He noted that Mr. Anderson's supplemental report dated November 9, 2015,[121] made the hypothetical assumption that Trader Joe's had left the Center, and he opined that the "as is" fair market value $6,885,000 in Mr. Anderson's supplemental report was closer to the reality of the situation at the Center.

As to the data Mr. Anderson used in his November 9, 2015, supplemental report, Mr. Dietrich took issue with the fact that the supplemental report included comparable rent data dating as far back as 2012 that was higher than, and could not be supported using, current market rent data.  He said that, as a result, Mr. Anderson's valuation opinions regarding the Center were somewhat overstated.  He found fault with Mr. Anderson's lease data used in preparing his reports, noting that Mr. Anderson's lease data dated back to 2012-2013, and was therefore not representative of current market conditions.  He also took issue with some of the comparable sales data Mr. Anderson had used in preparing his opinions as to the value of the Center.  Mr. Dietrich acknowledged that, while he and Mr. Anderson had used two of the same sales in preparing their valuation opinions under the sales comparison approach, Mr. Anderson's lease data as to one of those sales was out of date.  As to the other comparable sales relied upon by Mr. Anderson, Mr. Dietrich characterized them as not truly comparable to the characteristics of the Center, including one comparable in a much newer and larger center in the Summerlin area with a ninety-five percent occupancy rate.  Mr. Dietrich closed his direct testimony by reiterating his opinion that the "as is" market value of the Center was $6,600,000.

On cross-examination, Mr. Dietrich revisited the distinction between a "hypothetical condition" and an "extraordinary assumption" in preparing real estate appraisals under

---

[121]Exhibit 152.

controlling USPAP standards.[122]  Mr. Dietrich explained that, unlike the valuation opinions provided by Mr. Anderson, his opinions as to the value of the Center were not predicated upon either a "hypothetical condition" or an "extraordinary assumption."  He explained that his opinion was that the Center was properly valued at $6.6 million when the risks attendant to Trader Joe's status as a holdover month-to-month tenant was properly considered.

Mr. Dietrich was then asked about the rental rates at the Center reflected in his appraisal report.  He acknowledged that he had calculated the end cap space occupied by Trader Joe's at $0.83 per square foot, and the vacant inline spaces at $1.00 per square foot.  He explained that, as leasehold size increased at properties like the Center, the rental rates declined.  He conceded, though, that he had reviewed the rent roll at the Center, and none of the occupied space at the Center had been leased for less than $1.00 per square foot.  Mr. Dietrich also conceded that, while Trader Joe's was leasing its space at the Center on a month-to-month basis, it was actually paying rent at a rate of $1.63 per square foot for its space without objection–a rate almost exactly twice the $0.83 per square foot rate he used in preparing his opinions as to the Center's value.  He further acknowledged that for the five years prior to the expiration of TJ Plaza's lease agreement they had paid rent at a rate of $1.50 per square foot, and the rental rate under the three most recent leases for inline space at the Center was $1.00 per square foot.  He also noted that Mr. Anderson's report contemplated rental rates at the Center between $1.10 and $1.35 per square foot.

Mr. Dietrich was then asked about USPAP Standards Rule 1-1(c) and related comments regarding appraisal report development.  He agreed that in developing appraisals, USPAP Standards Rule 1-1(c) required appraisers to refrain from rendering appraisal services in a careless or negligent manner, such as making a series of errors that, although individually might

---

[122]The precise definitions of those terms as used in the USPAP is set forth in the text of his report.  See Exhibit I, p. 3 at nn. 1 and 2.

not significantly affect the results of an appraisal, in the aggregate affects the credibility of those results.  He acknowledged a series of errors in his report, including understating lot size by 0.66 acres, assigning incorrect frontage measurements to the streets surrounding the Center, incorrectly stating the site coverage ratio in the improvement description of the Center, use of inaccurate tax rates for the Center, use of a lease comparable where the only tenant was not conducting business operations, use of a lease comparable with an incorrect street address, use of a lease comparable that was an automotive sale center without an anchor tenant, and misspelling Trader Joe's as "Traider Joe's" in a couple of places.  He conceded that the errata to his appraisal report[123] identified eleven items in his original report that required correction and acknowledged that the Assessor's Parcel Number used in the errata was wrong as to both parcels comprising the Center.  He indicated, though, that the analytical portions of his report underpinning his conclusions as to value were still compliant with USPAP.

Mr. Dietrich acknowledged that Colliers has an office and an appraiser in Las Vegas, and that he has never lived in Las Vegas.  He agreed that the Las Vegas market demonstrates sound fundamentals, that the market is currently stable with no evidence to prove that would change at any time soon, that the greatest strength of the market was strong absorption trends, and that there were no observed weaknesses of the market that stand out.[124]  He also stated that the Las Vegas commercial real estate market was starting to recover.

As to his reconciliation of the values of the Center established under the income capitalization approach detailed in his report, Mr. Dietrich acknowledged that he had used a rent rate of $0.83 per square foot for the Trader Joe's leasehold in reaching a $7,080,000 value for the Center if Trader Joe's remained in the Center under a "market rent" lease.  He again conceded that Trader Joe's was actually paying nearly twice that amount under its existing

[123]Exhibit O.

[124]That testimony was consistent with the text of his report.  Exhibit I, p. 35.

month-to-month tenancy arrangement.  He stated, though, that no rational investor would assume that the Trader Joe's tenancy would continue long-term at the lease rate being paid under the month-to-month tenancy arrangement in the absence of a signed lease.  He agreed that if he had utilized the rent rate paid by Trader Joe's under its expired lease ($1.50 per square foot), or the rent rate paid by Trader Joe's under its existing month-to-month tenancy arrangement ($1.63 per square foot), the $7,080,000 value of the Center under the income capitalization approach would be much higher.  He also stated that the remaining useful life of the Center was about thirty years.  He stood by his opinion that the Center's current "as is" value was $6,600,000.

On redirect, Mr. Dietrich confirmed that the Trader Joe's decision not to renew its lease at the Center was not hypothetical, it was based upon his review of the facts provided to him in preparing his opinion as to the value of the Center.  He likewise confirmed that the Trader Joe's presence at the Center under a month-to-month tenancy was not hypothetical but was borne out by his review of those facts.  He also testified that if Trader Joe's terminated its month-to-month tenancy on thirty days' notice to TJ Plaza it would no longer be obligated to pay rent at the Center.

**6.      Jack Brungardt–US Bank's Feasibility and Interest Rate Expert[125]**

Mr. Brungardt testified that he is a Senior Managing Director for MCA Financial Group, Ltd. ("MCA"), a financial advisory firm.  He explained that he accepted engagements through MCA in a variety of areas, including turnaround and restructuring work, litigation work involving expert testimony, merger and acquisition matters, as well as valuation work.  He joined MCA in 2001.  He received a Bachelor of Science degree in finance from Arizona State University in 1989, and a Master of Business Administration degree in finance and accounting

---

[125]Mr. Brungardt's expert qualifications under FED. R. EVID. 702, underpinning his opinion testimony on feasibility and appropriate interest rates, were not contested at the Confirmation Hearing.  His full curriculum vitae is appended to his written report.  See Exhibit J.

from that school in 1993.

Prior to joining MCA, Mr. Brungardt was employed by Employee Solutions, a publicly traded company, from 1997 through 2001.  While working at Employee Solutions from 1997 through 2001, he held positions as corporate Treasurer and Senior Vice President for Financial Planning.  Prior to joining Employee Solutions, he worked for Arthur Anderson.  While employed at Arthur Anderson from 1993 through 1997, he served as a manager in their economic and financial consulting division.  Prior to joining Arthur Anderson, he was employed by Tim Love & Associates ("TLA").  TLA was a commercial real estate appraisal firm, where he worked as a research supervisor from 1990 through 1991.  Immediately after graduation from Arizona State University with his MBA, but before joining TLA, he worked for Ernst & Young in Cambridge, England, as a staff auditor in their audit group.

Mr. Brungardt stated that he had testified as an expert witness on ten prior occasions, including seven cases involving confirmation of reorganization plans in chapter 11 bankruptcy cases.  Five of the seven cases where he testified in the chapter 11 plan confirmation context had been filed in Las Vegas or Reno and had involved commercial properties such as storage units, industrial spaces, and apartment complexes.  He stated that he had provided testimony as to both plan feasibility and appropriate interest rates of interest for secured loans in the cases filed in the District of Nevada.  He explained that he had also testified about lost profits and also in partnership cases involving allegations of misappropriations of partnership money.

Asked if he had prepared a written report that embodied his opinions related to the TJ Plaza bankruptcy, Mr. Brungardt confirmed that he had done so, and the report was dated December 4, 2015.[126]  He explained that his report detailed his opinions regarding the feasibility of the TJ Plaza Plan of reorganization and underlying projections, an appropriate rate of interest for the secured financing contemplated by that plan, and the propriety of the proposed

---

[126]Exhibit J.

repayment terms for that financing.  He stated that, in preparing his report, he had reviewed the

TJ Plaza Plan and related disclosure statement, as well as TJ Plaza's monthly operating reports,

rent rolls, leases and renewals, various discovery responses, and appraisal reports regarding the

Center.  He also testified that he had conducted a market survey of commercial lenders

regarding the interest rates and repayment terms demanded in connection with current

commercial real estate loan transactions in the Las Vegas valley.  He specifically indicated that

he had reviewed the deposition transcript of Douglas Yokomizo, Trader Joe's Vice President -

Real Estate, and related emails.[127]  He said that a review of all of the leases in place at the

Center and related renewals was important because the leases were the source of significantly

all of the income generated by the Center's operations.

Asked about the assumptions incorporated into the TJ Plaza Plan, Mr. Brungardt noted

that it was assumed that Trader Joe's would remain a tenant at the Center for the entire ten-year

term of the plan.  He noted that the first year of the TJ Plaza Plan assumed that Trader Joe's

would pay rent at an annualized rate of $18.54 per square foot; that Trader Joe's would renew

its lease at some point during the ten-year plan term; and that the rent rate would increase in

each subsequent year.  He challenged the reasonableness of those assumptions based upon his

review of discovery conducted in the case, noting that Trader Joe's had not renewed its former

lease, was present at the Center under a month-to-month arrangement, and in his view, was not

likely to renew its lease.  He also took issue with the lease rates for the Trader Joe's leasehold

under the terms of the TJ Plaza Plan, stating that the rates were higher than what Trader Joe's

would likely agree to under current market conditions.  He said that, having reviewed Mr.

Yokomizo's deposition and related emails, he believed that there was little TJ Plaza could do to

convince Trader Joe's to renew its lease at the Center, and it was not reasonable to assume

Trader Joe's would remain a tenant at the Center for the entire ten-year term of the TJ Plaza

[127]See Exhibit 211.

63

Plan.  He stated that, if Trader Joe's did vacate the Center, it was likely that a replacement tenant would only agree to a lower rental rate commensurate with existing market conditions, negatively impacting upon the Center's cash flows and value.  He also pointed out that it would take some time to locate a new tenant, resulting in some lost rent and CAM income for the Center until a new tenant came on line.  He explained that he was unaware of any existing replacement tenant for the Trader Joe's leasehold, and efforts to locate a new tenant would also result in commission costs and other new tenant incentives paid for by the Center.  He testified further that he did not believe that the TJ Plaza Plan or projections had fully taken into account the possibility that Trader Joe's could vacate its tenancy at the Center.

Asked about the feasibility of the TJ Plaza Plan, Mr. Brungardt stated that, in his opinion, the plan was not feasible for a variety of reasons.  His first concern was that in his view, Trader Joe's was not likely to remain a tenant at the Center for the full ten-year term of the TJ Plaza Plan.  He also stated that it was unlikely that all of the other existing tenants at the Center would remain tenants, or would agree to rental rates that increased each year, during the entire ten-year plan term.  He further opined that the debt service estimates factored into the TJ Plaza Plan were not appropriate because the interest rate factor was too low.  He testified that, in his view, the TJ Plaza Plan did not fully contemplate or provide for tenant improvement costs and other rent concessions that would result from efforts to fill existing vacancies at the Center and the departure of existing tenants during the term of the Plan.  He also expressed concern that the TJ Plaza Plan provided no assurances that TJ Plaza could satisfy the balloon payment called for at the end of the plan term.

Asked for more detail regarding his concerns regarding the tenant income levels contemplated by the TJ Plaza Plan, Mr. Brungardt turned to his written report.[128]  He stated that,

---

[128]Exhibit J, p. 18; Exhibit J, p. 36 and supplement thereto (identified as Exhibit "E" of the MCA report).

when actual rental income figures generated by the Center's operations between 2010 and 2015 were compared to the projections underpinning the TJ Plaza Plan, the projections began at inflated levels, contemplating increases over historical rental income levels of 24%, 34%, and 45% in years 1, 4, and 8 of the plan term, respectively.  He stated that historical rental income generated by the Center tended to increase and decrease over time, whereas the projections in the TJ Plaza Plan always trended upward and always exceeded the historical income levels generated by the Center's operations.  He characterized the projections in the TJ Plaza Plan as being aggressive and somewhat speculative.

Asked for more detail as to his concerns regarding TJ Plaza's tenant retention and renewal projections, Mr. Brungardt referred to his report and noted that the TJ Plaza Plan assumed that all tenants at the Center would remain tenants for ten years.  He also observed that TJ Plaza's projections assumed that all existing tenants would pay higher rent rates each year. He explained that, in the case of a bakery tenant, TJ Plaza's projections were higher than the rental income generated under a recently renewed lease, and projected income from that lease was ninety-six thousand dollars more than what was called for under the terms of that recent lease renewal. He also explained that effective rental rates for the five newest tenants at the Center, reduced for related tenant concessions, were significantly lower than the actual rental rates incorporated into the TJ Plaza Plan.[129]  He also expressed concern that any new tenants in the Center would only agree to pay rental rates which, net of related new tenant incentives, would be less than the rental rates paid by existing tenants at the Center under their leases and the terms of related lease renewals.

Mr. Brungardt also took issue with TJ Plaza's projections related to existing tenants at the Center.[130]  With respect to TJ Plaza's lease income projections for 2016, he observed that

[129]See Exhibit J, pp. 18-25.

[130]See Exhibit 203.

the projections included Antique Traders on Decatur ("ATD"), noting that ATD was not actually a tenant in the Center as of the time of the Confirmation Hearing. He stated that the projections included a nail salon tenant which was up for lease renewal in August 2016. He reiterated that the income projections for a bakery tenant was ninety-six thousand dollars higher than the actual rental income required under the terms of its existing lease. He testified that TJ Plaza's rent projections were higher than required under the existing lease with Dotty's. Finally, he confirmed again that, in his opinion, it was not reasonable to assume that Trader Joe's would renew its lease at the Center. As to TJ Plaza's projections in future years, Mr. Brungardt stated that the projections suffered from similar errors, did not properly anticipate that various tenants would come up for renewal in subsequent years during the ten-year plan term and improperly assumed that all tenants would always renew their leases at increased rental rates each year.

Mr. Brungardt was asked if he had attempted to collect his concerns regarding TJ Plaza's income projections over the ten-year term of its Plan and adjusted the projections in a manner that would address those concerns. He testified that he had done so, and referred again to his written report to support his testimony on that topic.[131] He stated that, even using TJ Plaza's projections and the US Bank Loan terms proposed by TJ Plaza (i.e., $5.1 million loan at 4.53% annual interest), the Center's cash flow after debt service and plan payments in the first year of the plan term was in the amount of -$64,768.00.[132] He stated that, in his opinion, though, the appropriate terms of the US Bank Loan would be $6.3 million at 6.75%. He

---

[131]See generally Exhibit J, pp. 31-33 and supplements thereto (identified as Exhibits "B.1," "B.2," and "B.3" of the MCA report).

[132]The Court notes, however, that Mr. Brungardt's report shows positive cash flow from the Center after debt service and plan payments for all subsequent years, in amounts between $151,936.00 and $251,014.00, until the balloon payment comes due in the final year of the plan term. See Exhibit J, p. 31 and supplements thereto (identified as Exhibit "B.1" of the MCA report).

testified that, when TJ Plaza's projections were used, and the loan terms he viewed as appropriate were factored into the calculus, the Center's cash flow after debt service and plan payments in the first year of the plan term was in the amount of -$356,068.00.[133]  He testified further that, under the US Bank Loan terms he proposed, the Center's cash flow after debt service and plan payments would remain negative for first seven years of the plan term.[134]

Mr. Brungardt next testified that he had prepared two sets of revised projections for the Center, summarized in two separate portions of his written report.[135]  He explained that, in preparing his revised projections, he looked at each existing tenant at the Center, projected rent revenue from each of those tenants using known lease renewal terms or an assumed 1.5% annual increase in existing lease rates, added CAM revenue, and factored in a reasonable period of time to lease the Center up to a stabilized level of occupancy.[136]  He stated that, after recasting TJ Plaza's revenue projections, he utilized TJ Plaza's figures for operating and tenant expenses, as well as capital improvement costs.  He said that he also made a slight upward adjustment in TJ Plaza's projected costs for tenant improvements in the first two years of the plan term in view of the number of lease renewals in the near term.

Having developed his own financial projections regarding the Center's operations, Mr. Brungardt stated that he looked at those projections in two ways.  He explained that his first set of calculations summarized the debt service and plan payment obligations related to the Center

---

[133]Exhibit J, p. 31 and supplement thereto (identified as Exhibit "B.1" of the MCA report).

[134]Id.

[135]Exhibit J, pp. 32-33 and supplements thereto (identified as Exhibits "B.2" and "B.3" of the MCA report).

[136]Mr. Brungardt testified that he utilized the existing 24% vacancy rate at the Center for the first year of the plan, then assumed reductions in that vacancy rate to 20% in the second year, 15% in the third year, and 10% for the balance of the ten-year plan term.  See Exhibit J, pp. 32-33 and supplements thereto (identified as Exhibits "B.2" and "B.3" of the MCA report).

utilizing his revised financial projections and assuming a $10.00 per square foot lease rate for the Trader Joe's leasehold.[137]  He testified that, under that scenario, when TJ Plaza's proposed loan terms were employed in the analysis (i.e., $5.1 million US Bank Loan at 4.53%), the Center would have negative cash flow (in the amount of -$304,000.00) in the first year of the plan term, and a cumulative negative cash flow total during the first five years of the plan term (in the amount of -$69,028.00).[138]  He stated that, using his own income and expense projections, coupled with loan terms he considered appropriate (i.e., $6.3 million US Bank Loan at 6.75%), the Center would have negative cash flow in the amount of -$596,185.00 in the first year of the plan term, negative cash flow in the amount of -$221,649.00 in the second year of the plan term, and negative cash flow for the remainder of the ten-year plan term.[139]  He also testified that those figures assumed Trader Joe's remained as a tenant at the Center–an assumption he did not believe was reasonable under the facts known to him.  He stated that, if Trader Joe's were to actually vacate its leasehold at the Center, his cash flow projections would have been impacted in a significant and negative way.

As to his second set of calculations, Mr. Brungardt testified that he had again utilized his own revised financial projections, but this time he assumed an $18.00 per square foot lease rate

---

[137]Mr. Brungardt testified that, in preparing MCA report Exhibit "B.2" (MCA's Forecast No. 1), he assumed Trader Joe's would pay rent at $10.00 per square foot during the term of the plan, and that such a rate was reasonable and consistent with existing market conditions for such a tenancy.  He acknowledged that he made that assumption even though he was aware that Trader Joe's was actually paying $18.00 per square foot under their month-to-month tenancy arrangement at the Center.

[138]The Court notes, though, that Mr. Brungardt's projections also show that the cash flow generated by the Center after debt service and plan payments in the second year of the plan term was projected to be positive–$69,650.00–and was projected to remain at positive levels in all subsequent years at levels between $36,262.00 and $90,758.00 until the balloon payment date at the end of the plan term.  See Exhibit J, p. 32 and supplements thereto (identified as Exhibit "B.2" of the MCA report).

[139]See Exhibit J, p. 32 and supplements thereto (identified as Exhibit "B.2" of the MCA report).

for the Trader Joe's leasehold.[140]  He stated in that factual scenario, even if TJ Plaza's loan

terms were used (i.e., $5.1 million US Bank Loan at 4.53%), the Center would still generate

negative cash flow in the amount of -$228,412.00 in the first year of the plan and would have a

cumulative negative cash flow in the amount of -$77,055.00 through the end of the second year

of the TJ Plaza Plan.[141]  He testified that his revised financial projections, coupled with loan

terms he considered appropriate (i.e., $6.3 million US Bank Loan at 6.75%), yielded negative

cash flow for the Center in the amount of -$519,711.00 in the first year of the Plan term,

negative cash flow in the amount of -$139,942.00 in the second year of the plan term, and

stayed negative for the remainder of the ten-year plan term.

Having summarized his analysis of the projected cash flow for the Center, Mr.

Brungardt testified that, in his opinion, TJ Plaza's revenue projections for the Center were not

reasonable because they were both overstated and speculative.  He testified that, through his

review of the TJ Plaza Plan and disclosure statement, he had not noted any committed sources

of cash or capital that could be used to make up shortfalls in debt service and plan payment

requirements if the Center's revenue projections were not met during the plan term.  He

observed that there were references in the TJ Plaza Plan to obtaining financing secured by a lien

on the Center junior to the mortgage lien of US Bank but noted that there were no plan

---

[140]See Exhibit J, p. 33 and supplements thereto (identified as Exhibit "B.3" of the MCA report).  Mr. Brungardt testified that he viewed the $18 per square foot rate, which was actually being paid by Trader Joe's under its month-to-month tenancy at the Center, as an "above market" rate.

[141]Mr. Brungardt's report also reveals that, under this scenario, the cash flow generated by the Center in the second year of the plan term is projected to be significantly positive–$151,357.00–and is also projected to remain at positive levels each year thereafter, at levels between $132,299.00 and $192,775.00, until the balloon payment date at the end of the plan term.  The Center's cumulative negative cash flow is reduced to the amount of -$77,055.00 in the second year of the plan, and reaches a positive cumulative total of $1,073,415.00 prior to the balloon payment due date in the final year of the plan term.  See Exhibit J, p. 33 and supplements thereto (identified as Exhibit "B.3" of the MCA report).

provisions as to the amount or other terms of such financing if it was actually available to TJ Plaza, nor how such a loan would be repaid.[142]  As a result, he stated that he was unable to identify any sources of funds available to TJ Plaza if income from the Center was insufficient to meet debt service and plan payment requirements called for under the TJ Plaza Plan.

Mr. Brungardt's testimony then turned to an escrow agreement for tenant rollovers related to the Trader Joe's leasehold.[143]  He testified that the escrow agreement originally established an escrow account for the reimbursement of tenant improvement costs and up front leasing commissions in the event that it became necessary to replace Trader Joe's as a tenant at the Center.  He explained that the escrow agreement was among the original US Bank Loan Documents and that it was intended to provide US Bank with some assurance that a reasonable amount of money would be set aside to cover the cost of either paying for tenant improvements that Trader Joe's might demand to remain as a tenant at the Center, or finding a tenant to replace Trader Joe's if Trader Joe's were to vacate its leasehold.  He noted that, while the escrow agreement required a monthly payment into escrow of $2,083.22, the TJ Plaza Plan provided for termination of the escrow arrangement and did not provide for any similar deposits under the Plan going forward.[144]  He acknowledged that the TJ Plaza Plan did indicate that TJ Plaza "intended" to "internally reserve" for future tenant improvements and capital improvements at the Center.[145]  He stated that, in his view, the language used in the TJ Plaza Plan was that such internal reserves could be established at TJ Plaza's discretion in an account held by TJ Plaza, rather than requiring TJ Plaza to make mandatory deposits into an escrow

---

[142]Exhibit 227, ECF No. 690-1, p. 20 of 65, Section 3.3.2.8 (Subordinate Financing); Exhibit 228, ECF No. 691, p. 19 of 43 (same).

[143]Exhibit 6.

[144]Exhibit 227, ECF No. 690-1 p. 20 of 65, Section 3.3.2.10 (Impounds and Reserves); Exhibit 228, ECF No. 691, p. 19 of 43 (same).

[145]Id.

account for the benefit of US Bank.  He said that it was unclear from the TJ Plaza Plan how

such deposits, whether discretionary or mandatory, could be made if the Center did meet the

revenue projections contemplated under the plan.  He also reiterated that, while there were

references in the TJ Plaza Plan to obtaining financing secured by a lien on the Center junior to

the mortgage lien of US Bank, there were no plan provisions detailing the amount or other

terms of such financing if it was actually available to TJ Plaza, nor how such a loan would be

repaid.[146]

Mr. Brungardt was then asked if he had reviewed the November 9, 2015, report

regarding the value of the Center prepared by Mr. Anderson.[147]  He indicated that he had

reviewed that report, including a chart wherein Mr. Anderson assessed the impact upon the

Center, from a cost perspective, if Trader Joe's were to vacate its leasehold.[148]  He pointed out

that Mr. Anderson's report estimated that in order to locate enough tenants to bring the Center

to a stabilized occupancy level–including a replacement tenant for the Trader Joe's

leasehold–TJ Plaza would incur tenant improvement costs of roughly ten dollars per square

foot, yielding a total cost just over $234,000.[149]  He stated that he did not believe that the TJ

Plaza Plan provided for payment of all tenant improvement costs in the event that Trader Joe's

vacated its space at the Center because the projections underpinning the TJ Plaza Plan assumed

that Trader Joe's would remain a tenant at the Center for the entire ten-year plan term.  He

testified further that, based upon his review of TJ Plaza's last monthly operating report, TJ

Plaza had only ninety thousand dollars in available cash, which was insufficient to cover the

---

[146]  Exhibit 227, ECF No. 690-1 p. 20 of 65, Section 3.3.2.8 (Subordinate Financing);
Exhibit 228, ECF No. 691, p. 19 of 43 (same).

[147]Exhibit 152.

[148]Exhibit 152, p. 5.

[149]Id.

71

$234,030.00 tenant improvement cost figure referenced in Mr. Anderson's report.

Mr. Brungardt was then questioned about the monthly payment schedule TJ Plaza had prepared in support of the TJ Plaza Plan.[150]  He noted that the schedule assumed plan Loan terms of $5.1 million payable at 4.53% annual interest amortized over thirty years, with interest-only payments for the first two years and a balloon payment at the end of the ten-year plan term.  He observed that the balloon payment required at the end of the ten-year plan term was $4,354,844.11, and the plan provided no assurance that TJ Plaza would be able to refinance or sell the Center to meet the balloon payment obligation.[151]  He testified further that other than equity attributable to the value of the Center itself, the TJ Plaza Plan did not provide any detail as to how the balloon payment contemplated by the plan would or could be paid.

In summary, Mr. Brungardt stated that, in his opinion the TJ Plaza Plan was not feasible for the reasons detailed in the course of his prior testimony.  He was then asked about the 6.75% interest rate he had utilized when analyzing the cash flow generated by the Center after debt service and plan payment obligations.

Mr. Brungardt testified that he had developed an opinion as to the appropriate interest rate for a loan from US Bank under the terms of the TJ Plaza Plan, that the appropriate interest rate was 6.75% per annum, and that his report detailed how that opinion was reached.[152]  He explained that his interest rate calculation focused primarily on the formula approach or "prime plus" approach as contemplated by the <u>Till</u> decision.  He stated that he began with the prime interest rate, then added additional basis points to that rate based upon the circumstances of the estate, feasibility or default risk, duration risk, and the nature of security for the loan under

---

[150]Exhibit 202.

[151]<u>See</u> Exhibit 227, ECF No. 690, p. 30 of 43, Paragraph "D."

[152]Exhibit J, pp. 7-15; Exhibit J, p. 34 and supplement thereto (identified as Exhibit "C" of the MCA report).

consideration.  His testimony regarding the additional risk components over the Prime Rate utilizing the formula approach was consistent with the detail found in his written report and can be summarized as follows:

| | |
|---|---|
| Prime Rate: | 3.25% |
| Circumstances of the Estate: | 0.50% |
| Feasibility (Default Risk): | 1.00% |
| Duration (Interest Rate Risk): | 1.50% |
| Nature of Security (Security Risk): | 0.50% |
| **Appropriate Rate Under the Formula Approach:** | **6.75%** |

After testifying that the Prime Rate was used as the base rate in his calculations, Mr. Brungardt explained each of the additional categories of risk incorporated into his proposed 6.75% interest rate.[153]  As to the feasibility risk category, he testified that an additional risk factor of 1.00% was warranted due to the concerns identified in his prior testimony regarding TJ Plaza's revenue projections and their impact on plan feasibility, the inconsistency between the Center's historical financial performance and TJ Plaza's projections, TJ Plaza's assumption that all tenants would remain at the Center while continually renewing their leases at increased rent rates over the entire ten-year term of the Plan.

As to the duration and interest rate risk posed by the TJ Plaza Plan, Mr. Brungardt opined that an additional upward adjustment of 1.50% over the Prime Rate was reasonable in light of the ten-year term of the TJ Plaza Plan.  He explained that, in reaching that conclusion, he had considered the spread between one-month and ten-year U.S. Treasury yields, which was approximately 2.20%, as well as the spread between one-year and ten-year U.S. Treasury yields, which was about 1.85%.  He stated that he took a more conservative view in assigning a

---

[153]See Exhibit J, p. 34 and supplement thereto (identified as Exhibit "C" of the MCA report).

1.50% additional risk factor for duration risk, without explanation for the downward departure from the 1.85% to 2.20% spread identified through his analysis of U.S. Treasury yields.

Turning to the nature of the security risk component of the formula approach, Mr. Brungardt explained that he looked primarily at the current value of the Center in deciding to add an additional 0.50% to the base interest rate. He focused on the age of the Center, and the existing loan-to-value ratio for the Center, which he believed exceeded an appropriate loan-to-value parameter for commercial loans under current market conditions.[154]

Mr. Brungardt then testified that an additional upward adjustment of 0.50% was warranted due to the risk presented by the circumstances of TJ Plaza's estate. In that regard, he said that he looked primarily at qualitative issues such as the strength of the borrower and guarantor under the matured US Bank Loan, the lack of existence of committed sources of cash to fund debt service and plan obligations in the event of revenue shortfalls, the current condition of the commercial real estate industry, and TJ Plaza's willingness to provide common covenants and other assurances that they would perform their obligations under the plan after confirmation.

Having explained the underpinnings for his suggested additions to the Prime Rate under the formula approach adopted in Till, Mr. Brungardt opined that the appropriate interest rate for the financing contemplated by the TJ Plaza Plan was 6.75% per annum. He noted that, since his report was prepared, the Prime Rate had actually climbed to 3.50%, and that the additional risk premiums reflected in his testimony and report were particularly appropriate because of the uncertainty as to whether Trader Joe's would remain in the Center as a tenant, and the uncertainty that existing tenants would remain at the Center if rental rates were increased in

---

[154]Mr. Brungardt suggested that in his experience, commercial lenders utilize a sixty-five percent loan-to-value benchmark, and that the Center's seventy-seven percent loan-to-value ratio based upon TJ Plaza's assumptions ($5.1 million loan at 4.53% interest amortized over thirty years with a balloon in the tenth year) required an upward adjustment to the base rate.

each year of the TJ Plaza Plan.

Mr. Brungardt's testimony then turned from the formula approach adopted in Till to the market approach to calculating an appropriate rate of interest for financing of the sort contemplated by the TJ Plaza Plan.[155]  He explained that the market approach consisted of contacting a number of different lenders to determine the range of interest rates, duration limits, amortization periods, borrower covenants, and other loan terms typically required as a predicate to making a loan of the type contemplated by the TJ Plaza Plan.  He said that he viewed the market approach as being a reasonableness check on the interest rate he had derived under Till's formula approach.

Turning to the content of his report regarding the market approach to interest rates, Mr. Brungardt testified that he had contacted six lenders known to make commercial loans in the Las Vegas valley.[156]  He stated that, what he found generally was that lenders would make commercial loans at rates between 4.25% to 6.00% for creditworthy borrowers.  He said that the lenders he had canvassed would make commercial loans for terms between three and ten years, with the ten-year term available only to the most creditworthy borrowers with tenants and leases that would support the longer duration.  As to amortization periods, he indicated the lenders he had spoken with provided for amortization periods between twenty and thirty years.  He said that the 6.75% rate he had derived under Till's formula approach was reasonable in light of the 4.25% to 6.00% range established under the market approach, since the market approach data related to new loans for creditworthy borrowers who were not in bankruptcy, not refinancing of an existing loan on a commercial center involved in a chapter 11 bankruptcy case that would

---

[155]His testimony related to the market approach was consistent with the content of his written report.  See Exhibit J, pp. 14-15; see Exhibit J, p. 35 and supplement thereto (identified as Exhibit "D" of the MCA report).

[156]See Exhibit J, p. 35 and supplement thereto (identified as Exhibit "D" of the MCA report).

require a more intensive underwriting process.

Mr. Brungardt was asked if he was aware of the interest rate opinions expressed in the various written reports prepared by Dr. Wiles at the request of TJ Plaza.[157]  He answered in the affirmative, and took issue with certain aspects of the interest rate tables contained within Dr. Wiles' reports.  He commented that Table 1 within Dr. Wiles' report was simply a mathematical calculation, not a true application of the formula approach to interest rate calculations under the Till decision.  He observed that Table 1 in Dr. Wiles' report did not substantively address any of the risk factors above the Prime Rate discussed in Till (i.e., risk attendant to the circumstances of the estate, feasibility/default risk, duration/interest rate risk, or risk due to the nature of the security for the loan).  He said that Table 1 of Dr. Wiles' report simply added an interest range component to the Prime Rate, calculated by reducing the 1.00% to 3.00% range discussed in Till in proportion to the reduction in the Prime Rate between the date of the Till opinion and the date of Dr. Wiles' report.

Mr. Brungardt opined that Table 2 in Dr. Wiles' report was also a simple mathematical calculation, not a full application of the formula approach to interest rate calculations under Till.  He observed that in Table 2, Dr. Wiles had simply reduced the interest rate under the original US Bank Loan Documents by the percentage decline in the Prime Rate between the date of that loan and the date of his testimony.  Mr. Brungardt pointed out that Table 2 of Dr. Wiles' report did not substantively address any of the risk factors above the Prime Rate discussed in Till.  He also opined that the interest rate calculation reflected in Table 2 of Dr. Wiles' report was in effect the contract rate approach rejected by the Supreme Court in Till.  He took issue with the remaining tables in Dr. Wiles' reports as well, both because they did not substantively address any of the risk factors above the Prime Rate discussed in Till, and because the interest rates

---

[157]His testimony related primarily to Exhibit 153 and Exhibit 231 (which updated certain interest rate tables in that report through January 21, 2016).

reflected in those tables were either below the Prime Rate, or less than the Prime Rate plus 1.00%, the low end of the <u>Till</u> range.

Mr. Brungardt took further issue with Dr. Wiles' November 23, 2015, report, asserting that the report simply adopted TJ Plaza's financial projections as true without substantive analysis. He stated that the report failed to properly take into account the uncertainty attendant to Trader Joe's month-to-month tenancy, failed to consider that several existing tenants were up for lease renewals in the near term, and improperly assumed that Trader Joe's and all other existing tenants would remain tenants at the Center for the full ten-year term of the TJ Plaza Plan. He stated that he found no indication that Dr. Wiles was aware of the emails obtained from Trader Joe's in the course of discovery relating to their willingness to sign another lease or lease extension for their space at the Center. He stated that Dr. Wiles' report did not address the impact upon the Center if Trader Joe's opted to leave.

Mr. Brungardt also disagreed with Dr. Wiles' opinion that 4.53% was the appropriate rate of interest for the financing contemplated by the TJ Plaza Plan. He opined that the 4.53% interest rate simply did not properly factor in all of the risk factors which must be assessed under the <u>Till</u> decision. Mr. Brungardt stated that Dr. Wiles had not actually conducted a feasibility analysis regarding the TJ Plaza Plan when Dr. Wiles prepared his November 23, 2015, report. He reiterated that Dr. Wiles had simply adopted TJ Plaza's financial projections without substantive analysis. Mr. Brungardt noted that he had prepared a report dated December 11, 2015, to rebut the opinions set forth in Dr. Wiles' November 23, 2015, report.[158] Mr. Brungardt testified that his rebuttal report captured the deficiencies in Dr. Wiles' November 23, 2015, report; the reasons why Dr. Wiles' opinions were not reasonable as interest rate calculations in light of the guidance provided by the <u>Till</u> decision; and why Dr. Wiles' opinions

---

[158]Exhibit Z.

were insufficient to constitute a meaningful feasibility analysis regarding the TJ Plaza Plan.[159]

On cross-examination, Mr. Brungardt acknowledged that he did not hold a doctorate degree in finance, economics, or any other business field.  He stated that he is not a chartered financial analyst, and had never been appointed by a governor to assist in developing a state budget.  He said that he was neither a licensed commercial real estate broker, real estate agent, or certified general appraiser.  He stated that he had been involved in some engagements where he had negotiated commercial leases and related CAM charges, but not at a commercial retail property like the Center.  He said that he had been involved in the management of a small retail center in Las Vegas in 2009-2010, but did not negotiate leases or CAM charges in that particular engagement.[160]  He said that, while his resume did not reveal any experience in establishing the market rate for commercial leases in southern Nevada, his testimony as to whether various leases at the Center were above or below market rates was predicated largely upon the appraisal reports from Messrs. Anderson and Dietrich, as well as a quarterly industry publication on market rates issued by Colliers, and another issued by CBRE.  Asked if a series of errors in Mr. Dietrich's appraisal report would impact upon his opinions, Mr. Brungardt stated that, while he was not aware of the scope of any such errors, there would still be ample support for his opinion that several tenants at the Center were paying above-market rates for their leaseholds.

Mr. Brungardt acknowledged that he had no substantive experience in operating a commercial retail property similar to the Center, and had never applied for a loan related to the operation of a property like the Center where he served as guarantor.  He stated that he had, on behalf of MCA clients, prepared financial projections for submission to lenders in an effort to obtain financing secured by commercial properties.  He acknowledged that TJ Plaza's principal,

---

[159]Id.

[160]Mr. Brungardt identified that center as Centennial at Decatur.

Mr. Susa, had been involved in applying for and negotiating financing secured by commercial properties for over thirty years, and had successfully obtained such financing for over thirty different commercial properties in that time.  He said he was not surprised that Mr. Susa had successfully reorganized at least four commercial retail centers through chapter 11 bankruptcy proceedings.

Mr. Brungardt agreed that TJ Plaza had made every required payment during the ten-year term of the US Bank Loan, in amounts between thirty-five thousand and thirty-eight thousand dollars, with the exception of the balloon payment due at maturity.  He stated that it was not surprising that TJ Plaza had made all of those payments, even during the downturn in the Las Vegas real estate market, when the occupancy rate at the Center was much lower than seventy-four percent at the time of the Confirmation Hearing.  He stated that, while he had never served as the manager of a commercial retail center that successfully reorganized through the chapter 11 process, he had served as financial advisor for an MCA client in three related cases where chapter 11 plans were ultimately confirmed.

Mr. Brungardt was asked why he took issue with TJ Plaza's financial projections regarding the Center, particularly in view of Mr. Susa's experience in reorganizing commercial retail properties and in dealing with the tenants at the Center.  He reiterated that TJ Plaza's steadily increasing revenue projections were not supported by, and were inconsistent with, the historical financial performance of the Center.  He stated that there was insufficient evidence to support several assumptions underpinning the TJ Plaza Plan, including the assumption that existing tenants at the Center would always renew their leases at increasing rental rates during the ten-year term of the TJ Plaza Plan, that aggressive projections regarding the retention of new tenants could be met, and the assumption that Trader Joe's would not leave the Center during the ten-year plan term.

Mr. Brungardt was directed to the current rent roll for the Center maintained by TJ

Plaza,[161] and was asked to identify any new lease, or any recently executed lease renewal of a five- to seven-year duration, under which the tenant was paying rent at or below what Mr. Brungardt had characterized as the market rate of approximately $1.00 per square foot per month. Mr. Brungardt identified a few such leases,[162] but acknowledged that if blended with CAM income, those leases would yield a rent rate above the $1.00 per square foot market rate referenced in his written report.

Asked to look at TJ Plaza's income projections for the Center,[163] Mr. Brungardt agreed that the projections were cash flow positive. He posited that TJ Plaza's cash flow projections turned negative when various administrative expenses were considered, but conceded that he had not taken the cash balance on hand in TJ Plaza's debtor-in-possession bank account in reaching that conclusion. He also agreed that TJ Plaza's projections contemplated positive net income generated from the Center's operations during the term of the TJ Plaza Plan.

Returning to his written report,[164] Mr. Brungardt agreed that his projections for the Center anticipated negative cash flow in the first year of the TJ Plaza Plan, after debt service and plan payments in the amount of -$64,768.00.[165] He conceded that TJ Plaza had cash on deposit in its debtor-in-possession bank account, and that during the pendency of the TJ Plaza bankruptcy case TJ Plaza had been paying its net operating profits over to US Bank pursuant to court order. He noted that his projections did not refer to the funds on deposit in the debtor-in-

---

[161]Exhibit 214.

[162]Mango Tango at $1.00 per square foot for Units 1 through 4; Units 12 and 15 occupied by Amber Unicorn Books at $0.42 and $0.83 per square foot (which, together with Units 13 and 14 at rent of $1.55 per square foot yield a total tenant rent rate of $0.93 per square foot); and Mochiko Fried Chicken at $0.95 per square foot for Unit 16. See Exhibit 214.

[163]Exhibit 203.

[164]Exhibit J.

[165]Exhibit J, p. 31 and supplements thereto (identified as Exhibit "B.1" of the MCA report).

possession account because they were projections of cash flow from the Center's operations, not balance sheet statements as to TJ Plaza's asset holdings.

Mr. Brungardt agreed that several recent leases and renewals for inline space at the Center required rent in excess of the $1.00 per square foot market rate he had referenced in his testimony and report, with one tenant paying $2.93 per square foot.[166]  He disagreed with the contention that his projections did not contemplate stepped up rental rates during the term of the TJ Plaza Plan.  He stated that his projections utilized actual existing rental rates for tenants at the Center;[167] incorporated rent rate increases as actually set forth in existing tenant leases and any related renewal options; assumed that vacant space would be leased at the market rate as opposed to the higher rates paid by current tenants; and that the Center would reach a stabilized occupancy level of ninety percent by the fourth year of the TJ Plaza Plan term.  He suggested that at renewal, existing tenants could be expected to challenge the higher rental rates set forth in TJ Plaza's projections in an effort to lease their spaces at a rate more in line with the market.  He noted that Trader Joe's was the only tenant whose rent rate had been adjusted in his projections due to uncertainty as to whether their month-to-month tenancy would continue.[168]  Ultimately, Mr. Brungardt reiterated his opinion that his projections demonstrated that the TJ

---

[166]Mango Tango paying $1.00 per square foot for Units 1 through 4, in addition to funding two hundred thousand dollars of its own tenant improvement costs; Amena Bakery paying $1.21 per square foot for Units 9 and 10; and NV Restaurant Service (Dottys) paying $2.93 per square foot for Units 17 and 18.  See Exhibit 214.

[167]Mr. Brungardt also stated that his projections contemplated CAM charges as set forth in the lease and extension agreements for existing tenants at the Center.

[168]Mr. Brungardt also noted that his projections for Amena Bakery, the tenant in Units 9 and 10 at the Center, used a rental rate of $1.17 per square foot, while TJ Plaza's rent roll showed a rental rate of $1.21 per square foot.  He explained that the Amena Bakery lease had been renewed, and the renewal set forth a rental rate which included CAM charges.  He stated that, in his projections, he backed the CAM charges out of the $1.21 per square foot lease rate under the renewal, and included that income as a component of the CAM charges contained in his projections.

1  Plaza Plan was not feasible.

2      Mr. Brungardt was then asked about the additional risk components he had added to the

3  Prime Rate baseline in the interest rate calculations reflected in his report.[169]  With respect to the

4  1.00% feasibility risk addition, he confirmed that he had an extreme amount of concern as to

5  whether all existing tenants would continue to pay their current rental rates for the entire

6  duration of the TJ Plaza Plan.  He conceded that the 1.00% addition for feasibility risk was the

7  same as he had calculated for the prior confirmation hearing in the case, despite the fact that the

8  vacancy rent at the Center had declined from thirty-two percent to twenty-four percent in the

9  interim.  He noted that the significant risks attendant to the Center's operations and occupancy

10  remained unchanged (i.e., Trader Joe's had not exercised a long term renewal option, and TJ

11  Plaza still assumed that all existing tenants would renew their leases at increasing rental rates

12  during the ten-year term of the TJ Plaza Plan).  He acknowledged that the 1.00% feasibility risk

13  addition was an estimate based upon his experience, without any empirical data or study to

14  support it, but disagreed that it was simply speculation on his part.

15      Asked about the 0.50% additional risk component used in his interest rate calculus due

16  to the circumstances of the TJ Plaza estate, Mr. Brungardt confirmed that he had considered a

17  number of factors in reaching that figure:  the quality of the guarantor, the committed sources of

18  cash from TJ Plaza, the absence of common assurances related to plan performance, operating

19  funds shortfalls, the industry TJ Plaza is in, and TJ Plaza's ability to make plan payments.

20      He conceded that the TJ Plaza Plan did not seek to eliminate the personal guaranty of TJ

21  Plaza's principal, Mr. Susa.  He also acknowledged that the original US Bank Loan Documents

22  did not require TJ Plaza to maintain any particular amount of committed sources of cash related

23  to that loan.

24

25  _____

26      [169]Exhibit J, pp. 7-15; Exhibit J, p. 34 and supplement thereto (identified as Exhibit "C"
    of the MCA report).

As to common assurances related to plan performance, while Mr. Brungardt did not identify any particular covenants under the original US Bank Loan Documents that were eliminated under the terms of the TJ Plaza Plan, he did express concern about modifying the escrow agreement for tenant rollovers related to the Trader Joe's leasehold to an account held by TJ Plaza to be funded at its discretion.  He acknowledged that from a historical perspective, TJ Plaza had been able to raise eight hundred thousand dollars for tenant improvements related largely to the Trader Joe's space at the Center.  He conceded that, while the TJ Plaza Plan did not contain common assurances as to the borrower's ability to perform under a commercial loan, such as debt-to-equity ratio and debt service coverage ratio requirements, no such requirements existed under the terms of the original US Bank Loan Documents.[170]  Mr. Brungardt reiterated that he had concerns regarding operating fund shortfalls and TJ Plaza's ability to meet those shortfalls along with the payment requirements contemplated by the TJ Plaza Plan.  He stated that, in his view, TJ Plaza's historical performance in meeting all installment payment requirements prior to the balloon payment due at maturity under the terms of the original US Bank Loan had no impact upon those concerns.  He ultimately agreed that, while the TJ Plaza Plan generally provided for all reserves and impounds required under the original US Bank Loan Documents, he had assigned additional risk to the TJ Plaza Plan because the plan did not contain borrower performance covenants commonly imposed by lenders in the current commercial lending market.  He acknowledged that the 0.50% additional risk component used in his interest rate calculus due to the circumstances of the TJ Plaza estate was an estimate based upon his experience, without any empirical data or study to support it, but disagreed that it was simply speculation on his part.

Mr. Brungardt was next asked about the 1.50% additional duration risk component used

[170]Mr. Brungardt did note that the yield maintenance provisions under the terms of the original US Bank Loan were not included in the TJ Plaza Plan.

in his interest rate calculus.  He acknowledged that the 1.50% additional duration risk component was the same as he had assigned to TJ Plaza's original chapter 11 plan,[171] and reiterated that the 1.50% was less than the yield spread between one-month and ten-year US Treasuries he had examined.[172]  Mr. Brungardt agreed that a small amount of risk was inherent in the Prime Rate.  He was unwilling to concede, though, either that the 1.50% additional duration risk component referenced in his report was duplicative of the risk inherent in the Prime Rate, or that the amount of risk inherent in the Prime Rate was regularly disclosed or readily calculated.

Mr. Brungardt was then asked about the market rate approach he had explored in his interest rate analysis.[173]  He reaffirmed that based upon his communications with various lenders, the current range of interest rates on commercial loans to credit worthy borrowers was between 4.25% and 6.50%.[174]  He agreed that his proposed interest rate of 6.75% was slightly higher than the range of rates available to credit worthy borrowers seeking commercial financing like that contemplated under the TJ Plaza Plan.

With respect to the 0.50% additional risk component used in his interest rate calculus attributable to the nature of US Bank's security, Mr. Brungardt reiterated that his concerns related to the age of the Center, and the loan-to-value ratio of over sixty-five percent.  He noted that the Center had been built in 1979, so at the end of the TJ Plaza Plan it would be approximately forty-seven years old.  He stated that capital improvement expenditures and

---

[171]TJ Plaza's first chapter 11 plan had a plan term of twelve years, two years longer than the plan currently being considered for confirmation.

[172]He also acknowledged that between the date of his report and the date of his testimony, the yield spread had declined from over 2.00% to approximately 1.65%.

[173]Exhibit J, p. 35 and supplement thereto (identified as Exhibit "D" of the MCA report).

[174]Mr. Brungardt noted that he had also contacted Inca Capital, a private or "hard money" lender, who charged interest rates of between ten percent and eleven percent.  He observed that such loan was not contemplated under the terms of the TJ Plaza Plan.

deferred maintenance costs would increase as the Center aged during the term of the TJ Plaza Plan, and would be magnified if TJ Plaza departed from the Center.  He stated that potential purchasers would consider exposure to those costs a significant risk to their investment, particularly if the Center's loan-to-value ratio exceeded sixty-five percent.  As a result, he stated that a 0.50% additional risk component was appropriate given the nature of the collateral provided by the Center.  He conceded that if TJ Plaza's assertions as to the required loan ($5.1 million) collateralized by the Center's value ($7.6 million), the sixty-five percent loan-to-value ratio already existed.[175]  He stated that, if the required loan was $6.1 million and the value of the Center was $6.6 million, investors would not view the $500,000.00 equity cushion as sufficient to ensure that all costs attendant to foreclosure and liquidation of the Center would be recouped if the TJ Plaza Plan were to fail.[176]  He found it unsurprising that US Bank had never claimed to be undersecured during the case, but stood by his opinion that a 0.50% additional risk component was appropriate given the nature of the collateral provided by the Center.

Mr. Brungardt acknowledged that if TJ Plaza's assumptions and projections proved accurate and all required plan payments were made, the debt-to-equity ratio at the Center would be about 57% ten years after TJ Plaza's exit from bankruptcy.  Asked if at that point TJ Plaza could obtain financing secured by the Center, Mr. Brungardt said most borrowers in such a scenario would have a good chance of obtaining such financing if their leases were stable and their payment history was good.

On redirect examination, Mr. Brungardt reaffirmed that he had considered Colliers

---

[175]The Court notes that the loan-to-value ratio under those assumptions is actually 67.11%.

[176]Mr. Brungardt testified that if foreclosure costs are eight percent, and the value of the Center is assumed to be $6.1 million, the foreclosure costs would be $488,000.00.  The Court notes that if foreclosure costs are eight percent, the value of the Center is assumed to be $6.6 million, and the outstanding loan is assumed to be $6.1 million, the foreclosure costs would be $528,000.00, exceeding the $500,000.00 of available equity in the Center by $28,000.00.

International's Third Quarter 2015 Las Vegas Retail Report in preparing his written report and opinions.[177]  He noted that the Colliers report indicated that the average asking rental rate for the West Central portion of the Las Vegas valley, where the Center is located, was $1.04 per square foot per month, or $12.48 per square foot per year.[178]  He was next asked about his observation that if TJ Plaza's assumptions and projections proved accurate, the Center's leases were stable, and all required plan payments were made, TJ Plaza would have a good chance of obtaining financing secured by the Center.  He acknowledged that the TJ Plaza Plan contained no provisions regarding the potential sources for, or terms of, any such financing at the end of the ten-year plan term.  He noted that he was not aware of any commercial lender who would make such a commitment ten years in the future based solely upon projections prepared by a potential borrower.  According to Mr. Brungardt, any potential lender would engage in a significant underwriting effort, including a review of all leases, the duration of and time remaining under existing leases, additional information regarding the anchor tenant's commitment to remaining in the Center, available cash set aside for additional capital improvement and deferred maintenance expenses, an updated appraisal, preparation of the lender's own financial projections regarding the Center's value, and an evaluation of the status of any junior debt secured by the Center.

### 7. Melissa Vis–Asset Manager with LNR Partners, LLC, Special Servicer for US Bank

Ms. Vis testified by video conference, and confirmed that she had received a copy of all exhibits identified by the parties.  She stated that she attended the University of Miami for her undergraduate studies, and obtained a Masters of Business Administration degree from the University of Virginia.  She stated that she was currently employed as an asset manager for

[177]Exhibit J, p. 24 at n.28.

[178]Id.

LNR Partners, LLC ("LNR"), where her responsibilities were to manage a portfolio of loans in both performing and non-performing status. As to the non-performing loans within the portfolio assigned to her, she stated that it was her responsibility to deal with and enforce the terms of the pertinent loan documents.

Ms. Vis explained that LNR was a special servicer for US Bank. She stated that the role and duties of a special servicer included attempting to work out loans upon default, and ultimately to enforce the terms of loan documents for the benefit of the lender.[179] She observed that servicing of mortgage loans held by a REMIC trust is different from servicing a standard commercial mortgage loan. The difference is due to the fact that in a standard commercial loan, there is typically a single borrower and a single lender whose rights are advanced by the servicer upon default. Servicing of mortgage loans held in a REMIC trust is different, because multiple commercial loans are packaged and placed into the REMIC trust, and are collectively referred to as commercial mortgage backed securities ("CMBS Loans"). The CMBS Loans are then serviced for the benefit of multiple investors holding an interest in the REMIC trust, often including the lender(s) under the CMBS Loans held by the REMIC trust.

Ms. Vis testified that a prepayment premium provision was included under the terms of the original US Bank Loan. She testified that prepayment premiums are common in CMBS Loans, and are designed to protect the investors in REMIC trusts that hold the CMBS Loans. More particularly, the investors in the REMIC trusts (whose investments are often evidenced by bonds) expect a fixed rate of return over the full term of their investment. She stated that the prepayment premium provisions in CMBS Loans held in a REMIC trust ensure that investors in the REMIC trust receive their full expected rate of return on their investment, even if one or

---

[179]Ms. Vis explained that LNR was employed by US Bank to enforce the terms of the US Bank Loan for the benefit of a REMIC trust. She stated that a REMIC trust is a Real Estate Mortgage Investment Conduit Trust, a trust formed to hold commercial mortgages on behalf of bondholders.

more of the CMBS Loans held in the REMIC trust are paid off prior to maturity.  Ms. Vis observed that because the US Bank Loan obtained by TJ Plaza and secured by the Center had already matured, LNR was not seeking to recover any prepayment premium in connection with that loan.

Asked about the loan portfolio assigned to her by LNR, Ms. Vis stated that she was familiar with the general terms contained in promissory notes and deeds of trust executed in connection with commercial mortgage loans.  She indicated that her current portfolio at LNR consisted of approximately fifty commercial mortgage loans, ranging in size from $2 million to over $200 million, the majority of which were in non-performing status.  She indicated that when a commercial mortgage loan first reaches non-performing status LNR, in its role as servicer, would typically reach out to the borrower to pursue workout discussions.  She noted that when a non-performing commercial mortgage loan is undersecured, the borrower will typically negotiate for a voluntary surrender of the property.  She indicated that only a small portion of the mortgage loans assigned to her at LNR are resolved through chapter 11 bankruptcy proceedings, and stated that only three of the loans in her portfolio were involved in chapter 11 cases.[180]

Ms. Vis testified that she had been the LNR representative primarily responsible for servicing the US Bank Loan since July 2013.  She stated that the US Bank Loan was transferred to her as the result of a payment default at maturity of the loan.  She confirmed that she had reviewed and was familiar with the terms of the original US Bank Loan Documents.[181]  She observed that the original principal amount of the US Bank Loan was $5.1 million, with interest accruing at 5.58% annually, a ten-year term, and a maturity date of July 13, 2013.

---

[180]Ms. Vis also noted that some other loans in her portfolio were involved in chapter 7 bankruptcy proceedings.

[181]Exhibit 2.

88

Asked about the balance due under the US Bank Loan, Ms. Vis referred to a payoff statement prepared by LNR dated January 31, 2016.[182]  She noted that, while the payoff statement did not include third party expenses not yet billed to the lender,[183] it did include appropriate credits for all payments made by TJ Plaza, as well as funds in suspense, escrow and reserve accounts.  She recalled that the default rate of interest was four percent per annum above the contract rate, and stated that it was LNR's intent to collect interest at the default rate in accordance with the terms of the original US Bank Loan.  She also indicated that LNR would seek to collect late payment fees calculated at five percent of the amount of all missed payments in accordance with the terms of the original US Bank Loan.  She confirmed that the payoff amount for the US Bank Loan calculated by LNR, subject to true-up for not-yet-billed attorney fees and accrued interest, was $6,224,470.67 as of January 31, 2016.[184]

Ms. Vis confirmed that she was familiar with the July 9, 2003, Deed of Trust encumbering the Center, and securing repayment of the US Bank Loan.[185]  She also confirmed that she was familiar with the July 9, 2003, assignment of leases and rents executed in connection with the original US Bank Loan.[186]  She noted that the assignment of leases and rents was important from the lender's perspective, since the income from leases and rents at the Center was the primary source of revenue to be used in paying operating expenses and repaying the US Bank Loan.  She also verified her familiarity with the escrow agreement for tenant

---

[182]Exhibit 222.

[183]Ms. Vis observed that there were not-yet-billed legal fees for the months of November 2015, December 2015, January 2016, and February 2016, as well as additional accrued interest at the contract and default rates specified in the original US Bank Loan Documents.

[184]Exhibit 222.

[185]Exhibit 3.

[186]Exhibit 4.

rollover executed in connection with the US Bank Loan.[187]  She explained that the purpose of the escrow agreement for tenant rollover was to ensure that funds would be held on deposit with US Bank in an amount sufficient to pay tenant improvement costs and leasing commission expenses in connection with the renewal of the Trader Joe's lease, or replacement of Trader Joe's as a tenant if they opted to vacate their space at the Center.  She said that the escrow agreement for tenant rollover was a particularly important component of the original US Bank Loan due to Trader Joe's status as an anchor tenant at the Center.  She stated that in her view, it was unlikely that the US Bank Loan would have been made without such an agreement in place.

Asked about the availability of junior financing secured by the Center, Ms. Vis turned her attention back to the deed of trust securing repayment of the original US Bank Loan.[188]  She noted that such junior financing was available to TJ Plaza, subject to multiple steps and limitations, including US Bank approval of the terms of the junior financing; subordination of the junior lender's lien to US Bank's deed of trust against the Center; an eighty-percent loan-to-value ratio limitation; and a minimum debt service coverage ratio of 1.4.  She explained that the junior financing provisions in US Bank's deed of trust were important from the lender's perspective, because they protected the equity in the Center, and generated a higher likelihood of refinancing at maturity of the original US Bank Loan.  She also noted that such provisions regarding junior financing are common in commercial mortgage loan documents, and that she did not believe the original US Bank Loan would have been made without them.

Ms. Vis next confirmed that she had reviewed the terms of TJ Plaza Plan.[189]  She noted that, while the TJ Plaza Plan contemplated a ten-year repayment term, and stated that the lender was unwilling to consider a loan of that duration.  She explained that the original US Bank Loan

[187]Exhibit 6.

[188]Exhibit 3, pp. 23-27, Section 1.13.

[189]Exhibit 228.

matured in 2013, was nearly three years past maturity, and an additional ten-year extension would effectively make the loan term twenty-three years, longer than the lender deemed acceptable.  She noted that the TJ Plaza Plan provided for an interest rate of 4.53%, which was likewise unacceptable to US Bank.  She explained that not only was the proposed interest rate lower than the 5.58% interest rate provided for under the original US Bank Loan, it was a very low rate that did not adequately compensate the lender for the risk attendant to a ten-year loan term, and other significant risks such as losing Trader Joe's as an anchor tenant at the Center, and the risk of TJ Plaza's default during the plan term.  For those same reasons, Ms. Vis indicated that US Bank would not consider a loan that provided for interest-only payments for the first two years as contemplated by the TJ Plaza Plan.

Ms. Vis also noted that the TJ Plaza Plan proposed to eliminate the escrow agreement for tenant rollover, and to instead allow TJ Plaza to fund a tenant rollover account of its own in its discretion.  Ms. Vis indicated it would be US Bank's preference to continue the escrow deposit requirement, and to hold the related funds in an escrow account.

Ms. Vis testified that it was her understanding that the TJ Plaza Plan also permitted TJ Plaza to incur junior financing without prior approval from US Bank.  She stated plainly that such a provision was not acceptable to US Bank.

Asked whether it was accurate to state that TJ Plaza had made every installment payment under the original US Bank Loan prior to maturity, Ms. Vis answered in the negative.  She testified that TJ Plaza had missed the June 2013 installment payment, which was the last payment prior to the maturity date of the original US Bank Loan.

Ms. Vis was next asked about the ballot cast by US Bank, as transferee of the Sewer Claim, rejecting the TJ Plaza Plan.[190]  Ms. Vis noted that the ballot was executed by on behalf of US Bank by Arnold Shulkin, LNR's vice president and director of loan asset management.

---

[190]Exhibits 158 and 159.

As to US Bank's First Amended Plan of Reorganization (the "US Bank Plan"),[191] Ms. Vis testified that the plan was a straightforward marketing and sale plan that contemplated exposing the Center to a market for potential sale if a Qualifying Offer[192] was received.  As to the treatment of TJ Plaza's unsecured creditors, and creditors holding allowed administrative claims, Ms. Vis said that the US Bank Plan proposed to pay those creditors in full on the effective date.[193]  She stated that the source of the required payment would be from TJ Plaza's cash collateral account, and that if there was a shortfall, US Bank had agreed to advance the amounts necessary to pay those creditors in full.[194]

Asked about US Bank's secured claim, Ms. Vis testified that the US Bank Plan provided for full payment of that claim as itemized on LNR's payoff statement dated January 31, 2016,[195] including advances made by US Bank, interest at the contract rate, default interest, late fees, and attorney fees and costs if a qualified bid for the Center was received.[196]  Asked about treatment of TJ Plaza's equity interests, Ms. Vis said that the US Bank Plan did not contemplate any payment to equity holders, but noted that if a bid higher than a Qualifying Offer was received for the Center, the excess over plan administration costs would be distributed to equity holders.[197]

---

[191]Exhibit S.

[192]The US Bank Plan defines the term "Qualifying Offer" as "any offer equal to or greater [sic] the sum of the Class 1 Lender Secured Claim, the Plan Administrator's fees and costs, the Effective Date Advance and the Allowed Administrative Claims Advance."  Exhibit S, ECF No. 895, p. 12 of 31.

[193]Exhibit S, ECF No. 895, pp. 15-16 of 31 (Sections 3.02, 3.03, 3.05, and 3.06).

[194]See definition of "Effective Date Advance" at Exhibit S, ECF No. 895, p. 9 of 31.

[195]Exhibit 222.

[196]Exhibit S, ECF No. 895, p. 16 of 31 (Section 3.04).

[197]Exhibit S, ECF No. 895, p. 16 of 31 (Section 3.07).

Asked about the marketing and sale of the Center as contemplated under the US Bank Plan, Ms. Vis explained that the plan contemplated the appointment of a Plan Administrator vested with authority to appoint a manager and hire a real estate broker to market the Center for sale.  She said that the related costs would be paid from the proceeds of the sale of the Center.[198] She explained that under the US Bank Plan, the Center would be marketed for a period of two hundred days, with an additional seventy days to close a sale if a Qualifying Offer[199] is received during that marketing period.[200]  She also noted that the US Bank Plan afforded the Plan Administrator authority to ask the Court to extend either the two-hundred-day marketing period, the seventy-day time period to close, or both if appropriate.  She stated that under the US Bank Plan, upon receipt of a Qualifying Offer, the Plan Administrator would bring that offer to the Court for approval.[201]  Asked whether US Bank had voted to accept the US Bank Plan, Ms. Vis confirmed that it had.

Asked how long she had worked for LNR, Ms. Vis said she had worked there for approximately six years, and that she had serviced distressed loans for four-and-a-half to five years.  She stated that she had serviced loans to chapter 11 debtors on four occasions and reached a consensual agreement with one such debtor at some point during 2014.

Ms. Vis was then questioned about her familiarity with the original US Bank Loan Documents.  She stated that she did not know how the 5.58% interest rate under the US Bank Loan was established.  She stated that although she had reviewed the TJ Plaza loan file, and believed that an appraisal report regarding the Center had been prepared prior to the original US

---

[198]Exhibit S, ECF No. 895, pp. 19-23 of 31 (Sections 7.01through 7.04, inclusive).

[199]See definition of "Qualifying Offer" at Exhibit S, ECF No. 895, p. 12 of 31.

[200]See definitions of "Sale Date" and "Close Date," Exhibit S, ECF No. 895, pp. 8 and 13 of 31.

[201]Exhibit S, ECF No. 895, p. 22 of 31, Section 7.02.

Bank Loan in 2003, she had not been able to locate or review a copy of such a report. She said that the underwriting file related to the US Bank Loan indicated that the Center had a value of approximately $6 million when the original US Bank Loan was made in 2003. She reiterated that TJ Plaza had failed to make the last installment payment under the original US Bank Loan prior to maturity when it was due on June 11, 2013. When asked if TJ Plaza had remitted that payment on or about October 2, 2013–approximately four months late–she stated that did not alter the fact that the final installment payment had not been timely remitted, and that the payment in October 2013 was received after the original US Bank Loan had matured.[202] Ms. Vis indicated that she was unaware of any negotiations between TJ Plaza and US Bank or another servicer as of October 2013, or why TJ Plaza had remitted two separate payments of $36,133.76 well after the original US Bank Loan had matured. She also noted that the original US Bank Loan did not provide for a payment grace period, reiterated that those two $36,133.76 payments were made after the US Bank Loan had matured, and noted that correspondence regarding both payments referred to them as "partial payments."[203] She conceded that the two $36,133.76 payments made post-maturity in the late fall of 2013 were in the same amount as the regular monthly payments under the original US Bank Loan, but because the payments were late and made after maturity, refused to acknowledge that those payments were full monthly payments on that loan. She also pointed out that there were no payments made by TJ Plaza for five months after the US Bank Loan matured (i.e., TJ Plaza made no payments in June, July, August, September, or October 2013). Ms. Vis stated that, with the exception of the June 2013 payment and the balloon payment, she was not aware of any pre-maturity payments that had been missed by TJ Plaza during the ten-year term of that loan. She also stated that she was not aware of any impound, escrow, or property tax payments that TJ Plaza had missed during the

---

[202]See Exhibit 225.

[203]Id.

term of the US Bank Loan.  She further stated that she was not aware that TJ Plaza had failed to maintain appropriate insurance on the Center during the term of the original US Bank Loan.

Asked about the January 31, 2016, payoff statement LNR had prepared regarding the original US Bank Loan,[204] Ms. Vis noted that the principal balance due on the matured loan was $4,289,897.90; that unpaid interest due at the contract rate of 5.58% totaled $661,609.50; that unpaid interest due at the default rate of 4.00% totaled $459,495.73; and that unpaid late fees, accruing at 5.00% on all missed payments including the balloon payment due at maturity, totaled $216,332.32.  She also noted that interest continued to accrue under the matured US Bank Loan at the per diem rate of $1,141.59.  She testified that the total amount of accrued but unpaid interest and late fees due under the matured US Bank Loan, as shown on the LNR payoff statement, totaled $1,337,437.55; collection and administrative expenses related to that loan totaled $902,688.98; and that the total amount of unpaid interest, late fees, collection and administrative expenses related to that loan was $2,240,126.53.[205]  Asked to divide that amount by the unpaid principal balance of the matured US Bank Loan, Ms. Vis stated that the resultant percentage was slightly over fifty-two percent.  She also acknowledged that dividing the $902,688.98 total in accrued but unpaid collection and administrative expenses related to the matured US Bank Loan by the six hundred twenty-one days that TJ Plaza had been in bankruptcy yielded a per diem amount of $1,211.85 for collection and administrative expenses accrued during the bankruptcy case, or $70.26 more than the per diem rate of interest on the matured US Bank Loan.[206]  She stated, though, that the amounts due for collection and

[204]Exhibit 222.

[205]Ms. Vis observed that the total did not include attorney fees for US Bank in November 2015, December 2015, or January 2016.

[206]Ms. Vis was also asked about per diem amounts for collection and administrative expenses yielded under a "business day" calculus.  Reducing the denominator from seven to five, unsurprisingly, yielded a higher per diem figure for collection and administrative expenses related to the matured but unpaid US Bank Loan.

administrative expenses related to the matured but unpaid US Bank Loan were reasonable under all of the circumstances surrounding that loan.  She also testified that those amounts were consistent with the terms of the written documents executed by TJ Plaza when it took out the US Bank Loan in 2003.

When asked why she did not believe that the TJ Plaza Plan did not properly protect US Bank from risk attendant to the financing called for by the plan, Ms. Vis stated that there were significant existing risks related to the Center and the sponsors of the TJ Plaza Plan.  She testified that the terms of the financing proposed in the TJ Plaza Plan did not factor in those risks, and could be better structured to address them.  She said that she believed that if foreclosure became necessary, there was a risk that the US Bank Loan would not be paid in full, particularly in light of the uncertainty surrounding Trader Joe's month-to-month tenancy at the Center.

### 8.    Jeffrey Jacobs–US Bank's Proposed Plan Administrator

Mr. Jacobs testified that he holds a Bachelor's degree in accounting conferred by the University of Nevada, Las Vegas ("UNLV").  After completing his studies at UNLV, Mr. Jacobs became a Certified Public Accountant in the State of Nevada.  He worked for three years for Arthur Anderson, two-and-a-half of those as a senior auditor focusing primarily on gaming and internal controls.  He was next employed by an internet company in Seattle, preparing the company's filings for submission to the Securities and Exchange Commission.  He then worked for Starbucks Coffee Company in Seattle, preparing its filings for submission to the Securities and Exchange Commission.  He returned to Las Vegas in 2006, and from that point forward worked in the real estate industry, specializing in commercial receiverships and serving as a chief financial officer for an HOA management company.  He testified that he was currently employed as the Senior Vice-President of Receivership Services for B & R Property Management ("B & R"), as well as chief financial officer for level property management.

Mr. Jacobs stated that B & R manages approximately five thousand multi-family

apartments.  He explained that his duties in managing those apartments included hiring trained staff, including leasing agents and on-site management and maintenance staff for the properties, and contracting with vendors and service providers related to maintenance and upkeep of the properties.  He stated that B & R also prepares operating budgets for review with the owners of the properties, and establishes operating plans for the properties.  He explained that, while B & R does not directly manage any retail centers, its commercial receivership unit contracts with other service providers to oversee retail center properties, and to lease vacant space in such centers.  He stated that he had been appointed to serve as a receiver by courts in Nevada over fifty times, the majority of which were distressed commercial properties, primarily multi-family, retail and office centers.

Asked about how B & R engaged other service providers to manage commercial retail centers in receivership proceedings, Mr. Jacobs explained that each property is unique.  As a result, he said that B & R would look for service providers experienced in dealing with the asset type present in the receivership.  For a commercial retail center, B & R would look for a service provider with strong background in relationships within that particular niche market.  He noted that B & R would probably retain one broker for a small unanchored retail center, but a different broker for a larger anchored retail center.  He indicated that the key was to retain a broker that would actively work the relevant center and bring in new tenants.

Mr. Jacobs said that B & R had hired professionals to market and sell commercial properties in receivership on six different occasions.  He explained that, in those cases, B & R as receiver would obtain court approval to market and sell the property, retain a broker to market the property, inform the receivership court as to the offers received for the property, and bring the best and final offer forward for court approval.  If the receivership court approved the best and final offer, the transaction would move forward to closing.

Asked to review the US Bank Plan,[207] Mr. Jacobs confirmed that he was generally familiar with the plan. He said that he was aware that the US Bank Plan called for marketing and sale of the Center, and the appointment of a Plan Administrator to carry out that task. He stated that he was aware of the twenty-six specified duties to be carried out by the Plan Administrator under the terms of the US Bank Plan,[208] and confirmed that he had experience in carrying out each of those specific duties by virtue of his work experience at B & R and as a state court receiver. He stated that he would be able to discharge each of those duties if appointed to serve as Plan Administrator, but reiterated that he would require assistance from other retained professionals in doing so. Asked if the Plan Administrator's duties under the US Bank Plan encompassed the filing of tax returns for TJ Plaza, or to wind down TJ Plaza's business affairs, Mr. Jacobs answered in the negative.[209]

Mr. Jacobs reaffirmed that the Plan Administrator's duties under the US Bank Plan included the marketing and sale of the Center.[210] He said that he understood that the Plan Administrator would have two hundred days to market the Center, and if a qualified offer was obtained, to present that offer to the Court for approval. He stated that, upon Court approval of a qualified offer, the Plan Administrator would have seventy days to close the related transaction. He stated that both the two-hundred-day marketing period and the seventy-day period for closing of a transaction could be extended by court order. He also said that if no qualified offer was obtained, the automatic stay in bankruptcy would be terminated, and US Bank could proceed with foreclosure against the Center.

---

[207]Exhibit S, ECF No. 895.

[208]Exhibit S, ECF No. 895, pp. 19-21 of 31 (Section 7.01).

[209]His testimony was in keeping with the text of the US Bank Plan. Exhibit S, ECF No. 895, p. 21 of 31 (Section 7.01 at ll. 18-26).

[210]Exhibit S, ECF No. 895, p. 22 of 31 (Section 7.02).

Mr. Jacobs was then asked what his compensation would be if he were appointed to serve as Plan Administrator under the US Bank Plan. He said his fee would be a flat $3,000.00 per month. He stated that the third-party professionals he would hire for management, marketing and leasing of the Center would be an expense beyond his flat fee, and that those professionals would be chosen through a competitive bidding process. He was not, however, able to present an estimate of the additional fees to be incurred as a result of hiring third-party professionals necessary to carry out the duties of the Plan Administrator under the US Bank Plan.

Mr. Jacobs was next asked why the TJ Plaza bankruptcy estate should be required to compensate him as a Plan Administrator when he would admittedly have to retain third-party professionals to carry out his duties. He replied that in addition to being able to carry out many of the Plan Administrator's duties on his own, he would provide independent oversight that would not be present if such professionals were retained directly by the estate. He acknowledged that Mr. Susa had been providing management services for the Center for over ten years.

### 9.    Brendan Keating–Commercial Real Estate Broker

Called to testify in connection with US Bank's case in chief, Mr. Keating testified that he received dual Bachelor's degrees in finance and entrepreneurship from Creighton University in 2004. After graduating from college, he stated that he obtained real estate broker licenses in Nebraska, South Dakota, and Nevada, as well as a Nevada mortgage agent license. He explained that his Nevada real estate broker license enabled him to sell and lease commercial real estate, and manage other real estate agents. He said that he obtained his Nevada real estate broker license in December 2005. He stated that his Nevada mortgage agent license authorized him to assist clients in locating financing sources for commercial real estate transactions, and to charge a fee for that assistance. He testified that, in his ten years of experience as a Nevada real estate broker, he specialized in sales and leasing of commercial retail shopping centers. He said

that such activities comprised about seventy-five percent of his business operations.

Mr. Keating said that after graduating from college, he went to work for The Lund Company in Omaha, Nebraska, in July 2004. His duties at The Lund Company included involved commercial real estate sales and leasing transactions. In December 2005, he moved to Las Vegas, and began working for an entity called The Equity Group. When he joined The Equity Group, it had an existing property management business, but did not conduct any commercial real estate brokerage operations. Mr. Keating explained that he was involved in the startup of commercial brokerage business operations, and became an owner in The Equity Group in 2007. He said that during his tenure, he managed twenty-two agents, and the transactional volume of the commercial brokerage business operations at The Equity Group grew from near zero to over $6 million annually resulting from approximately three hundred transactions per year. He stated that, in addition to property management and brokerage operations, The Equity Group also provided investment sales and leasing. He testified that he left The Equity Group in July 2015, and started his own commercial real estate company called Logic Commercial Real Estate ("Logic"), where he is currently the Chief Executive Officer. He explained that, when he left The Equity Group, eighteen agents came with him to start up Logic, and that Logic is comprised of a property management department, a capital markets department, and a development services department. He noted that Logic had been involved in commercial real estate investment sales transactions totaling $35 million in the forty-five days prior to his testimony. He said that as a Nevada real estate broker since 2005, he had been involved in commercial real estate sales and leasing transactions totaling $450 million. Approximately seventy-five percent of those transactions were retail transactions, and $300 million of which involved investment sales. He said that the bulk of the transactions he handled as a broker involved retail centers, office centers, and a small number of industrial and land projects.

Mr. Keating explained that his duties as the CEO at Logic involved representation of

investors and landlords seeking to sell their properties, and management of the day to day operations of the company. He reaffirmed that he also oversees the activities of the 18 agents that joined Logic at its inception, helping them to avoid common issues in commercial real estate transactions, and to deal with those issues that could not be avoided as they arise. He said that he also helped the agents assess the seller's asking price in specific transactions to determine whether the price was overreaching, or was representative of a reasonable market price.

Mr. Keating testified that when a client retains his services to assist in the sale of a retail shopping center, he would typically begin by walking the property to be sold with the client to gain an understanding of the property's condition. He would then review the rent roll for the center, and review the financial statements related to the center's historical business operations. He would spend a significant amount of time looking into leasing assumptions, leasing and sales data for comparable properties, and would evaluate the strength of the cash flow generated by the property, making sure that the cash flow was appropriate based upon the data he had reviewed. He would next evaluate what the market would pay for that cash flow, and advise the owner of the property what an appropriate asking price would be for the property. Once an agreement with the owner was reached regarding the asking price, and a listing agreement was signed, Mr. Keating said that he would develop a marketing strategy and offering memorandum for the property. Thereafter, he would engage in marketing efforts for the center, and pursue interest from potential buyers until a letter of intent acceptable to the client was obtained, a purchase agreement was executed, an escrow was established, and the sale transaction closed.

Asked about his involvement with court supervised sales transactions, Mr. Keating said that he had been involved with several state court receivership sales, and one bankruptcy sale. He said that he had served as both the listing agent and the buyer's agent in connection with those sales.

Mr. Keating was next asked about a written marketing analysis report he had prepared

101

regarding the Center at the request of US Bank.[211]  He indicated that he had been retained to

prepare opinions as to the amount of money the Center could be expected bring through a

marketing and sale process if Trader Joe's remained a tenant, or alternatively, vacated the

Center.  Additionally, he had been retained to develop opinions as to the current market rent

rates, the best strategy for the marketing and sale of the Center in order to identify potential

purchasers, as well as issues that could potentially impact upon the sale of the Center.

In developing his opinions, Mr. Keating stated that he had performed a visual inspection

of the Center, reviewed the existing leases and rent roll, reviewed financial reports provided by

TJ Plaza, and prepared his own financial analysis regarding the Center.  In his analysis of

market leasing rates in Nevada, he indicated he had utilized a third-party software program.  He

stated that, after his report was finalized, he reviewed a transcript of the deposition of Trader

Joe's representative Douglas Yokomizo, as well as the appraisal reports prepared by Messrs.

Anderson and Dietrich as to the value of the Center.

Mr. Keating indicated that based upon his visual inspection of the Center, he considered

the Center to be in generally good condition, and that he had not noted any deferred

maintenance necessary for marketing and sale purposes.  He said that reconciliation of the

leases and rent roll identified some slight issues, but in general terms the rent roll and operating

expense data for the Center proved to be consistent with the financial information maintained

by TJ Plaza.  He indicated that such a reconciliation was important, as potential purchasers

would focus primarily on the cash flow provided by the Center, and ensuring the accuracy of

key financial data would avoid potential issues in the marketing and sale process.

Mr. Keating indicated that based upon his review of the Center and the deposition of

Douglas Yokomizo, he was aware that Trader Joe's remained in the Center as a month-to-

month tenant.  He also said that in his estimation, he did not think that Trader Joe's would be

---

[211]Exhibit Y.

renewing its lease going forward.  He indicated that the status of the Trader Joe's tenancy was

of importance in preparing his opinions, as the Trader Joe's lease encompassed about twenty-

six percent of the gross leaseable area in the Center, and yielded approximately forty percent of

the income generated by the Center.  As a result, Trader Joe's tenancy would be what investors

focused upon from an underwriting standpoint.  Mr. Keating said that the other shop spaces

within the Center appeared to be stabilized and within market rent rates.

Turning to the summary of lease analysis and market conditions portion of his written

report,[212] Mr. Keating explained that he had, through the use of third-party software, analyzed

both vacancy rates and asking rental rates for retail centers in the geographical area where the

Center is located[213] for the ten-year period from 2005 through 2015.  He stated that the data

showed that, while vacancy rates had declined from their peak in 2009-2010, asking rental rates

had not rebounded from a steep decline.  As to the Trader Joe's space at the Center, Mr. Keating

indicated that the market rate for that space would be between $10.00 and $13.00 per square

foot annually.  He said that the market rate was probably closer to the $10.00 per square foot

rate, but acknowledged that renewing tenants sometimes renew at above-market rates because

the tenant knows what their sales have been historically, and the risk to their business of

relocating.  He reiterated that the smaller leaseholds within the Center were generally within

what he considered to be market rates, substantiated by the renewal rate of the Dotty's lease.

He said that he did not believe that potential purchasers would mark the leasing income from

the smaller tenants either down or up.  He noted that there was an inverse relationship between

the rental rate for Trader Joe's on the one hand, and the rental rates for smaller tenants at the

Center on the other.  He said that was atypical in a retail center, as rates charged to anchor

---

[212]Exhibit Y, p. 5.

[213]The geographical boundaries reflected in his report were U.S. Highway 95 on the
north, Desert Inn Road on the south, Interstate 15 on the east, and Rainbow Boulevard on the
west.

tenants like Trader Joe's are commonly less than the rates charged to smaller tenants.

Mr. Keating indicated that Trader Joe's month-to-month tenant status was of particular concern in his analysis, because tenants with available renewal options typically exercise them promptly to avoid losing the space to a competitor. He also stated that Trader Joe's month-to-month tenancy would also impact the marketing and sale process, because potential purchasers would view such a tenancy as reliable income going forward.

Asked whether he had also considered comparable sales in his analysis, Mr. Keating answered in the affirmative.[214] He said that a comparable sales analysis provided insight into what potential purchasers would consider the market to be in deciding whether to purchase an asset like the Center. He testified that, based upon his comparable sales analysis, marketing the Center at a price between $6.25 million and $6.75 million was consistent with current market conditions and recent sales in the area where the Center is located.[215]

With respect to the recommended strategy for marketing the Center,[216] Mr. Keating said that after a listing agreement was executed, he would build a thirty- to forty-page offering memorandum containing salient information regarding the Center and would then engage in a nationwide marketing process including emails and telephone calls directed to suitable purchasers.[217] After receipt of letters of intent from interested buyers, he said that he would

---

[214]Exhibit Y, pp. 17 and 18.

[215]Exhibit Y, p. 7.

[216]Exhibit Y, p. 6.

[217]See id. Mr. Keating indicated that the market for assets like the Center was generally comprised of investors from California, and parties seeking to obtain the tax benefits attributable to a 1031 property exchange. He indicated that parties seeking 1031 exchange benefits were of particular interest, as their interest in acquiring an asset like the Center is not motivated exclusively by the income generated by the asset.

work with those buyers to identify the best potential sale,[218] convert that buyer's letter of intent into a purchase agreement, and then proceed to close the sale transaction.  He said that the two biggest issues in connection with obtaining a successful sale would be to ensure that the buyer understood the issues arising from Trader Joe's month-to-month tenancy, and that the sale would require court approval.  From a timing standpoint, he testified that a successful marketing and sale campaign for an asset like the Center would generally require a sixty-day marketing period, followed by a ninety-day period to close the transaction with the ultimate purchaser.[219]

Asked about the costs attendant to the marketing and sale process regarding the Center, Mr. Keating said that he would budget $500,000.00 for any necessary maintenance and repair costs to ensure that the Center remained in saleable condition, in addition to a four percent broker commission related to the sale.  He indicated that those costs would be borne by TJ Plaza as the seller, and would typically be paid from the proceeds generated by a successful sale of the Center.

As to whether he had ever authored any published articles on the topic of market analysis in the past ten years, Mr. Keating said he had not.  He also acknowledged that he had not previously testified as an expert witness in the past four years.  Directed to a copy of his curriculum vitae,[220] he acknowledged that Logic was the subsidiary of a Delaware company, and while office lease arrangements and other preparatory work began in July 2015, the organizational papers forming Logic were not filed with the Nevada Secretary of State until August 2015.  He also agreed that in addition to being an owner of Logic, he was also a manager of that company.  He conceded that Logic had only been formed about four months

---

[218]A summary of desirable characteristics in a potential purchaser are spelled out in Mr. Keating's report.  See Exhibit Y, p. 6.

[219]Exhibit Y, p. 6.

[220]Exhibit EE.

before his written report was prepared, and that, while Logic's website was not currently operational, it was scheduled to go live March 1, 2016.  He also agreed that, while his written curriculum vitae said that he had been a commercial real estate broker with The Equity Group from December 2005 through July 2015, he had not actually obtained his Nevada broker's license until March 2009.

Mr. Keating said that, while he had reviewed the appraisal reports prepared by Messrs. Anderson and Dietrich, he had failed to identify them as documents reviewed in preparing his own report.  He acknowledged that he is not a certified general appraiser in the state of Nevada. He conceded that he does not hold an either an MAI certification, an SRA certification, or an AI-GRS designation from the Appraisal Institute.  He stated that, because he did not hold such certifications and designations, he was very careful not to express opinions as to the value of real estate.  He stated that his opinions were limited to a marketing analysis, and that he would defer to the expertise of certified appraisers on the question of the value of the Center.  He noted, though, that he trusted his own expertise in developing an effective marketing and sale strategy for a particular property more than a simple opinion of value from an appraiser.  He acknowledged that the $6.25 million low-end asking price for the Center reflected in his report was well below the appraised values set forth in the appraisal reports prepared by Messrs. Anderson and Dietrich, but reiterated his belief that such pricing was appropriate in connection with the marketing and sale of the Center.

Mr. Keating reaffirmed that his report set the market value of the Trader Joe's lease at between $10.00 and $13.00 per square foot annually, even though Trader Joe's was currently paying nearly twice that amount under its month-to-month tenancy arrangement at the Center. He said that was not surprising, as the market rental data varied widely due to the historical decline in leasing rates in the area where the Center is located.[221]  He stated that he was

---

[221]Exhibit Y, p. 5.

uncertain as to why Trader Joe's had not exercised its right to renew its lease at the Center.

When asked about the comparable leasing data set forth in his report, Mr. Keating acknowledged that he had used two leases at the Sahara Pavilion North, and one at the Sahara Pavilion South in preparing his report.  He agreed that the Sahara Pavilion properties were across the street from the Center, and that two of the three comparable leases at those properties were for rent rates of $1.35 and $1.50 per square foot per month, or between $16.20 and $18.00 per square foot annually.  He acknowledged that those rental rates were significantly higher than the $10.00 to $13.00 range referenced in his report, but stated that the Center differed significantly from the Sahara Pavilion properties due to location, visibility, and access from surrounding streets.

Mr. Keating confirmed that his written report reflected a $551,995.59 net operating income figure for the Center.[222]  He agreed that the net operating income figure was set after a $47,696.00 reduction for "NNN Leakage."  He explained that the term "NNN Leakage" reflected the operating expense borne by TJ Plaza attributable to vacant space at the Center.  He found it unsurprising that a certified appraiser had reached a $575,938.00 net operating income figure for the Center.

Mr. Keating was then asked about his calculations regarding an appropriate marketing price for the Center.  He acknowledged that he had used his net operating income figure of $551,995.59, with a capitalization rate of 8.2% to 8.8%, in reaching a reasonable marketing price of $6.25 million to $6.75 million.[223]  He stated that it was unsurprising that a certified appraiser would have instead employed a capitalization rate of 6.94% and 7.75% in establishing the value of the Center, but also stated that he did not believe such capitalization rates were appropriate.  Directed to the appraisal report prepared by Mr. Dietrich, he conceded that he had

[222]Exhibit Y, p. 11.

[223]Exhibit Y, p. 4.

informed Mr. Dietrich that, "the Cap Rate for the Center would be in the range of 7.0% to 7.5% without TJ's," and that, "[w]ith TJ's staying, Cap Rate is in the 6.5% to 7.0% range at market rent."[224]  He suggested that the differential between the capitalization rate in his report (8.2% to 8.8%) and the information in Mr. Dietrich's report (6.5% to 7.5%) could have resulted by an assumption by Mr. Dietrich that if Trader Joe's left, they would be replaced by a new tenant paying rent at a lower rate in keeping with the market.  Directed to a "Capitalization Rate Surveys [sic] (OAR)" chart in Mr. Dietrich's report, Mr. Keating acknowledged that the chart showed he had stated Mr. Dietrich that capitalization rates for the fourth quarter of 2015 were in the 6.50% to 7.50% range, with the average being 7.00%.[225]  He noted that information was accurate if Trader Joe's remained at the Center, and entered into a new lease.  He also pointed out that in his own report, he calculated the marketing price for the Center under four distinct scenarios: Trader Joe's remains under a month-to-month tenancy (capitalization rate 8.2% to 8.8%); Trader Joe's renews its lease at high end of market rate at $13.00 per square foot annually (capitalization rate 6.8% to 7.4%); Trader Joe's renews at low end of market rate at $10.00 per square foot annually (capitalization rate 6.3% to 6.9%); and Trader Joe's vacates (capitalization rate of 4.0% to 4.2%).[226]  Ultimately, he verified that he was more comfortable with the capitalization rates reflected in his own report.  He also agreed that application of a 7.0% capitalization rate to his own net operating income figure of $551,995.59 yielded a value for the Center of just over $7.8 million.

Asked if he was confident that a one-hundred-fifty-day period for marketing and sale of the Center would afford a potential buyer enough time to conduct appropriate due diligence,

---

[224]Exhibit I, p. 38.

[225]Exhibit I, p. 68.

[226]Mr. Keating noted that if Trader Joe's vacated, the capitalization rates were so low that investor interest would be focused on price per square foot considerations rather than capitalization rate calculations.

review existing leases and obtain assignments, conduct a Phase I environmental report, conduct an ALTA survey, finalize financing and close a transaction, Mr. Keating said he was.  He noted that he had not been involved in many sales in Las Vegas in the preceding year that had taken more than ninety days to close.  He confirmed that the four percent brokerage commission was the total brokerage commission that would result from a sale of the Center.  He noted that if an outside broker was involved, the four percent commission would be shared with the outside broker, with no additional cost attendant to the sale.

At that point, US Bank rested with respect to its case related to plan confirmation.  TJ Plaza was afforded the opportunity to present rebuttal evidence, but declined to do so.  The evidentiary record was then closed, and a post-hearing briefing schedule was established for the parties.  Briefs were timely filed by the parties.  The questions of whether a plan should be confirmed, and if so, which one, are ripe for resolution.

### D.     The Value of the Center

The Court has considered the record evidence as to the value of the Center, including without limitation the expert testimony and opinions of Messrs. Anderson and Dietrich.  The Court is also mindful of testimony from other witnesses that touched on the question of the valuation of the Center, including without limitation that of Mr. Susa and Mr. Keating.

The Court finds the appraisal credentials of Messrs. Anderson and Dietrich to be sufficient to support the opinions they expressed as to the value of the Center in their respective reports and testimony.  The parties did not challenge their qualifications as valuation experts at the Confirmation Hearing.  The Court finds that the valuation opinions expressed by Mr. Anderson are slightly more credible than those expressed by Mr. Dietrich.  Mr. Dietrich's reports contained a number of errors developed in detail during cross-examination at the Confirmation Hearing.  The Court finds no single error particularly egregious, and Mr. Dietrich's testimony generally clarified those errors to the Court's satisfaction.  When the errors in Mr. Dietrich's reports are considered in the collective, they do indicate a lack of attentiveness

to detail.  That said, the Court finds the expert testimony of both Mr. Anderson and Mr. Dietrich to be helpful in establishing the value of the Center in the context of plan confirmation.

The valuation opinions of Messrs. Anderson and Dietrich were to the effect that if Trader Joe's continues to pay rent for its space (as to which no long term lease extension had been signed at the time of the Confirmation Hearing), the "as is" fair market value of the Center is between $7,080,000 and $7,675,000.  The valuation opinions expressed by Messrs. Anderson and Dietrich if Trader Joe's were to vacate the Center (an event which the evidence showed had not occurred as of the Confirmation Hearing), suggest that the "as is" fair market value of the Center is between $6,170,000 and $6,885,000.

After careful consideration of the record evidence, the Court finds that there is a significant degree of risk that Trader Joe's will leave the Center in the near term, as they had not executed any of their existing long-term lease extensions at the time of the Confirmation Hearing.  Still, they had not vacated the Center as of the Confirmation Hearing and were consistently paying rent for their space as a month-to-month tenant.  On the specific facts of this case, and in view of the record evidence developed by the parties, the Court concludes that the appropriate value of the Center for confirmation purposes is at the low end of the "as is" fair market value range assuming that Trader Joe's will continue to pay rent on a monthly basis, and slightly higher than the top end of the value of the Center if Trader Joe's vacates its leasehold–an event which had not yet happened as of the Confirmation Hearing.  For plan confirmation purposes, the Court finds that the value of the Center is $7,080,000.

### E.    Amounts Due Under the Matured US Bank Loan

The parties agreed by stipulation that the unpaid principal amount owed by the Debtors under the matured US Bank Loan at the time of the Confirmation Hearing was $4,289,897.90.  They also agreed by stipulation that the accrued and unpaid interest at the contract rate under the matured US Bank Loan at the time of confirmation was $661,609.50.  The parties therefore agreed that TJ Plaza owed US Bank principal and accrued interest at the contract rate of no less

than $4,951,507.40 under the matured US Bank Loan as of the Confirmation Hearing.  They

agreed on little else regarding the unpaid balance due.

Ms. Vis testified credibly that under the terms of the matured US Bank Loan, TJ Plaza

also owed US Bank accrued but unpaid default interest at four percent ($459,495.73), accrued

but unpaid late fees ($216,332.32), accrued but unpaid attorney fees and charges ($878,089.07),

and other miscellaneous unpaid fees ($24,599.91), for a total unpaid balance due of

$6,530,024.43.  After reductions through the application of suspense funds ($268,325.99) and

reserve balances on hand ($37,227.77), and subject to a true up for additional unbilled attorney

fees incurred after October 2015, and accruing interest and late fees, Ms. Vis testified that TJ

Plaza owed US Bank the sum of $6,224,470.67 as of January 31, 2016.[227]

At confirmation, TJ Plaza vigorously challenged the reasonableness of the amounts US

Bank claimed it was due under the terms of the matured US Bank Loan.[228]  TJ Plaza also asserts

that the existing maturity default under the US Bank Loan would be cured through confirmation

of the TJ Plaza Plan, even though that plan does not provide for payment of the full amount

owed to US Bank for default interest, late fees, attorney fees and charges, and other

miscellaneous fees.  But the preponderance of the evidence established that the US Bank Loan

Documents expressly allow for the recovery of default interest, late fees, attorney fees and

charges, and other miscellaneous fees upon default by TJ Plaza.  The preponderance of the

evidence also established that a default occurred when TJ Plaza failed to pay the balance due

under the US Bank Loan at maturity, and has continued thereafter, triggering the provisions

entitling US Bank to recover default interest, late fees, attorney fees and charges, and other

miscellaneous fees.  The preponderance of the evidence was also sufficient to establish the

---

[227]See also Exhibit 222.

[228]The Court has separately disallowed a total of $66,119.00 in attorney fees and costs
claimed by US Bank.  See ECF No. 1117.

amounts owed by TJ Plaza to US Bank under the terms of the matured US Bank Loan.

In summary, the Court finds that the preponderance of the evidence presented at confirmation established that the following amounts were owed by TJ Plaza to US Bank under the matured US Bank Loan as of January 31, 2016:

|  |  |
|---|---|
| **Amounts Owed for:** | |
| Principal: | $4,289,897.90 |
| Contract Interest: | $ 661,609.50 |
| Default Interest: | $ 459,495.73 |
| Late Fees: | $ 216,332.32 |
| Attorney Fees: | $ 878,089.07 |
| Miscellaneous Fees: | $   24,599.91 |
| **Subtotal:** | **$6,530,024.43** |
| **Less Reductions for:** | |
| Suspense Funds: | $ 268,325.99 |
| Reserve Balances: | $  37,227.77 |
| Attorney Fee Reduction[229]: | $   66,119.00 |
| **Amount Due Under US Bank Loan as of January 31, 2016:** | **$6,158,351.67**[230] |

## III.    CONCLUSIONS OF LAW

### A.    Jurisdiction, Venue, and Core Proceedings

The Court has jurisdiction over Debtors' bankruptcy case pursuant to 28 U.S.C.

---

[229]Id.

[230]Interest and late fees continue to accrue, as the matured US Bank Loan remains unpaid. Ms. Vis testified credibly that per diem interest accruing at the Note rate is $664.93, and at the default rate was $476.66, for a total per diem interest factor of $1,141.59.  See also Exhibit 222.

§§ 157(a) and 1334(a), and LR[231] 1001(b)(1).  Venue of this case is appropriate in the District of Nevada pursuant to 28 U.S.C. § 1408(1).

Under 28 U.S.C. § 157(b)(3):

The bankruptcy judge shall determine, on the judge's own motion or on timely motion of a party, whether a proceeding is a core proceeding under this subsection or is a proceeding that is otherwise related to a case under title 11.  A determination that a proceeding is not a core proceeding shall not be made solely on the basis that its resolution may be affected by State law.

Under LR 9014.2(c):

The Court may sua sponte determine and enter an order on whether the proceeding is a core proceeding not subject to entry of final orders or judgment by the bankruptcy court, unless the district court withdraws the reference first.

As required by 28 U.S.C. § 157(b)(3), authorized by LR 9014.2(c), and on its own motion, the Court determines that the plan confirmation issues addressed in this memorandum are core proceedings pursuant to 28 U.S.C. §§ 157(b)(2)(A), (L), and (O), as to which the Court may enter a final order or judgment in a manner consistent with Article III of the United States Constitution without withdrawal of the reference by the United States District Court for the District of Nevada.

**B.      Disclosure Statement Approval Standards**

The standard for approval of a disclosure statement accompanying a chapter 11 plan of reorganization is embodied in 11 U.S.C. § 1125(a)(1), which reads:

§ 1125.  Postpetition disclosure and solicitation
(a)      In this section–
    (1)      "adequate information" means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed

---

[231]The Local Rules of Bankruptcy Practice of the United States District Court for the District of Nevada.

judgment about the plan, but adequate information need not include such information about any other possible or proposed plan and in determining whether a disclosure statement provides adequate information, the court shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information[.]

Bankruptcy courts have discretion in determining what constitutes adequate information. Comput. Task Grp., Inc. v. Brotby (*In re* Brotby), 303 B.R. 177, 193 (9th Cir. BAP 2003), quoting Texas Extrusion Corp. v. Lockheed Corp. (*In re* Texas Extrusion Corp.), 844 F.2d 1142, 1157 (5th Cir.), cert. denied, 488 U.S. 926 (1988). The adequate information determination is a subjective one, made on a case-by-case basis.  Brotby, 303 B.R. at 193, quoting Texas Extrusion, 844 F.2d at 1157.

When determining the adequacy of information during the pre-solicitation phase, "the court is acting in a context in which information may be sketchy and preliminary."  Brotby, 303 B.R. at 194, quoting Official Comm. of Unsecured Creditors v. Michelson (*In re* Michelson), 141 B.R. 715, 718 (Bankr. E.D. Cal.1992).  At plan confirmation, however, "[w]hat once appeared to be adequate information may have become plainly so inadequate and misleading as to cast doubt on the viability of the acceptance of the plan and to necessitate starting over."  Brotby, 303 B.R. at 194, quoting Michelson, 141 B.R. at 719.  "[T]he use of misleading or false information in a disclosure statement may be so serious as to invalidate the voting by creditors as to a plan, requiring a new round of voting after necessary corrections to the disclosure statement are made."  Brotby, 303 B.R. at 194; see also Micro-Waste Corp. v. Sanitec Indus., Inc. (*In re* Sanitec Indus., Inc.), 2009 WL 7809007, *15 (9th Cir. BAP Dec. 21, 2009).  This framework emphasizes increasing the level of disclosure in order to achieve confirmation. Michelson, 141 B.R. at 719-20.  The use of amended disclosure statements and revised financial projections is not an uncommon part of the confirmation process. See, e.g., In re Hoff, 54 B.R. 746, 748-52 (Bankr. D.N.D. 1985) (addressing an amended disclosure statement and revised financial data submitted at confirmation, and finding the plan complied with §

1129(a)(2)); see also Brotby, 303 B.R. at 193 (citing Everett v. Perez (*In re* Perez), 30 F.3d

1209, 1216-18 (9th Cir. 1994), and noting that disclosure statement issues may be properly

addressed at confirmation, so long as the confirmation record as to how such issues were dealt

with is fully developed).

        In addressing the issue of whether adequate information is present in a disclosure

statement, courts have considered a variety of relevant factors, such as whether the disclosure

statement contains: (1) a description of the available assets and their value; (2) the scheduled

claims; (3) the estimated return to creditors under a Chapter 7 liquidation; (4) the collectability

of accounts receivable; (5) the actual or projected realizable value from recovery of preferential

or otherwise voidable transfers; (6) litigation likely to arise in a non-bankruptcy context; (7) tax

attributes of the debtor; and (8) the relationship of the debtor with affiliates.  In re Pac. Shores

Dev., Inc., 2011 WL 778205, *4 (Bankr. S.D. Cal. Feb. 25, 2011), citing In re Reilly, 71 B.R.

132, 134 (Bankr. D. Mont. 1987); see also In re Metrocraft Publ'g Servs., Inc., 39 B.R. 567, 568

(Bankr. N.D. Ga. 1984); In re Neutgens, 87 B.R. 128, 129 (Bankr. D. Mont. 1987); In re

Diversified Inv'rs Fund XVII, 91 B.R. 559, 561 (Bankr. C.D. Cal. 1988).  The bankruptcy court

does not conduct an independent investigation, but instead relies on its reading for "apparent

completeness and intelligibility[.]"  Brotby, 303 B.R. at 194, quoting Michelson, 141 B.R. at

719.

        **C.    Confirmation Standards**

        Chapter 11 plan confirmation standards are spelled out in 11 U.S.C. § 1129.

Bankruptcy courts in the Ninth Circuit have the affirmative duty to make sure that all

applicable requirements under Section 1129 have been met.  Liberty Nat'l Enters. v.

Ambanc La Mesa Ltd. P'ship (*In re* Ambanc La Mesa Ltd. P'ship), 115 F.3d 650, 653

(9th Cir. 1997), cert. denied, 522 U.S. 1110 (1998); In re Orchards Vill. Invs., LLC,

2010 WL 143706, *1 (Bankr. D. Or. Jan. 8, 2010).  The Court will confirm a chapter 11

plan if the plan proponent proves by a preponderance of the evidence either:

1.      that all applicable requirements of Section 1129 have been met; or

2.      if the only condition to confirmation that is not satisfied is Section
        1129(a)(8), that the plan satisfies the cramdown standards under Section
        1129(b); that is, that the plan does not discriminate unfairly against, and is
        fair and equitable with regard to, each impaired class that has not accepted
        the plan.

In re Bellows, 554 B.R. 219, 226 (Bankr. D. Alaska 2016).  Generally, when a plan of

reorganization satisfies each of the requirements contained in Section 1129(a), the court shall

confirm the plan without considering Section 1129(b).  In re Art & Architecture Books of the

21st Century, 2016 WL 1118743, *6 (Bankr. C.D. Cal. Mar. 18, 2016), citing United States v.

Arnold & Baker Farms (In re Arnold & Baker Farms), 177 B.R. 648 (9th Cir. BAP 1994), aff'd,

85 F.3d 1415 (9th Cir. 1996), cert. denied, 519 U.S. 1054 (1997).  Section 1129(b) only applies

if a class whose claims or interests are impaired does not accept the plan as required by Section

1129(a)(8).  A plan of reorganization need only satisfy the requirements of Section 1129(b) with

respect to classes that voted against the plan.  Art & Architecture, 2016 WL 1118743 at *6,

citing Kane v. Johns-Mansville Corp. (In re Johns-Mansville Corp.), 843 F.2d 636, 650 (2d Cir.

1988).

        In this case, two competing plans are before the Court for purposes of confirmation.  If

both the TJ Plaza Plan and the US Bank Plan satisfy all of the confirmation standards imposed

by Section 1129(a) and (b), Section 1129(c) is implicated.  Section 1129(c) provides as follows:

(c)     Notwithstanding subsections (a) and (b) of this section and except as
        provided in section 1127(b) of this title,[232] the court may confirm only

---

[232]Section 1127(b) permits modification of a plan:
[A]t any time after confirmation of such plan and before substantial
consummation of such plan, but may not modify such plan so that such plan as
modified fails to meet the requirements of sections 1122 and 1123 of this title.
Such plan as modified under this subsection becomes the plan only if
circumstances warrant such modification and the court, after notice and a hearing,
confirms such plan as modified, under section 1129 of this title.

Section 1127 is not implicated here, since this case does not involve post-confirmation

116

> one plan, unless the order of confirmation in the case has been revoked under section 1144 of this title.[233]  If the requirements of subsections (a) and (b) of this section are met with respect to more than one plan, the court shall consider the preferences of creditors and equity security holders in determining which plan to confirm.

As a result, if both the TJ Plaza Plan and the US Bank Plan pass confirmation muster under Section 1129(a) and (b), only one of the competing plans can be confirmed by the Court.  See In re Meruelo Maddux Properties, Inc., 2013 WL 4045922, *7 (C.D. Cal. Aug. 7, 2013), aff'd, 637 F. App'x 1012 (9th Cir. 2016); Orchards Village, 2010 WL 143706 at *21-*22.

### D.    Disclosure Statement Analysis Under Section 1125(a)(1)

Disclosure statements to accompany the TJ Plaza Plan and the US Bank Plan were conditionally approved by separate orders entered on August 28, 2015,[234] and September 4, 2015,[235] respectively.[236]  TJ Plaza served its solicitation package regarding the TJ Plaza Plan on September 4, 2015.[237]  US Bank served its solicitation package regarding the US Bank Plan on September 8, 2015.[238]  The orders conditionally approving the parties' disclosure statements were entered prior to the solicitation of ballots in support of the plans.  Since solicitation of ballots only occurred after orders conditionally approving  the parties' disclosure statements were entered, the requirements of Section 1125(b) are satisfied so long as the disclosure statements also contained adequate information as required by Section 1125(a)(1).  See, e.g., In

---

modification of a plan.

[233]No order of confirmation has been entered or revoked prior to the docketing of this decision.

[234]ECF No. 698.

[235]ECF No. 710.

[236]Conditional approval of chapter 11 disclosure statements is provided for by operation of LR 3017.

[237]ECF No. 709.

[238]ECF No. 716.

1    re Trans Max Techs., Inc., 349 B.R. 80, 86 (Bankr. D. Nev. 2006).

2            The conditionally approved disclosure statement accompanying the TJ Plaza Plan

3    contains a full description of the valuation and operating performance of the Center.  It also

4    contains a full discussion of the claim arising from the US Bank Loan; the claims asserted by TJ

5    Plaza's affiliates; the claims purchased by US Bank, inclusive of the Sewer Claim; and the

6    claims of general unsecured trade claims.  It advises that the estimated return to creditors under

7    a Chapter 7 liquidation would be less than the dividend resulting from liquidation, and contains

8    a liquidation analysis at Exhibit 5, while carefully advising that neither refinancing of the US

9    Bank Loan secured by the Center, nor confirmation of the plan, is guaranteed.  The

10   collectability of accounts receivable is not discussed in depth, but the disclosure statement

11   contains a significant amount of detail regarding the Center's rental income, signage income,

12   and income generated by CAM charges.  The value recoverable through preferential or

13   otherwise voidable transfers is mentioned, and while not discussed in detail, such claims are of

14   only modest relevance to the success or failure of the TJ Plaza Plan if confirmed.  Sufficient

15   reference is made to the non-bankruptcy actions taken by US Bank to enforce the US Bank

16   Loan secured by the Center, including the verified complaint US Bank filed seeking the

17   appointment of a receiver.  Creditors are advised that the tax consequences resulting from

18   confirmation of the TJ Plaza Plan will vary depending upon a number of factors, and advises

19   creditors to consult their tax advisor regarding the proposed treatment of their claims.  While

20   US Bank makes much of the fact that there is no specific discussion of the non-renewal of the

21   Trader Joe's lease, the evidence at confirmation was that Trader Joe's was continuing to pay

22   rent on a month-to-month basis, and had not vacated the Center.  Having considered the full

23   record in this case, the Court concludes that TJ Plaza has proven by a preponderance of the

24   evidence that the disclosure statement accompanying the TJ Plaza Plan does contain adequate

25   information sufficient to meet the disclosure statement approval standard imposed by Section

26   1125(a)(1).  See Pac. Shores, 2011 WL 778205 at *4.

The analysis of US Bank's disclosure statement is slightly more involved.  The order conditionally approving US Bank's original disclosure statement was entered on September 4, 2015.[239]  US Bank's conditionally approved disclosure statement related to the original US Bank Plan.  Four days later, US Bank served its conditionally approved disclosure statement, together with the original US Bank Plan and a related a notice of hearing.[240]  Having solicited creditor ballots based upon its conditionally approved disclosure statement and the original US Bank Plan, US Bank prepared a ballot summary, and filed it on November 9, 2015.[241]

On January 12, 2016, two months after filing its ballot summary, and just one week prior to the commencement of the Confirmation Hearing, US Bank filed an amended plan and disclosure statement.[242]  No notice of hearing regarding US Bank's amended disclosure statement was filed.  No certificate of service of US Bank's amended disclosure statement is evident from a review of the docket.  No order conditionally approving US Bank's amended disclosure statement has been entered by the Court.  No ballot summary was docketed after US Bank's amended disclosure statement was filed.  Thus, while US Bank did file an amended disclosure statement, its amended disclosure statement was neither conditionally approved by the Court, nor actually utilized to solicit ballots from creditors.  Stated another way, the only ballot summary filed by US Bank refers to creditor ballots obtained through the service of US Bank's plan and disclosure statement as originally filed–not as amended.  That said, the Court is mindful that "[t]he use of amended disclosure statements and revised financial projections is not an uncommon part of [the chapter 11 plan confirmation] process."  See, e.g., In re Hoff, 54 B.R. 746, 748-52 (Bankr. D.N.D. 1985).

---

[239]ECF Nos. 696, 697, and 710

[240]ECF Nos. 715 and 716.

[241]ECF  No. 804.

[242]Exhibits R and S; see also ECF Nos. 895 and 896.

US Bank's conditionally approved disclosure statement (which was actually served upon creditors and parties in interest), reflects that the Center serves as collateral for the US Bank Loan in the original amount of $5.1 million. Each of the classes of claims are discussed, including an estimation of the amount of the claims within each separate class. A discussion of the return to creditors under the original US Bank Plan, and a narrative of how a chapter 7 liquidation would impact their claims as opposed to plan confirmation, is present. The collectability of accounts receivable is not discussed, but the method of the proposed marketing and sale of the Center, and the distribution of resultant proceeds, is described in significant detail. The value recoverable through preferential or otherwise voidable transfers is mentioned, and while not discussed in detail, such claims are not directly relevant to the asset sale contemplated via confirmation of the US Bank Plan. There is substantive disclosure of the non-bankruptcy actions taken by US Bank to enforce the US Bank Loan secured by the Center, including the prebankruptcy receivership action US Bank had commenced in state court. It is noted that US Bank did not believe the marketing and sale of the Center would have "any significant adverse tax consequences," and advises creditors to consult their own tax advisors as to the overall tax implications of the original US Bank Plan. There is no discussion of the relationship between TJ Plaza and its affiliates, but there is significant discussion about the prepetition financing that US Bank provided for TJ Plaza secured by the Center.

Having considered the entire record before it, the Court concludes that US Bank has proven by a preponderance of the evidence that its original disclosure statement, as conditionally approved by the Court, contains adequate information sufficient to meet the disclosure statement approval standard imposed by Section 1125(a)(1). See In re Pac. Shores, 2011 WL 778205 at *4. The analysis must continue, though, since US Bank subsequently filed an amended plan and disclosure statement just prior to the Confirmation Hearing.

While the amended disclosure statement filed by US Bank was not conditionally approved by this Court, it contains more detailed information about its proposed marketing and

sale plan than the original disclosure statement–not less.  No creditors or parties in interest, aside from TJ Plaza, objected to the adequacy of the information contained in US Bank's original, conditionally approved, disclosure statement.  The record reflects that TJ Plaza was aware of the content of the amended disclosure statement, which was admitted into evidence at the Confirmation Hearing.[243]  US Bank's amended disclosure statement was filed in an attempt to address various objections raised by TJ Plaza directed to the content of US Bank's original, conditionally approved, disclosure statement.  More specifically, US Bank's amended disclosure statement substitutes the term "Plan Administrator" for the term "Plan Transferee"[244] as used in the conditionally approved disclosure statement.  It sets forth the Plan Administrator's powers and duties in detail.  It makes plain that the Plan Administrator would be Mr. Jacobs; that he would be compensated for his services at the rate of $3,000.00 per month either from cash collateral or through an advance from US Bank; that he would hire other professionals to manage, market, and sell the Center; that he would owe a fiduciary duty to act in the best interests of TJ Plaza's bankruptcy estate and would be subject to bankruptcy court oversight; and that he would be required to seek this Court's approval for the sale of the Center contemplated under the amended US Bank Plan.  Requiring this Court's oversight of the marketing and sale process countervails TJ Plaza's contention that the US Bank disclosure statement as amended does not satisfy the adequate information standard imposed under Section 1125(a)(1).  US Bank's amended disclosure statement also defines a "Qualifying Offer" for the Center as any offer in excess of the total of the US Bank Loan, the Plan Administrator's fees and costs, and certain advances made by US Bank in connection with the marketing and sale

---

[243]Exhibit R.

[244]The Court is aware of the distinction between these two terms, and the concomitant duties identified for a "Plan Transferee" and a "Plan Administrator" under the original and amended US Bank Plans.  For the sake of brevity and clarity, the Court uses the term "Plan Administrator" throughout this Memorandum as referencing and encompassing both positions.

1 process.

2   The Court concludes that US Bank has proven by a preponderance of the evidence that

3 its original disclosure statement does contain adequate information sufficient to satisfy the

4 disclosure statement approval standard imposed by Section 1125(a)(1).  No party other than TJ

5 Plaza objected to the adequacy of the information contained in US Bank's original disclosure

6 statement.  The Court concludes further that US Bank's amended disclosure statement, while

7 not conditionally approved or utilized to solicit creditor ballots, augmented the information

8 contained in its original disclosure statement in a manner that inured to the benefit of TJ Plaza.

9 The Confirmation Hearing record confirms that TJ Plaza was afforded the full and fair

10 opportunity to question Mr. Jacobs regarding his role as the anticipated Plan Administrator as

11 discussed in US Bank's amended disclosure statement.  Review of the record of the

12 Confirmation Hearing does not suggest that US Bank used misleading or false information in its

13 disclosure statement, either as conditionally approved or as amended, much less misleading or

14 false information so serious as to require a new round of voting after making more disclosure

15 statement amendments.  <u>Brotby</u>, 303 B.R. at 194.

16   For the foregoing reasons, the Court approves both the disclosure statement filed by TJ

17 Plaza as amended to date, and the disclosure statement filed by US Bank as amended to date, on

18 a final basis under Section 1125.  The remaining issue for resolution is whether either or both of

19 the chapter 11 plans filed by TJ Plaza and US Bank are confirmable under Section 1129.

20   **E.    Confirmation Analysis Under Section 1129**

21   **1.    Section 1129(a)(1):  Compliance with Applicable Provisions of the
             Bankruptcy Code**
22

23 Section 1129(a)(1) requires that a chapter 11 plan must comply with the applicable

24 provisions of the Bankruptcy Code as a prerequisite to confirmation.  The "legislative history of

25 subsection 1129(a)(1) suggests that Congress intended the phrase 'applicable provisions' in this

26 subsection to mean provisions of Chapter 11 that concern the form and content of

reorganization plans . . . such as section 1122 and 1123, governing classification [of claims] and contents of plan[s]." Johns-Manville Corp., 843 F.2d at 648-49 (quoting S. REP. NO. 95-989, at 126 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5912); see In re Trenton Ridge Inv'rs, LLC, 461 B.R. 440, 463 (Bankr. S.D. Ohio 2011) (quoting Johns-Manville Corp., supra); In re 20 Bayard Views, LLC, 445 B.R. 83, 94 (Bankr. E.D.N.Y. 2011) ("Courts interpret th[e] language [of § 1129(a)(1)] to mean that a plan must meet the requirements of Bankruptcy Code Sections 1122 and 1123."); Art & Architecture, 2016 WL 1118743 at *7-*12.

### a.    Compliance with Classification Requirements Under Section 1122

Apart from an administrative-convenience exception under Section 1122(b) not relevant here, "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." Zante, Inc. v. Delgado (In re Zante, Inc.), 467 B.R. 216, 218 (D. Nev. 2012) (quoting 11 U.S.C. § 1122(a)).  Section 1122(a) requires only that claims must be "substantially similar" to be placed into the same class.  It prevents dissimilar claims from being placed into the same class, but it does not prevent substantially similar claims from being placed into different classes. Zante, Inc. at 218 (citing Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.), 280 F.3d 648, 661 (6th Cir.), cert. denied, 537 U.S. 816 (2002)) (other internal citations omitted).  "To the contrary, the bankruptcy court has substantial discretion to place similar claims in different classes." Zante, Inc. at 218-19 (citing Dow Corning Corp., 280 F.3d at 661, and Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co. (In re U.S. Truck Co.), 800 F.2d 581, 585 (6th Cir. 1986)); see also Wells Fargo Bank, N.A. v. Loop 76, LLC (In re Loop 76, LLC), 465 B.R. 525, 536-37 (9th Cir. BAP 2012), aff'd, 578 F. App'x 644 (9th Cir. 2014).

The TJ Plaza Plan as amended at the time of the Confirmation Hearing classifies claims

in the following way[245]:

> **Class 1 -** US Bank Secured Claim
>
> **Class 2 -** Other Secured Claims
>
> **Class 3 -** Priority Non-Tax Claims
>
> **Class 4 -** General Unsecured Trade Claims
>
> **Class 5 -** Equity Interests
>
> **Class 6 -** City of Las Vegas Claim

Under the TJ Plaza Plan, the Sewer Claim is clearly placed into a class separate from other general unsecured trade claims.

The Ninth Circuit Court of Appeals has held that a claim which is substantially similar to other claims may be classified separately under a chapter 11 plan, even though Section 1122(a) does not say so expressly.  In re Rexford Props., LLC, 558 B.R. 352, 361 (Bankr. C.D. Cal. 2016) (citing Barakat v. Life Ins. Co. of Va. (*In re* Barakat), 99 F.3d 1520, 1524-25 (9th Cir.1996), cert. denied, 520 U.S. 1143, reh'g denied, 520 U.S. 1225 (1997)).  Whether claims are "substantially similar" under 11 U.S.C. § 1122(a) is a question of fact.  Bankruptcy courts have broad latitude in making the "substantially similar" determination, which is reviewed for clear error.  Zante, Inc., 467 B.R. at 218 (citing Steelcase, Inc. v. Johnston (*In re* Johnston), 21 F.3d 323, 327 (9th Cir. 1994)).  To determine whether claims are substantially similar, "bankruptcy court judges must evaluate the nature of each claim, i.e., the kind, species, or character of each category of claims."  Rexford Props., 558 B.R. at 361 (quoting Johnston, 21 F.3d at 327).

The Sewer Claim, separately classified as a Class 6 Claim under the TJ Plaza Plan, is substantially similar to the other general unsecured claims comprising Class 4 under that plan. The sewer services provided at the Center by the City of Las Vegas giving rise to the Sewer

---

[245]See Exhibit 228, ECF No. 691, pp. 17-22 of 43; see ECF No. 754, p. 2 of 3.

Claim were provided on an unsecured basis.  TJ Plaza received billings for those services on an

unsecured basis, like the debts held by trade creditors that comprise the balance of the

unsecured trade creditor claims comprising Class 4.[246]  Significantly, the United States District

Court for the District of Nevada has determined that the priority status of the Sewer Claim was

lost upon assignment from the City of Las Vegas to US Bank and is therefore a general

unsecured claim.[247]  The Ninth Circuit Court of Appeals recently dismissed TJ Plaza's appeal

from the District Court's decision.[248]  The Court therefore concludes that the Class 6 Sewer

Claim is a general unsecured claim, and is substantially similar to the other general unsecured

claims comprising Class 4 under the TJ Plaza Plan.  The remaining question is whether the TJ

Plaza Plan's separate classification of the Sewer Claim can pass analytical muster under Section

1122.

     In determining whether separate classification of substantially similar claims is

appropriate in the context of Section 1122, Ninth Circuit law requires a "legitimate business or

economic justification" for the separate classification.  Rexford Props., 558 B. R. at 363 (citing

Barakat, 99 F.3d at 1526).  "The proposed preferential treatment of vendors that provide

genuine operational or financial benefits to the debtor–in a genuine effort to induce them to

continue doing so–is a legitimate business and economic justification for separately classifying

the claims of such vendors."  Id.  That standard "accords with the objective of assessing

whether a business or economic justification [for separate classification] is legitimate. Vendors

holding claims that are separately classified from other unsecured claims must be providing

[246]TJ Plaza's ballot summary shows the four claims are held primarily by trade creditors:
Allstate Roofing; Edgar's Services, Inc.; NextGen; O'Rourke Plumbing; Stout Electric; J&J
Services; Vortex Industries; and Zolton Hollo, LLC.  See ECF No. 891-1, p. 2 of 2.

[247]See note 40, supra.

[248]TJ Plaza, LLC v. U.S. Bank, Nat'l Ass'n, Ninth Circuit Case No. 15-16968 ECF No.
34 (April 24, 2017).  See also note 40, supra.

genuine operational or financial benefits to the debtor, and the preferential treatment offered to those vendors must be reasonably calculated to induce their continued support of the debtor." Rexford Props., 558 B.R. at 363.

However, placing a creditor's claim in a class separate from a class comprised of other substantially similar claims constitutes impermissible "gerrymandering" when it is done for the sole purpose of obtaining acceptance of a class of creditors under a plan. Rexford Props., 558 B.R. at 363. Subject to the foregoing limitations, bankruptcy courts have the discretion to approve a debtor's proposed classification scheme. Rexford Props., 558 B.R. at 361 (citing Johnston, 21 F.3d at 327-28) (other internal citations omitted).

The TJ Plaza Plan's classification of the Sewer Claim as a Class 6 Claim, separate from the substantially similar general unsecured claims comprising Class 4, is permissible only if the record evidence establishes a "legitimate business or economic justification" for that separate classification. Rexford Props., 558 B.R. at 361 (citing Barakat, 99 F.3d at 1526). In determining whether a "legitimate business or economic justification" exists for the separate classification of the Sewer Claim under the TJ Plaza Plan, the Court has considered the entire record developed at the Confirmation Hearing, including without limitation Mr. Susa's testimony as to why the Sewer Claim was classified separately.

Mr. Susa stated that separate classification and payment of the Sewer Claim was necessary to avoid potential for difficulties in obtaining permits from the City of Las Vegas if sewer related repairs or upgrades were required at the Center, and to avoid continued litigation costs attendant related to the Sewer Claim. Those reasons are debunked, though, by his testimony confirming that he was aware that US Bank had purchased the Sewer Claim from the City of Las Vegas, and in exchange had paid the City the balance of the Sewer Claim in full. Mr. Susa also testified that he was aware of the significance of the Sewer Claim when the TJ Plaza Plan was amended to place it in Class 6, separate from the other general unsecured claims

comprising Class 4.[249]  His testimony showed that he knew US Bank's purchase of the Sewer

Claim potentially afforded US Bank a blocking position as to acceptance of TJ Plaza's amended

plan by the Class 4 general unsecured creditor class.  His testimony also showed that he was

aware that inclusion of the Sewer Claim in Class 4 would result in rejection of the TJ Plaza Plan

by that impaired creditor class.  The Court also agrees with US Bank that the treatment of Class

4 unsecured claims under the TJ Plaza Plan–payment in full with interest six months after the

Effective Date–is an artificial impairment of that class.  The record reflects that TJ Plaza had

enough cash on hand to pay all outstanding Class 4 Claims, inclusive of the Sewer Claim had it

not already been paid by US Bank, in full with interest upon the Effective Date.

    Having considered the entire record developed at the Confirmation Hearing, the Court

concludes that TJ Plaza's placement of the Sewer Claim in Class 6, separate from the

substantially similar general unsecured creditors comprising Class 4, was not predicated upon a

"legitimate business or economic justification."  The record does not establish any genuine

operational or financial benefits to TJ Plaza as a result of that separate classification. The

separate treatment afforded to the City of Las Vegas is not reasonably calculated to induce their

continued support of TJ Plaza, particularly in light of the fact that the Sewer Claim was

purchased by US Bank, and paid in full.  The Court further concludes that placement of the

Sewer Claim in Class 6, separate from the other substantially similar claims comprising

impaired Class 4, was done for the sole purpose of obtaining acceptance from the creditors

holding the claims comprising impaired Class 4 under the TJ Plaza Plan.  As such, the separate

classification of the Sewer Claim under the TJ Plaza Plan constitutes impermissible

"gerrymandering," the TJ Plaza Plan does not satisfy the classification requirements under

Section 1122(a), and TJ Plaza has not proven by a preponderance of the evidence that its plan

complies with the applicable provisions of the Bankruptcy Code as required by Section

---

[249]See ECF No. 754.

1129(a)(1).[250]

Article 3 of the US Bank Plan provides for the following separate classes of claims[251]:

> **Class 1 -** Lender Secured Claim

> **Class 2 -** General Unsecured Claims

> **Class 3 -** Priority Non-Tax Claims

> **Class 4 -** All Interests in Debtors

Under the US Bank Plan, each class of creditors is comprised of creditors holding substantially similar claims. The Court therefore concludes that US Bank has carried its burden of proving by a preponderance of the evidence that the US Bank Plan satisfies the classification requirements under Section 1122(a).

### b.    Mandatory Plan Content Requirements Under Section 1123(a)

Section 1123(a) sets forth the mandatory content requirements with which every chapter 11 plan must comply. <u>Art & Architecture</u>, 2016 WL 1118743 at *9; <u>Trenton Ridge</u>, 461 B.R. at 466 (discussing confirmation requirements imposed by Section 1123(a)).

### i.    Section 1123(a)(1)

Section 1123(a)(1) generally requires that chapter 11 plans designate classes of claims and interests. More particularly, Section 1123(a)(1) requires that chapter 11 plans designate classes of claims, other than claims of a kind specified in Sections 507(a)(2) (administrative expense claims), 507(a)(3) (claims arising during the "gap" period in an involuntary case), or 507(a)(8) (priority tax claims). <u>Art & Architecture</u>, 2016 WL 1118743 at *9. Administrative claims and priority tax claims do not require class designation under Section 1123(a)(1)

---

[250]Resultantly, the Sewer Claim will be treated as a Class 4 general unsecured claim for the remainder of the Court's confirmation analysis.

[251]<u>See</u> ECF No. 696, pp. 11-14 of 27, as amended at Exhibit S; <u>see</u> Exhibit S, ECF No. 895, p. 16 of 31.

"because their rights may not be impaired.  The Bankruptcy Code specifies how they must be treated in a plan unless the holder of the claim affirmatively agrees to a less favorable treatment."  In re Western Asbestos Co., 313 B.R. 832, 841 n.11 (Bankr. N.D. Cal. 2003); 20 Bayard Views, 445 B.R. at 94; Art & Architecture, 2016 WL 1118743 at *9.

As discussed above, both the TJ Plaza Plan and the US Bank Plan do classify claims and interests as contemplated by Section 1123(a)(1).  Both plans also address, but do not separately designate as classes, administrative claims and priority tax claims.[252]  Having carefully reviewed both the TJ Plaza Plan and the US Bank Plan, the Court concludes that both TJ Plaza and US Bank have carried the burden of proving by a preponderance of the evidence that their respective Plans satisfy the requirements of Section 1123(a)(1).

### ii.    Section 1123(a)(2)

Section 1123(a)(2) of the Bankruptcy Code requires a plan to "specify any class of claims or interests that is not impaired under the plan."  Section 1124(1) of the Bankruptcy Code provides that "a class of claims or interests is impaired under a plan unless . . . the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest."  The Ninth Circuit has held that, when determining impairment under Section 1124, "[t]he narrow question that thus arises is whether . . . 'legal, equitable, [or] contractual rights' were *changed by the Plan* [.]"  See Art & Architecture, 2016 WL 1118743 at *9 (emphasis in original) (citing L & J Anaheim Assocs. v. Kawasaki Leasing Int'l, Inc. (*In re* L & J Anaheim Assocs.), 995 F.2d 940, 943 (9th Cir.1993)).

The following classes of claims or interests are specified as not impaired under the terms of the TJ Plaza Plan as amended at the time of the Confirmation Hearing[253]:

---

[252]See Exhibit 228, ECF No. 691, pp. 16-17 of 43, Section 2.1; see ECF No. 696, p. 12 of 27, as amended at Exhibit S.

[253]See Exhibit 228, ECF No. 691, pp. 17-22 of 43; see ECF No. 754, p. 2 of 3.

**Class 2 -** Other Secured Claims

**Class 3 -** Priority Non-Tax Claims

**Class 5 -** Equity Interests

**Class 6 -** City of Las Vegas Claim[254]

The following classes of claims or interests are specified as not impaired under the US Bank Plan[255]:

**Class 2 -** General Unsecured Claims

**Class 3 -** Priority Non-Tax Claims

All unimpaired classes of claims or interests are specifically identified in the text of the TJ Plaza Plan. The same is true with respect to the US Bank Plan. Having carefully reviewed both the TJ Plaza Plan and the US Bank Plan, the Court concludes that TJ Plaza and US Bank have each carried the burden of proving by a preponderance of the evidence that their respective Plans satisfy the requirements of Section 1123(a)(2).

### iii.    Section 1123(a)(3)

Section 1123(a)(3) requires that a plan "specify the treatment of any class of claims or interests that is impaired under the plan." See Art & Architecture, 2016 WL 1118743 at *9. The TJ Plaza Plan identifies the following classes of claims as impaired, and specifies how those classes will be treated if the TJ Plaza Plan is confirmed:

**Class 1 -** US Bank Secured Claim[256]:  Treatment through a refinanced loan as

detailed in Section 3.3.2, with US Bank entitled to vote to accept or reject the TJ

Plaza Plan.

---

[254]For clarity, avoidance of doubt, and as discussed above, the simple fact that the TJ Plaza Plan specifies that the Class 6 Sewer Claim is unimpaired does not make separate classification of the Sewer Claim proper in the context of Sections 1122 and 1129(a)(1).

[255]See ECF No. 696, pp. 11-14 of 27, as amended at Exhibit S.

[256]See Exhibit 228, ECF No. 691, pp. 17-21 of 43, Sections 3.3.2 and 3.3.3.

**Class 4 -** General Unsecured Trade Claims[257]:  Treatment by "payment in full of
their Allowed Claims by no later than six (6) months after the Effective Date" of
the TJ Plaza Plan, together with interest at either the Federal Judgment Rate, or
alternatively at the applicable contractual interest rate if the Class 4 claim holder
either filed a timely proof of claim, or provided TJ Plaza's counsel with written
notice of the contractual interest rate on or before the Effective Date.  Class 4
claimants are also entitled to vote to accept or reject the TJ Plaza Plan.

The US Bank Plan identifies the following classes of claims as impaired, and specifies
how those classes will be treated if the US Bank Plan is confirmed:

**Class 1 -** Lender Secured Claim[258]:  Under the US Bank Plan, treatment of US Bank's
secured claim involves conveyance of title to the Center and all related personal
property to a Plan Administrator; assumption of the underlying indebtedness by
the Plan Administrator on the Effective Date; and in lieu of discharge of the
secured claim, marketing and sale of the Center and all related personal property
by professionals retained by the Plan Administrator.

**Class 4 -** All Interests in Debtors[259]:  The treatment of Class 4 claims under the US Bank
Plan is that holders of equity interests in the Debtors "will neither receive nor
retain any interests on account of" such interests, but will "receive net proceeds
from the sale of the [Center], to the extent any remain after all Allowed Claims
have been satisfied in full."

Impaired classes of claims or interests are properly identified by, and the treatment of
impaired classes of claims or interests is specifically spelled out in, the text of the TJ Plaza

---

[257]See Exhibit 228, ECF No. 691, p. 22 of 43, Sections 3.6.2, 3.6.3, and 3.6.4.

[258]See ECF No. 696, p. 13 of 27, as amended at Exhibit S.

[259]See ECF No. 696, p. 14 of 27, as amended at Exhibit S.

Plan.  The same is true with respect to the US Bank Plan.  Having carefully reviewed both the TJ Plaza Plan and the US Bank Plan, the Court concludes that TJ Plaza and US Bank have each carried the burden of proving by a preponderance of the evidence that their respective Plans satisfy the requirements of Section 1123(a)(3).

### iv.    Section 1123(a)(4)

Section 1123(a)(4) requires that a plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest."  Art & Architecture, 2016 WL 1118743 at *10; Trenton Ridge, 461 B.R. at 466.  Stated another way, Section 1123(a)(4) provides that all creditor claims within a class must be treated equally, unless one or more creditors within the class agree to less favorable treatment of their claims.

The TJ Plaza Plan does provide for equal treatment of creditor claims within each class, except to the extent that one or more creditors within a class agree to less favorable treatment of their claims.[260]  The US Bank Plan does not provide for distinct treatment of creditor claims within classes at all, stating instead that all creditors within classes will receive the same treatment under the plan.[261]  Having carefully reviewed both the TJ Plaza Plan and the US Bank Plan, the Court concludes that TJ Plaza and US Bank have each carried the burden of proving by a preponderance of the evidence that their respective Plans satisfy the requirements of Section 1123(a)(4).

### v.    Section 1123(a)(5)

Section 1123(a)(5) of the Bankruptcy Code requires a plan of reorganization to "provide adequate means for the plan's implementation" and sets forth a non-inclusive list of ten

---

[260]See ECF No. 696, pp. 17-22 of 43, as amended at Exhibit S; see ECF No. 754, p. 2 of 3, Section 3.8.2.

[261]See ECF No. 696, pp. 13-14 of 27, as amended at Exhibit S.

examples for doing so.  In general terms, Section 1123(a)(5) is an "empowering" statute meant to enhance the ability of a trustee, a debtor in possession, or plan proponent to deal with property of the estate by providing for preemption of conflicting state laws.  Universal Coops., Inc. v. FCX, Inc. (*In re* FCX, Inc.), 853 F.2d 1149, 1155 (4th Cir. 1988), cert. denied, 489 U.S. 1011 (1989).  The methods of plan implementation set forth in Section 1123(a)(5) are self-executing, so a plan of reorganization may propose actions to implement the plan notwithstanding contrary non-bankruptcy law or agreements.  Art & Architecture, 2016 WL 1118743 at *10 (citing, inter alia, Pac. Gas & Elec. Co. v. California ex rel. California Dept. of Toxic Substances, 350 F.3d 932, 937 (9th Cir. 2003), cert. denied, 543 U.S. 956 (2004)).  The examples of adequate means for implementation of a plan provided in Section 1123(a)(5) are illustrative, and the Section does not exclude or limit any other means.  Pac. Gas, 350 F.3d at 937; see also Art & Architecture, 2016 WL 1118743 at *10.

The TJ Plaza Plan contains a number of methods for implementation of the Plan, including:

- **Retention by the debtor of all or any part of the property of the estate - Section 1123(a)(5)(A):** TJ Plaza Plan Section 4.1 ("On the Effective Date, without any further action by Debtors or Reorganized Debtors, all of the Debtors' assets shall vest in Reorganized Debtors, subject to the terms and conditions of the Plan[.]");

- **Satisfaction or modification of any lien - Section 1123(a)(5)(E):** TJ Plaza Plan Section 4.1.2 ("[W]ithout any further action by Reorganized Debtors or U.S. Bank, all of the U.S. Bank Loan Documents shall be deemed to have been amended as set forth in and after having given effect to the Plan.  All potential discrepancies or inconsistencies between the U.S. Bank Loan Documents and the Plan shall be construed and resolved in favor of the effectuation and implementation of the provisions and intentions of the Plan."); and

- **Curing or waiving of any default - Section 1123(a)(5)(G):** See TJ Plaza Plan

Sections 3.3.2.16 ("On the Effective Date, all pre-Effective Date defaults under the U.S. Bank Loan Documents shall be deemed to have been cured and reinstated consistent with this Plan and the Confirmation Order and on the Effective Date, Debtors and/or Reorganized Debtors shall be fully current and in good standing thereunder.") and 4.1.2 ("[W]ithout any further action by Reorganized Debtors or U.S. Bank, all of the U.S. Bank Loan Documents shall be deemed to have been amended as set forth in and after having given effect to the Plan.")

The TJ Plaza Plan contains additional provisions regarding plan implementation, including continued corporate existence (Section 4.1.1), identification of the post-effective date management of the reorganized debtor (Section 4.3), the treatment of executory contracts and unexpired leases (Section 5), making distributions contemplated by the terms and conditions of the Plan (Section 6), discharge of claims and interests (Section 10.1), revesting of the Debtors' estate in the reorganized Debtors (Section 10.8), and preservation of litigation claims (Section 10.9).

The US Bank Plan is a marketing and sale plan.  As such, it sets forth a straightforward method for implementation of the Plan as contemplated by Section 1123(a)(5):

- **Transfer of all or any part of the property of the estate to one or more entities, whether organized before or after confirmation of such plan - Section 1123(a)(5)(B):** The US Bank Plan defines the duties of the Plan Administrator as, among other things, entry upon and taking possession of the Center and collecting rent;

- **Sale of all or any part of the property of the estate, either subject to or free of any lien, or the distribution of all or any part of the property of the estate among those having an interest in such property of the estate - Section 1123(a)(5)(D):** The US Bank Plan details the process through which the Center

1    will be marketed and sold if the US Bank Plan is confirmed and spells out the

2    related funding and distribution mechanics after the Center is sold.

3    The TJ Plaza Plan contains provisions that are consistent with Section 1125(a)(5), and spell out

4    with appropriate specificity the means through which the Plan will be implemented if

5    confirmed. The same is true with respect to the US Bank Plan. Having carefully reviewed both

6    the TJ Plaza Plan and the US Bank Plan, the Court concludes that TJ Plaza and US Bank have

7    each carried the burden of proving by a preponderance of the evidence that their respective

8    Plans satisfy the requirements of Section 1123(a)(5).

9                    **vi.    Section 1123(a)(6)**

10    Section 1123(a)(6) requires that a plan provide for the inclusion in the charter of the

11    debtor, if the debtor is a corporation, of a provision prohibiting the issuance of nonvoting equity

12    securities, and providing, as to the several classes of securities possessing voting power an

13    appropriate distribution of such power among such classes, including, in the case of any class of

14    equity securities having a preference over another class of equity securities with respect to

15    dividends, adequate provisions for the election of directors representing such preferred class in

16    the event of default and the payment of such dividends. 11 U.S.C. § 1123(a)(6). Art &

17    Architecture, 2016 WL 1118743 at *11. The Ninth Circuit has stated "Section 1123(a)(6) only

18    prohibits the issuance of new nonvoting securities." Id., citing Acequia, Inc. v. Clinton (In re

19    Acequia, Inc.), 787 F.2d 1352, 1361 (9th Cir. 1986). "By its express terms, § 1123(a)(6) might

20    appear to apply only "if the debtor is a corporation," 11 U.S.C. § 1123(a)(6), and here the

21    Debtors are limited liability companies. Section 1123(a)(6), however, has been applied to

22    debtors that are limited liability companies. See, e.g., 20 Bayard Views, 445 B.R. at 95."

23    Trenton Ridge, 461 B.R. at 467, n.7.

24    Section 4.1.3 of the TJ Plaza Plan provides as follows:

25    **Prohibition of Non-Voting Equity Securities**. The Reorganized Debtors'
26    articles of incorporation, organization, operating agreements, and/or bylaws shall
      be amended as necessary to satisfy the provisions of the Plan and the Bankruptcy

> Code, which shall include, among other matters, pursuant to section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of non-voting equity interests, but only to the extent required by the Bankruptcy Code.

In view of the provisions of Section 4.1.3 of the TJ Plaza Plan, the Court concludes that TJ Plaza has carried its burden of proving by a preponderance of the evidence that the TJ Plaza Plan satisfies Section 1123(a)(6).

US Bank is not a debtor corporation. The US Bank Plan contemplates only the marketing and sale of assets of the Debtors and does not authorize US Bank to issue any securities by or on behalf of the Debtors. The Court therefore concludes that Section 1123(a)(6) is either satisfied with respect to the US Bank Plan, or is simply inapplicable in the confirmation calculus because US Bank is not a corporate debtor.

### vii.    Section 1123(a)(7)

Section 1123(a)(7) requires that a plan "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan. . . ." 11 U.S.C. § 1123(a)(7). The TJ Plaza Plan contemplates that the Debtors will remain in possession of the Center with existing ownership and management remaining unchanged, and does not contain substantive provisions governing the selection of any officer, director or trustee.[262]

US Bank's marketing and sale plan does not contain substantive provisions governing the selection of any officer, director or trustee for the Debtor. It does contemplate that US Bank's collateral will be transferred to a Plan Administrator, who will in turn hire professionals as needed to manage, market and sell the Center.[263] The US Bank Plan as amended identifies

---

[262]See Exhibit 228, ECF No. 691, p. 23 of 43, Sections 4.1.1 (Reorganized Debtors), 4.3 (Operations and Management of Reorganized Debtors), and 4.4 (No Governance Action Required).

[263]See ECF No. 696, p. 5 of 27, as amended at Exhibit S; see id., pp. 16-17 of 27, as amended at Exhibit S. See also Exhibit S, ECF No. 895, p. 20 of 31.

Mr. Jacobs as the Plan Administrator, and makes the activities of the Plan Administrator and the ultimate sale of the Center subject to oversight by the Court.

The US Bank Plan does not, however, identify any of the second tier of professional(s) the Plan Administrator will need to hire to manage, market and sell the Center, and commits the retention of second tier professionals to the Plan Administrator's sole discretion.  It does not explain why a second tier of professionals is necessary to enable the Plan Administrator to market and sell the Center.  It does not estimate or limit the costs attendant to retention of the second tier professionals, placing the interests of TJ Plaza's equity holders in significant jeopardy of dilution or elimination through administrative and professional expenses incurred in the course of liquidating the Center.  The amount of attorney fees incurred by US Bank in these proceedings shows that risk is substantial.  And it does not explain how it will be determined whether the second tier professionals hold or represent any interests that are inconsistent with the best interests of creditors, equity security holders, and the bankruptcy estates involved in this case.

Based upon its independent review of the evidence developed by the parties at the Confirmation Hearing, the Court concludes that TJ Plaza has established by a preponderance of the evidence that its plan satisfies the requirements of Section 1123(a)(7).  The Court further concludes that US Bank has not carried its burden of proving by a preponderance of the evidence that its marketing and sale plan is consistent with the interests of creditors and equity security holders in the context of Section 1123(a)(7), and therefore has not proven by a preponderance of the evidence that its plan complies with the applicable provisions of the Bankruptcy Code as required by Section 1129(a)(1).

### viii.    Section 1123(a)(8)

Section 1123(a)(8) was added to the Bankruptcy Code to provide that, to be confirmable, an individual debtor's plan must provide for the payment to creditors of all or such portion of earnings from personal services or other future income of the debtor.  Neither TJ

Plaza nor US Bank are individual debtors.  The Court therefore concludes that Section

1123(a)(8) is inapplicable to the plan confirmation analysis.  <u>Art & Architecture</u>, 2016 WL

1118743 at *12.

### c.    Permissive Plan Provisions Under Section 1123(b)

Section 1123(b) of the Bankruptcy Code sets forth a panoply of permissive provisions

that may be incorporated into a chapter 11 plan, including any "provision not inconsistent with

the applicable provisions of [the Bankruptcy Code]".  <u>Art & Architecture</u>, 2016 WL 1118743 at

*12 (citing <u>Dow Corning Corp.</u>, 280 F.3d at 656).  The competing plans at issue both contain a

variety of permissive plan provisions contemplated by Section 1123(b):

■**Plans may impair or leave unimpaired any class of claims, secured or unsecured,
or of interests - Section 1123(b)(1)**:  As discussed in the analysis under
Sections 1123(a)(1) through (3), claims in Classes 2, 3, 5, and 6 are unimpaired
under the TJ Plaza Plan.  Classes 1 and 4 are impaired, and US Bank's secured
claim is the only claim in Class 1 under the TJ Plaza Plan.

Under the US Bank Plan, claims in Classes 2, 3, and 5 are unimpaired.
Claims in Classes 1 and 4 are impaired, and US Bank's secured claim is the only
claim in Class 1 under the US Bank Plan.

■**Subject to 11 U.S.C. § 365, the plans may provide for the assumption, rejection,
or assignment of any executory contract or unexpired lease of the debtor not
previously rejected - Section 1123(b)(2):**  Section 5 of the TJ Plaza Plan
provides for the assumption and rejection of specified executory contracts and
unexpired leases.[264]  Assumption and rejection of executory contracts and

---

[264]Exhibit 228, ECF No. 691, pp. 24-26 of 43, Sections 5.1 through 5.9, inclusive.

1  unexpired leases is generally addressed in Article 6 of the US Bank Plan.[265]

2  ■**Plans may provide for the sale of all or substantially all of the property of the**

3  **estate, and the distribution of the proceeds of such sale among holders of**

4  **claims or interests - Section 1123(b)(4):**  Article 7 of the US Bank Plan

5  explains how the marketing and sale of the estate assets comprising US Bank's

6  collateral will be implemented, and how the resultant proceeds will be

7  distributed.[266]

8  ■**Plans may modify the rights of holders of secured claims, other than a claim**

9  **secured only by a security interest in real property that is the debtor's**

10  **principal residence, of holders of unsecured claims, or leave unaffected the**

11  **rights of holders of any class of claims - Section 1123(b)(5):**  The essence of

12  the TJ Plaza Plan is the modification of the secured US Bank Loan in an effort to

13  cure the existing maturity default under that loan.  The details of how TJ Plaza

14  proposes to modify the secured US Bank Loan are set forth in Section 3.3 of the

15  TJ Plaza Plan.[267]

16  ■**Plans may include any other appropriate provision not inconsistent with the**

17  **applicable provisions of the Bankruptcy Code - Section 1123(b)(6):**  Except

18  as expressly addressed elsewhere in the Court's confirmation analysis, neither

19  the TJ Plaza Plan nor the US Bank Plan contain provisions inconsistent with the

20  applicable provisions of the Bankruptcy Code.

21          **d.      Cure Requirements Under 1123(d)**

22

23  [265]ECF No. 696, p. 16 of 27, as amended at Exhibit S; Exhibit S, ECF No. 895, pp. 18-19
24  of 31.

25  [266]ECF No. 696, pp. 16-17 of 27, as amended at Exhibit S.  Exhibit S, ECF No. 895, pp.
     19-23 of 31.

26  [267]Exhibit 228, ECF No. 691, pp. 17-21 of 43, Sections 3.3.1 through 3.3.3, inclusive.

Section 1123(d) applies in cases where a plan proposes to cure a prebankruptcy default under a loan agreement between the debtor and a secured creditor, and provides:

**§1123. Contents of plan**

\* \* \*

(d)    Notwithstanding subsection (a) of this section, and sections 506(b), 1129(a)(7), and 1129(b) of this title, if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law.

Under Section 2.1(a) of the Deed of Trust, an "Event of Default" under the US Bank Loan includes, without limitation, when TJ Plaza fails to pay any money due to US Bank under the Note.  The preponderance of the evidence at the Confirmation Hearing plainly established that TJ Plaza failed to pay the balance owed to US Bank when the US Bank Loan matured, and that a maturity default continues to exist under the US Bank Loan Documents.  Ms. Vis testified credibly that in addition to the principal and contract interest due under the terms of the matured US Bank Loan, TJ Plaza owed US Bank accrued but unpaid default interest at four percent ($459,495.73), accrued but unpaid late fees ($216,332.32), accrued but unpaid attorney fees and charges ($878,089.07), and other miscellaneous unpaid fees ($24,599.91).

As noted above in the analysis under Section 1123(a)(5)(G), Section 3.3.2.16 of the TJ Plaza Plan contains a cure provision, stating that "[o]n the Effective Date, all pre-Effective Date defaults under the U.S. Bank Loan Documents shall be deemed to have been cured and reinstated consistent with this Plan and the Confirmation Order and on the Effective Date, Debtors and/or Reorganized Debtors shall be fully current and in good standing thereunder." TJ Plaza strenuously argues that the cure provisions contained in the TJ Plaza Plan are permissible, and "[a]s applied in the case at hand, [the cure provision] would allowing [sic] the Debtors to avoid the payment of default interest and late fees" which according to US Bank's payoff statement and Ms. Vis' testimony would be "$459,495.73 in default interest and

$216,332.32 in late fees . . . for a total of $675,828.05."[268]

TJ Plaza cites to decisions from the Ninth Circuit Court of Appeals as support for the proposition that late fees and accrued interest at the default rate in need not be paid in order to effectuate a cure of the maturity default under the US Bank Loan, notwithstanding the plain language of Section 1123(d).[269]  The decisions relied upon by TJ Plaza were, however, recently and squarely overruled by the Ninth Circuit Court of Appeals in Pacifica L 51, LLC v. New Invs, Inc. (In re New Invs., Inc.), 840 F.3d 1137 (9th Cir. 2016) ("Both the text and the legislative history of § 1123(d) make clear that the provision was intended to limit parties to the benefit of their bargain when a debtor seeks to effectuate a cure and return to pre-default conditions.  The parties bargained for a higher interest rate on the Note in the event of default, and Pacifica is entitled to the benefit of that bargain under the terms of § 1123(d).").[270]  A

---

[268]ECF No. 897, p. 60 of 62.

[269]Gen. Elec. Capital Corp. v. Future Media Prods., Inc. (In re Future Media Prods., Inc.), 536 F.3d 969 (9th Cir. 2008) and Great Western Bank & Trust v. Entz-White Lumber & Supply, Inc. (In re Entz-White Lumber & Supply, Inc.), 850 F.2d 1338 (9th Cir. 1988), are cited in TJ Plaza's pre-confirmation reply brief.  ECF No. 897, p. 60 of 62.

[270]In Pacifica L 51, the Ninth Circuit applied Washington state law in determining that the default interest rate provided for in the parties' loan documents was appropriate under "applicable nonbankruptcy law."  Nevada law authorizes default interest rates and other fees and charges to be imposed under a written loan agreement at any rate agreed upon by the parties to the agreement.  Specifically, Nevada Revised Statute ("NRS") § 99.050 reads:

> **Agreed interest rates; compounding; charges or fees.**  Except as otherwise provided in section 670 of the John Warner National Defense Authorization Act for Fiscal Year 2007, Public Law 109-364, or any regulation adopted pursuant thereto, parties may agree for the payment of ***any rate of interest*** on money due or to become due on any contract, for the compounding of interest if they choose, and for any other charges or fees.  The parties shall specify in writing the rate upon which they agree, that interest is to be compounded if so agreed, and any other charges or fees to which they have agreed.

NRS § 99.050 (emphasis added); see also Williams v. Bank of Am., N.A., 2016 WL 3883441, *4 (D. Nev. July 18, 2016) ("Usury is no longer a cause of action in Nevada. . . .  Under Nevada

1    similar outcome was recently reached by the Ninth Circuit Bankruptcy Appellate Panel in Wells

2    Fargo Bank, N.A. v. Beltway One Dev. Grp., LLC (*In re* Beltway One Dev. Grp., LLC), 547

3    B.R. 819 (9th Cir. BAP 2016).

4         The Court concludes that under the controlling decision of the Ninth Circuit in Pacifica

5    L 51, the persuasive decision of the Ninth Circuit Bankruptcy Appellate Panel in Beltway One,

6    and the preponderance of the evidence developed at the Confirmation Hearing, the cure

7    provisions contained in the TJ Plaza Plan run afoul of the plain language of Section 1123(d).  TJ

8    Plaza cannot properly avoid sums due for accrued default interest, late fees, or attorney's fees

9    through the expedient of a cure provision like the one contained in the text of its proposed plan

10   of reorganization.  Since the TJ Plaza Plan does not satisfy the cure requirements imposed by

11   Section 1123(d), TJ Plaza has not proven by a preponderance of the evidence that its plan

12   complies with the applicable provisions of the Bankruptcy Code as required by Section

13   1129(a)(1).

14        The US Bank Plan does not contain a cure provision within the purview of Section

15   1123(d).  As a result, the Court concludes that Section 1123(d) is inapplicable in the

16   confirmation calculus as it relates to the US Bank Plan.

17            **e.    Summary of the Confirmation Analysis Under
18                    Section 1129(a)(1)**

19        The Court concludes that the TJ Plaza Plan fails to satisfy the classification

20   requirements of Section 1122 as the result of impermissible gerrymandering, and does not

21   satisfy the cure requirements imposed by Section 1123(d).  The Court therefore concludes that

22   TJ Plaza has failed to carry its burden of proving by a preponderance of the evidence that the TJ

23   Plaza Plan complies with the applicable provisions of the Bankruptcy Code as required by

24   Section 1129(a)(1).

25   _____

26   law, parties may agree to any interest amount.  See NRS § 99.050.  Usury was superseded by
     NRS § 99.050; therefore, plaintiff's usury claim is dismissed with prejudice.")

As to the US Bank Plan, the Court concludes that US Bank has not carried its burden of proving by a preponderance of the evidence that its marketing and sale plan is consistent with the interests of creditors and equity security holders in the context of Section 1123(a)(7).  As a result, the Court concludes that US Bank has not proven by a preponderance of the evidence that its plan complies with the applicable provisions of the Bankruptcy Code as required by Section 1129(a)(1).

### 2.    Section 1129(a)(2): Plan Proponent's Compliance with Applicable Provisions of the Bankruptcy Code

Section 1129(a)(2) of the Bankruptcy Code requires the Court to find that "[t]he proponent of the plan [has] complie[d] with the applicable provisions of" the Bankruptcy Code. "Compliance with the disclosure and solicitation requirements is the paradigmatic example of what the Congress had in mind when it enacted section 1129(a)(2)." See Trenton Ridge,  461 B.R. at 467 (citing Michelson, 141 B.R. at 719, In re Trans World Airlines, Inc., 185 B.R. 302, 313 (Bankr. E.D. Mo. 1995) ("The principal purpose of section 1129(a)(2) of the Bankruptcy Code is to assure that the plan proponents have complied with the disclosure requirements of section 1125 of the Bankruptcy Code in connection with the solicitation of acceptances of the plan.")); see In re Texaco Inc., 84 B.R. 893, 906-07 (Bankr. S.D.N.Y. 1988).  The confirmation requirements imposed by Section 1129(a)(2) have been analyzed in previous decisions by this Court, and were explained in the following way:

> It is of course beyond doubt that a plan may not be confirmed if the proponent solicits votes before approval and distribution of a disclosure statement.  That result flows from the text of Section 1125(b): "An acceptance or rejection of a plan may not be solicited after the commencement of the case . . . from a holder of a claim . . . unless, at the  time of or before such solicitation, there is transmitted to such holder the plan . . . , and a written disclosure statement approved . . . by the court as containing adequate information."  Section 1129(a)(2) then elevates Section 1125(b)'s prohibition into a confirmation requirement.
>
> But the solicitation here–and it was a solicitation because it directly requested that creditors exercise their vote on a specific plan in a particular way–occurred *after* the court had approved debtor's disclosure statement. Under such circumstances, the need addressed by Section 1125(b) has been met. Creditors

possess a disclosure statement that the court has vetted, usually with assistance of interested party objections.

Trans Max, 349 B.R. at 86 (emphasis in original).

Separate orders conditionally approving the disclosure statements prepared to accompany the TJ Plaza Plan and the US Bank Plan were approved by order of the Court on August 28, 2015,[271] and September 4, 2015,[272] respectively.  TJ Plaza served its solicitation package regarding the TJ Plaza Plan on September 4, 2015.[273]  US Bank served its solicitation package regarding the US Bank Plan on September 8, 2015.[274]  The orders conditionally approving the parties' disclosure statements were entered prior to the solicitation of ballots in support of the respective plans.

Since solicitation of ballots occurred only after orders conditionally approving the parties' disclosure statements were entered, the need addressed by Section 1125(b) has been met.  Trans Max, 349 B.R. at 86.  The Court has also concluded that the disclosure statements filed by TJ Plaza and US Bank, as amended to date, meet the adequate information standard for approval under Section 1125(a)(1) on a final basis.  As a result, the Court concludes that both TJ Plaza and US Bank have established by a preponderance of the evidence that their respective Plans comply with the provisions of the Bankruptcy Code governing the adequacy of disclosure statements, notice, disclosure, and solicitation.  The Court therefore concludes that the requirements of Section 1129(a)(2) of the Bankruptcy Code have been satisfied with respect to both the TJ Plaza Plan and the US Bank Plan.  Art & Architecture, 2016 WL 1118743 at *15; Trans Max, 349 B.R. at 86.

---

[271]ECF No. 698.

[272]ECF No. 710.

[273]ECF No. 709.

[274]ECF No. 716.

### 3. Section 1129(a)(3): Plan Proposed in Good Faith and Not by Any Means Forbidden by Law

Under Section 1129(a)(3), a plan must have "been proposed in good faith and not by any means forbidden by law."  The Ninth Circuit Court of Appeals addressed the question of good faith in the context of Section 1129(a)(3) in Platinum Capital, Inc. v. Sylmar Plaza, L.P. (*In re* Sylmar Plaza, L.P.), 314 F.3d 1070, 1074-75 (9th Cir. 2002), cert. denied, 538 U.S. 1035 (2003), stating:

> Section 1129(a)(3) does not define good faith.  In re Madison Hotel Assocs., 749 F.2d 410, 425 (7th Cir. 1994).  A plan is proposed in good faith where it achieves a result consistent with the objectives and purposes of the Code.  Ryan v. Loui (*In re* Corey ), 892 F.2d 829, 835 (9th Cir. 1989), cert. denied, 498 U.S. 815 (1990); see also Madison Hotel, 749 F.2d at 425 ("[F]or purposes of determining good faith under section 1129(a)(3) . . . the important point of inquiry is the plan itself and whether such plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code.").  The requisite good faith determination is based on the totality of the circumstances. Stolrow v. Stolrow's, Inc. (*In re* Stolrow's, Inc.), 84 B.R. 167, 172 (9th Cir. BAP 1988).  Insolvency is not a prerequisite to a finding of good faith under § 1129(a).  See Stolrow's, Inc. at 171. Moreover, that a creditor's contractual rights are adversely affected does not by itself warrant a bad faith finding.  "In enacting the Bankruptcy Code, Congress made a determination that an eligible debtor should have the opportunity to avail itself of a number of Code provisions which adversely alter creditors' contractual and nonbankruptcy rights."  In re PPI Enters., Inc., 228 B.R. 339, 344-45 (Bankr. D. Del. 1998), aff'd, 324 F.3d 197 (3d Cir. 2003). "[T]he fact that a debtor proposes a plan in which it avails itself of an applicable Code provision does not constitute evidence of bad faith."  PPI Enters., 228 B.R. at 347 (stating that it is not bad faith to take advantage of a particular provision of the Code for the purpose of capping the amount of a creditor's claim).
>
> While the protection of creditors' interests is an important purpose under chapter 11, the Supreme Court has made it clear that successful debtor reorganization and maximization of the value of the estate are the primary purposes of chapter 11 relief.  Bonner Mall P'ship v. US Bancorp Mortg. Co. (*In re* Bonner Mall P'ship), 2 F.3d 899, 916 (9th Cir. 1993), cert. granted, 510 U.S. 1039, appeal dismissed, 513 U.S. 18 (1994), citing NLRB v. Bildisco & Bildisco, 465 U.S. 513, 527 (1984) and Toibb v. Radloff, 501 U.S. 157, 164 (1991).

See also In re Seasons Partners, LLC, 439 B.R. 505, 512-13 (Bankr. D. Ariz. 2010) ("The bankruptcy definition most commonly applied is that the good faith, which is needed to confirm a plan of reorganization, requires the plan to achieve a result consistent with the objectives and

purposes of the Bankruptcy Code."). The requirement of good faith must be viewed in light of the totality of the circumstances surrounding the establishment of a chapter 11 plan. <u>Art & Architecture</u>, 2016 WL 1118743 at *15 (citing <u>Sylmar Plaza,</u> 314 F.3d at 1074).

The Ninth Circuit Court of Appeals has also noted that the good faith requirement does not depend on a debtor's subjective intent, but rather "encompasses several, distinct equitable limitations that courts have placed on Chapter 11 filings." <u>Marsch v. Marsch</u> (*In re* Marsch), 36 F.3d 825, 828-29 (9th Cir. 1994). Generally, a plan is not filed in good faith if it represents an attempt "to unreasonably deter and harass creditors" and to "achieve objectives outside the legitimate scope of the bankruptcy laws." <u>Id</u>.

Having considered the record as a whole, the Court concludes that the TJ Plaza Plan was not filed in bad faith. TJ Plaza filed this bankruptcy case after the US Bank Loan matured, and after refinancing attempts with US Bank proved unsuccessful. The TJ Plaza Plan seeks to reorganize TJ Plaza's debts, and to restructure the matured US Bank Loan. As the Ninth Circuit Court of Appeals noted in <u>Sylmar Plaza</u>, successful debtor reorganization and maximization of the value of the estate are the primary purposes of chapter 11 relief.[275] On this record, the Court cannot conclude that it is "obvious that [TJ Plaza is] attempting unreasonably to deter and harass creditors" through the filing of its plan. <u>Marshall v. Marshall</u> (*In re* Marshall), 721 F.3d 1032, 1047-49 (9th Cir. 2013) (citing <u>Meadowbrook Inv'rs Grp. v. Thirtieth Place, Inc.</u> (*In re* Thirtieth Place, Inc., 30 B.R. 503, 505 (9th Cir. BAP 1983), quoting <u>In re Levinsky</u>, 23 B.R. 210, 218 (Bankr. E.D.N.Y. 1982)). As a result, the Court concludes that TJ Plaza has proven by a preponderance of the evidence that the TJ Plaza Plan was not filed in bad faith in the context of Section 1129(a)(3).

The Court likewise concludes that the totality of the circumstances demonstrates that the US Bank Plan was not filed in bad faith in the context of Section 1129(a)(3). US Bank filed its

---

[275]<u>Sylmar Plaza</u>, 314 F.3d at 1074-75.

Plan after its secured loan to TJ Plaza had matured and remained unpaid, and at a point in time when Trader Joe's continued status as an anchor tenant at the Center was uncertain. The US Bank Plan generally seeks to enforce US Bank's rights under the US Bank Loan Documents, and to liquidate US Bank's collateral to satisfy its secured claim. In <u>Sylmar Plaza</u>, the Ninth Circuit Court of Appeals noted that the protection of creditors' interests is an important purpose under chapter 11.[276] As a result, the Court concludes that US Bank has also proven by a preponderance of the evidence that the US Bank Plan was not filed in bad faith in contravention of Section 1129(a)(3) of the Bankruptcy Code.

As determined previously, though, the TJ Plaza Plan's separate classification of the Sewer Claim constituted improper gerrymandering violative of Section 1122, and contains cure provisions that fail to comply with the cure requirements imposed by of Section 1123(d). As a result, the Court concludes that the TJ Plaza Plan was proposed by means forbidden by bankruptcy law as embodied in those provisions of the Bankruptcy Code, and that TJ Plaza has therefore failed to prove by a preponderance of the evidence that the TJ Plaza Plan meets the confirmation requirements imposed under Section 1129(a)(3).

As to the US Bank Plan, the Court previously determined that US Bank failed to prove by a preponderance of the evidence that its marketing and sale plan is consistent with the interests of creditors and equity security holders in the context of Section 1123(a)(7). The Court therefore concludes that the US Bank Plan was proposed by means forbidden by bankruptcy law in the form of Section 1123(a)(7), and that US Bank therefore failed to prove by a preponderance of the evidence that the TJ Plaza Plan meets the confirmation requirements imposed under Section 1129(a)(3).

### 4.    Section 1129(a)(4): Certain Payments Subject to Court Approval

Bankruptcy Code Section 1129(a)(4) requires that any payment made or to be made by a

---

[276] <u>Id.</u>

plan proponent, the debtor, or by a person issuing securities, or acquiring property under the plan, for services or for costs and expenses in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of the court, as reasonable. Art & Architecture, 2016 WL 1118743 at *15 (citing In re Drexel Burnham Lambert Grp., Inc., 138 B.R. 723, 760 (Bankr. S.D.N.Y. 1992) and In re Johns-Manville Corp., 68 B.R. 618, 632 (Bankr. S.D.N.Y. 1986), aff'd, 78 B.R. 407 (S.D.N.Y. 1987), aff'd 843 F.2d 636 (2d Cir. 1988) (other internal citations omitted)). "This subsection mandates full disclosure of all payments or promises of payment for services, costs, and expenses in connection with the case, and subjects the reasonableness of such payments to the scrutiny and approval of the Court." Trenton Ridge, 461 B.R. at 472-73 (citations omitted). "Court approval of payments for services and expenses is governed by various Bankruptcy Code provisions–e.g., §§ 328, 329, 330, 331, and 503(b)–and need not be explicitly provided for in a Chapter 11 plan." Art & Architecture, 2016 WL 1118743 at *15 (quoting In re Future Energy Corp., 83 B.R. 470, 488 (Bankr. S.D. Ohio 1988)).

There has been no suggestion that either the TJ Plaza Plan or the US Bank Plan fail to satisfy the requirements of Section 1129(a)(4). The Court, based on its independent review, finds that the requirements of that Section are satisfied by both plans.[277] In summary, the Court concludes that TJ Plaza and US Bank have each proven by a preponderance of the evidence that their respective plans provide for appropriate Court approval of payments made under those plans, satisfying the requirements of Section 1129(a)(4) of the Bankruptcy Code.

### 5.    Section 1129(a)(5):  Disclosure of Identity and Affiliations of Certain Individuals

Under Section 1129(a)(5), the Court shall confirm a plan, if at all, only if:

---

[277] See Exhibit 228, ECF No. 691, p. 16 of 43, Section 2.2.2; see id., p. 34 of 43, Section 11.1.2; see ECF No. 696, p. 12 of 27, as amended at Exhibit S; see id., p. 26 of 27, as amended at Exhibit S.

(A)(i)   The proponent of the plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan; and

(ii)   the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy; and

(B)   the proponent of the plan has disclosed the identity of any insider that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider.

The TJ Plaza Plan states that "[f]rom the Effective Date until the dissolution of Reorganized Debtors, the Debtors' present property manager and leasing agent, Real Estate Management, LLC, a Nevada limited liability company, of which Jeff Susa is a managing member, shall continue to manage and operate Debtors' Real Property[.]"[278]  In light of Mr. Susa's extensive experience in operating the Center, and his testimony as to how he would operate the Center if the TJ Plaza Plan were to be confirmed, the Court concludes that TJ Plaza has carried its burden of proving by a preponderance of the evidence that its plan complies with the confirmation requirements imposed by Sections 1129(a)(5)(A) and (B).  Trenton Ridge, 461 B.R. at 473; Art & Architecture, 2016 WL 1118743 at *16.

The original US Bank Plan provided for appointment of an unnamed "Plan Transferee." As amended, the US Bank Plan provides for appointment of Mr. Jacobs to serve as a "Plan Administrator."  Mr. Jacobs, through retention of a second tier of unidentified professionals, is to assume management and control of the Center, and cause the Center to be listed for sale such that it shall be sold within two hundred seventy days after the Effective Date.[279]  The Court concludes that the "Plan Transferee" generally referenced in the original US Bank Plan, and Mr. Jacobs as the "Plan Administrator" specifically identified under the amended US Bank Plan, is a

---

[278]See Exhibit 228, ECF No. 691, p. 23 of 43, Section 4.3.

[279]See generally ECF No. 696, pp. 16-17 of 27, as amended at Exhibit S.

149

"successor" to the Debtors in the context of Section 1129(a)(5)(A)(i). The Court concludes further that, while US Bank failed to disclose the identity and affiliations of the individual proposed to serve as the "Plan Transferee" under its original plan, the US Bank Plan as amended specifically identifies Mr. Jacobs as the "Plan Administrator," and discloses his qualifications to serve in that capacity. US Bank made Mr. Jacobs available for questioning about his role as Plan Administrator under the amended US Bank Plan during the course of the Confirmation Hearing. As a result, the Court concludes that US Bank has proven by a preponderance of the evidence that its plan complies with the confirmation requirement imposed by Section 1129(a)(5)(A)(i). Trenton Ridge, 461 B.R. at 473; Art & Architecture, 2016 WL 1118743 at *16.

As discussed previously in the confirmation analysis under Sections 1129(a)(1) and 1123(a)(7), though, the US Bank Plan does not identify any of the second tier of professional(s) the Plan Administrator will need to hire to manage, market and sell the Center, and commits the retention of second tier professionals to the Plan Administrator's sole discretion. It does not explain why a second tier of professionals is necessary to enable the Plan Administrator to market and sell the Center. It does not estimate or limit the costs attendant to retention of the second tier professionals, placing the interests of TJ Plaza's equity holders in significant jeopardy of dilution through administrative and professional expenses in the course of liquidating the Center. And it does not explain how it will be determined whether the second tier professionals hold or represent any interests that are inconsistent with the best interests of creditors, equity security holders, and the bankruptcy estates involved in this case. As a result, the Court concludes that US Bank has failed to prove by a preponderance of the evidence that its plan complies with the confirmation requirements imposed by Section 1129(a)(5)(A)(ii).

### 6.    Section 1129(a)(6): Governmental Regulatory Approvals

Section 1129(a)(6) of the Bankruptcy Code requires as a condition precedent to confirmation that any governmental regulatory entity with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such

rate change is expressly conditioned on such approval.  Neither TJ Plaza nor US Bank is subject

to such governmental rate regulations, so neither the TJ Plaza Plan nor the US Bank Plan

provides for any rate changes that are subject to governmental approval.  As a result, Section

1129(a)(6) is inapplicable in the confirmation calculus.  Art & Architecture, 2016 WL 1118743

at *16 (citing In re Sound Radio, Inc., 93 B.R. 849, 854 (Bankr. D.N.J. 1988), aff'd in part 103

B.R. 521 (D.N.J. 1989), aff'd, 908 F.2d 964 (3d Cir. 1990), and Texaco, 84 B.R. at 908).

### 7.    Section 1129(a)(7):  The Best Interest of Creditors Test

Section 1129(a)(7) is the statutory embodiment of the so-called "best interest of

creditors" test as a predicate to confirmation.  As the Ninth Circuit Court of Appeals explained in

Marshall v. Marshall (In re Marshall), 721 F.3d 1032,1046 (9th Cir. 2013), Section 1129(a)(7)

requires that:

> [w]ith respect to each impaired class of claims or interests–
> (A) each holder of a claim or interest of such class–
>     (i) has accepted the plan; or
>     (ii) will receive or retain under the plan on account of such claim or
> interest property of a value, as of the effective date of the plan, that is not
> less than the amount that such holder would so receive or retain if the
> debtor were liquidated under chapter 7 of this title on such date.

Stated differently, Section 1129(a)(7) requires that as a predicate to confirmation, with respect to

each impaired class of claims or interests, each holder of a claim or interest of such class has

either accepted the plan, or will receive or retain under the plan property of a value, as of the

effective date, not less than the amount that such holder would receive or retain if the debtor

were liquidated under chapter 7 on such date.  Art & Architecture, 2016 WL 1118743 at *17

(citing Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. La Salle St. P'ship, 526 U.S. 434, 442

(1999) and United States v. Reorganized CF & I Fabricators, Inc., 518 U.S. 213, 228 (1996)).

The TJ Plaza Plan identifies two impaired classes of claims: Class 1 (US Bank's Secured

Claim) and Class 4 (General Unsecured Claims).  The ballot summary regarding the TJ Plaza

Plan[280] reveals that US Bank's secured claim, the only claim in Class 1, is impaired and that US Bank cast its vote to reject the TJ Plaza Plan.  The ballot summary likewise shows that not all creditors holding Class 4 (General Unsecured Claims) voted to accept the TJ Plaza Plan.  As a result, the TJ Plaza Plan does not satisfy the confirmation requirement imposed by Section 1129(a)(7)(A)(i).

The liquidation analysis appended to the disclosure statement that accompanied the TJ Plaza Plan[281] suggests, and the record developed at the Confirmation Hearing confirms, that US Bank would receive full payment for its impaired Class 1 secured claim upon liquidation of the Center and US Bank's related collateral.  The liquidation analysis and Confirmation Hearing record also establish that no distribution would reach the Class  4 creditors who voted to reject the TJ Plaza Plan in a chapter 7 liquidation filed on the effective date of the TJ Plaza Plan.  The Court concludes that TJ Plaza has carried its burden of proving by a preponderance of the evidence that each holder of a claim or interest in impaired Classes 1 and 4 will receive or retain under the TJ Plaza Plan property of a value, as of the effective date, not less than the amount that such holder would receive or retain if Debtors were liquidated under chapter 7 on such date.  As a result, the TJ Plaza Plan satisfies the confirmation requirement imposed by Section 1129(a)(7)(A)(ii).

For clarity and avoidance of doubt, in concluding that the TJ Plaza Plan complies with Section 1129(a)(7)(A)(ii), the Court has considered, and on the record before it rejects, US Bank's argument that "grossing up" its secured claim to include default interest, late fees and attorney fees in a hypothetical chapter 7 liquidation mandates a different conclusion.  To the contrary, in a liquidation US Bank would **retain** the lien upon its collateral, and **receive** the value of its collateral at liquidation.  "Grossing up" US Bank's secured claim in a chapter 7

[280]ECF No. 891.

[281]Exhibit 227, ECF No. 690-5, pp. 2-3 of 3.

liquidation would effectively ensure that all general unsecured creditors holding Class 4 claims who voted to reject the TJ Plaza Plan would receive nothing, satisfying Section 1129(a)(7)(A)(ii). See Zante, Inc., 467 B.R. at 219 ("Because nothing is not less than nothing, the Plan satisfied § 1129(a)(7) without amendment.").

The US Bank Plan identifies the Class 1 secured claim held by US Bank as an impaired creditor class that voted to accept the US Bank Plan.[282] The other two creditor classes identified under the US Bank Plan (i.e., Class 2 General Unsecured Claims, and Class 3 Priority Non-Tax Claims) are unimpaired, as the US Bank Plan provides that they will be paid in full upon the sale of the Center.[283] The holders of Class 4 equity interests in the Debtors, though, are impaired under the US Bank Plan. The US Bank Plan provides that impaired Class 4 equity interests "will neither receive nor retain any interests on account of their Interests" under the plan, and are deemed to have rejected it under Section 1126(g). As a result, the US Bank Plan does not satisfy the confirmation requirement imposed by Section 1129(a)(7)(A)(i).

US Bank's liquidation analysis, as well as the preponderance of the related evidence developed at the Confirmation Hearing, establish that US Bank would receive full payment for its impaired Class 1 secured claim upon a chapter 7 liquidation of the Center and US Bank's related collateral.[284] The preponderance of the evidence at the Confirmation Hearing also established that if the Center and US Bank's related collateral were liquidated in a chapter 7 proceeding, no distribution would reach the holders of Class 4 equity interests in the Debtors following full payment of the senior claims held by creditors in Classes 1 through 3. Even if that were not the case, the US Bank Plan provides that the holders of Class 4 equity interests "will

---

[282]ECF No. 696, pp. 13-14 of 27, as amended at Exhibit S; ECF No. 804, p. 2 of 7.

[283]ECF No. 696, pp. 13-14 of 27, as amended at Exhibit S.

[284]As discussed supra, the Court has determined that the value of the Center and other related assets subject to US Bank's secured claim is $7,080,000, and that the amount owed to US Bank under the matured US Bank Loan as of the Confirmation Hearing was $6,158,351.67.

receive net proceeds from the sale of the Property, to the extent any remain after all other Allowed Claims have been satisfied in full."[285]

On the record before it, the Court concludes that US Bank has carried its burden of proving by a preponderance of the evidence that each holder of a claim or interest in impaired Classes 1 and 4 will receive or retain under the US Bank Plan property of a value, as of the effective date, not less than the amount that such holder would receive or retain if Debtors were liquidated under chapter 7 on such date.  As a result, the US Bank Plan satisfies the confirmation requirement imposed by Section 1129(a)(7)(A)(ii).

### 8. Section 1129(a)(8) and 1129(b):  Plan Acceptance by Creditor Classes; Unfair Discrimination; Fair and Equitable Treatment of Non-Accepting Creditor Classes

#### a. No Unanimous Class Acceptance of Either Plan

Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests either accepts the plan, or is not impaired under the plan. See Texaco, 84 B.R. at 909. The requirement of Section 1129(a)(8) is the only condition precedent included in Section 1129(a) which is not necessary for confirmation.  "If a plan satisfies the confirmation criteria set forth in section 1129(a), including the requirement that if a class of claims is impaired, at least one impaired class of claims accepts the plan, the plan may be confirmed notwithstanding the opposition of one or more impaired classes of claims or interests, provided the plan satisfies section 1129(b)."  7 COLLIER ON BANKRUPTCY ¶1129.02[8] (Alan N. Resnick & Henry J. Sommer, eds., 16th ed. 2016).  Whether a class has accepted the plan is determined by reference to Section 1126 of the Bankruptcy Code.  Under Section 1126(f), any class which is not impaired under the plan is conclusively presumed to have accepted the plan. 11 U.S.C. § 1126(f).  See Art & Architecture, 2016 WL 1118743 at *17.  Under Section 1126(g), if a plan "provides that the claims or interests of [a] class do not entitle the holders of such claims or interests to receive or

---

[285]ECF No. 696, p. 14 of 27, as amended at Exhibit S.

retain any property under the plan on account of such claims or interests[,]" that class is "deemed not to have accepted a plan." See Trans Max, 349 B.R. at 89 (noting that where a plan provides for elimination of the interests held by current equity security holders in the debtor, the class holding those equity interests is deemed to have rejected the plan by operation of Section 1126(g)).

Under the TJ Plaza Plan, US Bank's Class 1 Secured Claim is an impaired class. The ballot summary regarding the TJ Plaza Plan[286] reveals that US Bank, the holder of the only claim in Class 1, voted to reject the TJ Plaza Plan. Because Class 1 unanimously voted to reject the TJ Plaza Plan, that plan does not satisfy the confirmation requirement imposed by 11 U.S.C. § 1129(a)(8). The only route to confirmation available for the TJ Plaza Plan is through the cramdown process under Section 1129(b).

The US Bank Plan classifies US Bank's Class 1 Secured Claim as an impaired class. Unsurprisingly, the ballot summary regarding the US Bank Plan[287] reveals that US Bank, the holder of the only claim in Class 1, cast its vote to accept the US Bank Plan. Classes 2 (General Unsecured Claims) and 3 (Priority Non-Tax Claims) are classified as unimpaired under the US Bank Plan, and are therefore presumed to have accepted that plan by operation of Section 1126(f). The US Bank Plan acknowledges that the holders of Class 4 equity interests in the Debtors "are impaired" because they "will neither receive nor retain any interests on account of their Interests under the [US Bank] Plan.[288] Further, the US Bank Plan concedes that the holders of Class 4 equity interests in the Debtors "are deemed to have rejected the [US Bank] Plan pursuant to 11 U.S.C. § 1126(g).[289] There is nothing in the ballot summary prepared by US Bank

---

[286]ECF No. 891.

[287]ECF No. 804.

[288]ECF No. 696, p. 14 of 27, as amended at Exhibit S.

[289]ECF No. 696, p. 14 of 27, as amended at Exhibit S.

which reflects rejection of the US Bank Plan by the Class 4 equity interest holders by operation of Section 1126(g).[290]  But the evidence is clear, as is the related legal effect of the Class 4 equity interest holders' rejection of the US Bank Plan by operation of Section 1126(g).  See Trans Max, 349 B.R. at 89 ("Trans Max's plan seeks to eliminate all outstanding equity securities, including those held by Higgins. As all current equity security holders are being eliminated, the class is deemed to have rejected the plan, 11 U.S.C. § 1126(g), and thus the only method of confirmation is nonconsensual cramdown under 11 U.S.C. § 1129(b).")

To summarize, the preponderance of the evidence falls short of establishing unanimous acceptance of either the TJ Plaza Plan, or the US Bank Plan, by all impaired classes of creditors or interest holders.  If confirmation of either plan is to be had, the cramdown requirements of Section 1129(b) must be satisfied.

### b.    Cramdown Analysis

Section 1129(b) of the Bankruptcy Code provides that a plan can be confirmed even if the plan is not accepted by all impaired classes as contemplated by Section 1129(a)(8).  In such a situation, the court may confirm a plan if the plan "does not discriminate unfairly" and is "fair and equitable" as to each impaired class that has not accepted the plan.  11 U.S.C. § 1129(b)(1). See In re Rexford Props., 558 B.R. at 368; Art & Architecture, 2016 WL 1118743 at *18.  A plan does not "discriminate unfairly" within the meaning of the Bankruptcy Code if a dissenting class is treated equally with respect to other classes of equal rank.  Art & Architecture, 2016 WL 1118743 at *18 ("A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a dissenting class is treated equally with respect to other classes of equal rank.").

As to a class of dissenting secured creditors, the "fair and equitable" cramdown requirement is satisfied if any one of the three alternatives set out in Section 1129(b)(2)(A) is satisfied.  The plan must provide either that: (1) the secured lender will retain its liens and be

---

[290]ECF No. 804, pp. 1-2 of 7.

paid in deferred payments an amount that equates to the present value of the secured creditor's

claim; (2) the secured lender's collateral will be sold free and clear of liens with the liens

attaching to the proceeds, and treating the claim under either of the other two alternatives; or (3)

the secured creditor will realize the "indubitable equivalent" of its claim. 11 U.S.C.

§ 1129(b)(2)(A).  In re Souza, 2012 WL 8441318, *5 (Bankr. E.D. Cal. Nov. 26, 2012);

RadLAX Gateway Hotel, LLC v. Amalgamated Bank, 566 U.S. 639, 132 S. Ct. 2065, 2069-70

(2012).  As explained by the United States District Court for the District of Arizona:

> In order for cramdown to be implemented, and the Plan confirmed over a class'
> vote against it, the Debtor must show that the Plan does not unfairly discriminate
> against that dissenter, and that its treatment is "fair and equitable."  These latter
> terms have defined meanings, and in this case, require that its lien interests
> remain in place, and if payments are deferred and paid over a term, that those
> payments have appropriate "value."  This "value" is generally understood to be a
> market rate of interest, considering the terms, quality of the security and any risk
> to be borne by the affected creditor.  In re P.J. Keating Co., 168 B.R. 464, 472
> (Bankr. D. Mass. 1994) (quoting applicable portion of § 1129(b)(2)(A)).  As a
> result, the interest rate paid to the secured creditor must be an appropriate rate of
> interest so that the creditor may realize the present value of the secured portion of
> the claim.  In re Landscape Assocs., Inc., 81 B.R. 485, 487-88 (Bankr. E.D. Ark.
> 1987).  If a Chapter 11 plan proposes payment of an interest rate below the "range
> of prevailing market rates for loans of comparable risk and duration" or which
> does not take into account the actual risk of that loan, confirmation must be
> denied because the deferred payments will not yield the present value of the claim
> and, therefore, the plan is not "fair and equitable" and will not satisfy
> § 1129(b)(2)(A)(i)(II).  See, e.g., In re One Times Square Assocs. Ltd. P'ship, 159
> B.R. 695, 706 (Bankr. S.D.N.Y. 1993).[291]

In re Linda Vista Cinemas, L.L.C., 442 B.R. 724, 748 (Bankr. D. Ariz. 2010).

A plan is fair and equitable as to a class of unsecured claims which rejects a plan if the

plan provides (a) for each holder of a claim included in the rejecting class to receive or retain on

account of that claim property that has a value, as of the effective date of the plan, equal to the

allowed amount of such claim; or (b) that the holder of any claim or interest that is junior to the

claims of such class will not receive or retain on account of such junior claim or interest any

---

[291]The full citation is In re One Times Square Assocs. Ltd. P'ship, 159 B.R. 695, 706
(Bankr. S.D.N.Y. 1993), aff'd, 165 B.R. 773 (S.D.N.Y.), aff'd, 41 F.3d 1502 (2d Cir. 1994), cert.
denied, 513 U.S. 1153 (1995).

property at all.  11 U.S.C. § 1129(b)(2)(B).

Finally, a plan is fair and equitable as to a class of equity interests that rejects a plan if the plan provides (a) that each holder of an interest included in the rejecting class receives or retains on account of that interest property that has a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption to which such holder is entitled, or the value of such interest; or (b) that the holder of any interest that is junior to the interests of such class will not receive or retain any property at all on account of such junior interest under the plan. 11 U.S.C. § 1129(b)(2)(C).  See generally Art & Architecture, 2016 WL 1118743 at *18.

The TJ Plaza Plan identifies two impaired creditor classes: Class 1, comprised exclusively of US Bank's secured claim, and Class 4, comprised of general unsecured creditors.[292]  The US Bank Plan identifies Class 1, also comprised exclusively of US Bank's secured claim, as an impaired creditor class.[293]  The US Bank Plan further identifies the holders of Class 4 equity interests as impaired.[294]  The classes of claims and interests impaired by the TJ Plaza Plan, and by the US Bank Plan, will be addressed in turn under the relevant provisions of Section 1129(b).

### i.    Unfair Discrimination Analysis

The TJ Plaza Plan provides that US Bank holds the sole secured claim in Class 1.[295]  All other secured claims are classified separately under the TJ Plaza Plan.[296]  Art & Architecture, 2016 WL 1118743 at *18 ("A plan does not discriminate unfairly within the meaning of the

---

[292]Exhibit 228, ECF No. 691, p. 17 of 43, Section 3.2.

[293]ECF No. 696, p. 13 of 27, as amended at Exhibit S.

[294]ECF No. 696, p. 14 of 27, as amended at Exhibit S.

[295]Exhibit 228, ECF No. 691, p. 17 of 43, Section 3.3.1.

[296]Exhibit 228, ECF No. 691, p. 21 of 43, Section 3.4.1.

Bankruptcy Code if a dissenting class is treated equally with respect to other classes of equal rank."). Since there is only one creditor within Class 1, and there are no other classes of creditors of equal rank, the Court concludes that the TJ Plaza Plan does not "discriminate unfairly" as to US Bank's Class 1 Claim.

Under the TJ Plaza Plan, Class 4 general unsecured claims are held by multiple creditors, but all creditors holding Class 4 claims receive the same treatment.[297] More particularly, Section 3.6 of the TJ Plaza Plan provides that absent an agreement to less favorable treatment, all holders of Class 4 claims "will receive payment in full of their Allowed Claims by no later than six (6) months after the Effective Date, plus interest as set forth [in the TJ Plaza Plan]." On the record before it, the Court concludes that the preponderance of the evidence demonstrates that the TJ Plaza Plan does not "discriminate unfairly" with respect to the holders of impaired Class 4 claims, because that plan treats all creditors holding Class 4 claims equally, and there is no other legitimate class of claims of equal rank.[298]

Like the TJ Plaza Plan, the US Bank Plan provides that the sole secured claim in Class 1 is the secured claim held by US Bank.[299] There are no other classes of secured claims under the US Bank Plan. Art & Architecture, 2016 WL 1118743 at *18 ("A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a dissenting class is treated equally with respect to other classes of equal rank."). Since US Bank is the sole creditor within Class 1, and there are no other classes of creditors of equal rank, the Court concludes that the US Bank Plan does not "discriminate unfairly" as to US Bank's Class 1 Claim.

Under the US Bank Plan, to the extent that the Class 4 equity interests are held by

---

[297]Exhibit 228, ECF No. 691, p. 22 of 43, Sections 3.6.2 and 3.6.3.

[298]The Court has previously rejected TJ Plaza's separate classification of the Class 6 Sewer Claim as improper gerrymandering.

[299]ECF No. 696, p. 12 of 27, as amended at Exhibit S.

multiple parties, such equity interests receive the same treatment.[300]  More particularly, the US

Bank Plan provides that the holders of Class 4 equity interests "will neither receive nor retain

any interests on account of their Interests under the Plan" but "will receive net proceeds from the

sale of [US Bank's Collateral], to the extent any remain after all other Allowed Claims have been

satisfied in full."[301]  On the record before it, the Court concludes that the preponderance of the

evidence demonstrates that the US Bank Plan does not "discriminate unfairly" with respect to the

holders of impaired Class 4 equity interests, because that plan treats all Class 4 equity interests

equally, and there are no other classes of equity interests of equal rank.

To summarize, the Court concludes that TJ Plaza and US Bank have each demonstrated

by a preponderance of the evidence that their respective plans do not "discriminate unfairly" in

the context of Section 1129(b)(1).  The next issue is whether either or both of those plans are

"fair and equitable" in their treatment of dissenting classes of claims or interests.

### ii.    Fair and equitable analysis

In order to satisfy the "fair and equitable" requirement with respect to US Bank's

impaired Class 1 secured claim, the TJ Plaza Plan employs the avenue available to it under

Section 1129(b)(2)(A)(i).  Under that Section, in order to meet the "fair and equitable" standard,

the TJ Plaza Plan must provide both that US Bank will retain its liens on the collateral securing

its claim, and will be paid in deferred payments an amount that equates to the present value of its

secured claim.

The TJ Plaza Plan expressly provides that US Bank will retain its liens on the collateral

securing its claim.  More particularly, the TJ Plaza Plan provides that "[u]ntil payment in full of

the U.S. Bank Refinanced Loan, US Bank shall retain any and all Liens in and to the U.S. Bank

---

[300]ECF No. 696, p. 14 of 27, as amended at Exhibit S.

[301]Id.

160

Collateral to the extent provided in the U.S. Bank Loan Documents."[302]

The TJ Plaza Plan does not, however, stop there.  It significantly alters various terms and covenants contained in the US Bank Loan Documents designed to protect US Bank's secured claim.  Mr. Susa acknowledged that, while US Bank would retain its lien on the Center to secure payment of the loan contemplated by TJ Plaza's plan, the plan provided TJ Plaza the ability to obtain financing secured by the Center, subordinate in priority to US Bank's first lien, without US Bank's consent.  That is a very impactful change, since it would allow TJ Plaza to unilaterally reduce–or even completely eliminate–any available equity in US Bank's collateral base without US Bank's prior knowledge or consent.  The Confirmation Hearing record also established that a junior lien financing transaction secured by the Center is during the term of the TJ Plaza Plan is not a remote possibility.  Mr. Susa testified that TJ Plaza could well need to utilize such junior lien financing to meet unanticipated operational expenses for the Center, including without limitation additional improvements to the Trader Joe's leasehold if requested, at some point during the ten year term of the Plan.

Mr. Susa likewise testified that TJ Plaza's plan modified certain impound and reserve requirements imposed by the existing US Bank Loan Documents.  He stated that, under the TJ Plaza Plan, TJ Plaza would continue to make the $387.50 monthly replacement reserve payment to US Bank during the plan term, but capital expense reserve funds would be retained by TJ Plaza, instead of being remitted to US Bank per the original US Bank Loan Documents.  As a result, TJ Plaza's decision whether to make capital expense reserve payments would be at its discretion, and US Bank would have no ability to easily verify that capital expense reserve funds were actually being retained by TJ Plaza.  As noted by the United States Bankruptcy Court for the District of Massachusetts:

> The covenants to be included in the loan documents of a cramdown need not precisely track the covenants in the parties' existing loan agreement. In re Western

---

[302]Exhibit 228, ECF No. 691, p. 18 of 43, Section 3.3.2.2.

Real Estate Fund, Inc., 75 B.R. 580 (Bankr. W.D. Okla. 1987); In re Coastal
Equities, Inc., 33 B.R. 898 (Bankr. S.D. Cal. 1983). Yet the covenants should not
leave the lender so bare of protection as to greatly increase the risk or require a
corresponding increase in the interest rate.

P.J. Keating Co., 168 B.R. at 473.

Allowing TJ Plaza to unilaterally impair or eliminate the equity in US Bank's collateral

base through junior lien financing without prior knowledge or approval from US Bank, and

eliminating TJ Plaza's obligation to deposit capital expense reserve funds with US Bank, the TJ

Plaza Plan greatly increases US Bank's risk related to its already matured loan secured by the

Center. Additionally, as discussed above, the TJ Plaza Plan contains a cure provision that fails

to comply with Section 1123(d) and seeks to avoid paying US Bank "$459,495.73 in default

interest and $216,332.32 in late fees . . . for a total of $675,828.05."[303] When the entire record is

considered, the Court concludes that TJ Plaza has failed to prove by a preponderance of the

evidence that the TJ Plaza Plan is "fair and equitable."

Additionally, when the guidance provided by the United States Supreme Court in Till v.

SCS Credit Corp., 541 U.S. 465 (2004) is properly applied to the evidence developed at the

Confirmation Hearing, the cramdown interest rate provided for in the TJ Plaza Plan is

insufficient to ensure that US Bank will realize the present value of the secured portion of its

Class 1 Claim. As the Linda Vista Cinemas court noted:

> As case law has evolved since Till, another approach is obtaining traction. In
> both In re American HomePatient, Inc., 420 F.3d 559 (6th Cir. 2005)[304] and
> Mercury Capital Corp. v. Milford Conn. Assocs., L.P., 354 B.R. 1 (D. Conn.
> 2006), . . . bankruptcy courts [were urged] to first consider whether an "efficient
> market" exists, and if so, to utilize those rates. If no efficient market exists, then a
> bankruptcy court should fall back on the formula approach [adopted by the
> Supreme Court in Till]. See generally Gary W. Marsh, Matthew M. Weiss,
> Chapter 11 Interest Rates After Till, 84 Am. Bankr. L.J. 209 (Spring 2010)
> (review of development of cramdown interest rates since 2004).

---

[303]See note 268 and accompanying text, supra.

[304]The complete citation is In re Am. HomePatient, Inc., 420 F.3d 559 (6th Cir. 2005),
cert. denied, 549 U.S. 942 (2006).

1 | Linda Vista Cinemas, 442 B.R. at 750.

2 |     While a degree of normalcy is slowly returning to the commercial lending market in Las

3 | Vegas, Dr. Wiles testified credibly that it is not yet truly an efficient market.  Having considered

4 | the entire record developed in this case, the Court agrees with Dr. Wiles.  The question then

5 | becomes whether the formula approach to cramdown interest rate calculations adopted by the

6 | Supreme Court in Till validates the 4.53% interest rate set forth in the TJ Plaza Plan.  See In re

7 | Davis, 2016 WL 7076985, *2 (Bankr. N.D. Cal. Dec. 5, 2016) (the Till decision "forms the basis

8 | for fixing a proper interest rate under § 1129(b)(2)(A)(i)(II) when, as here, there is no efficient

9 | market rate.") (citing In re Tapang, 540 B.R. 701, 707-08 (Bankr. N.D. Cal. 2015) ("[A]

10 | bankruptcy court should apply the market rate of interest where there exists an efficient market.

11 | And, when no efficient market exists for a Chapter 11 debtor, then the Bankruptcy Court should

12 | employ the formula approach endorsed by the Till plurality.") (internal citations omitted)).  As

13 | the Tapang court explained:

> Under the formula approach, the Court calculates the appropriate interest rate by beginning with the national prime rate and then adjusting upward based upon any risk factors. Till, 541 U.S. at 479, 124 S. Ct. 1951. These risk factors include, but are not limited to, the circumstances of the estate, the nature of the security, and the duration and feasibility of the plan. Id. The Supreme Court made clear that, "starting from a concededly low estimate and adjusting upward places the evidentiary burden squarely on the creditors[.]" Id.

18 | Tapang, 540 B.R. at 707.

19 |     The evidence presented at the Confirmation Hearing was consistent as to the relevant

20 | national Prime Rate to be used in the formula approach to the cramdown interest rate calculation

21 | in this case.  The testimony of Dr. Wiles and Mr. Brungardt established that the national Prime

22 | Rate at the commencement of the contested Confirmation Hearing in this case on January 19,

23 | 2016, was 3.50%.[305]  As a result, the 4.58% interest rate proposed under the TJ Plaza Plan is at

---

[305]The national Prime Rate had previously been at 3.25%, but was raised to 3.50% on December 17, 2015, almost exactly a month prior to the start of the Confirmation Hearing.

the very low end of the typical cramdown interest rate range referenced in Till (i.e., 1.00% to 3.00% above the Prime Rate, or between 4.50% and 6.50%). Because the formula approach adopted in Till is not limited to a simple mathematical calculation, however, the interest rate component of the fair and equitable calculus cannot stop there.

As part of US Bank's proof on the issue of the proper cramdown interest rate, Mr. Brungardt testified that, in his opinion, an upward adjustment of 0.50% above the Prime Rate was warranted due to the risk presented by the circumstances of TJ Plaza's estate. The Court is mindful that, as was demonstrated through cross-examination, Mr. Brungardt's testimony that a 0.50% upward adjustment from the Prime Rate is reasonable in light of the circumstances present in the TJ Plaza estate was simply Mr. Brungardt's expert opinion. His opinion was not based upon a treatise, a professional text, or any recognized publication that had accumulated data regarding rate adjustments under Till's formula approach. In expressing his expert opinion regarding a risk adjustment due to the circumstances of the estate, though, Mr. Brungardt testified that he had carefully considered qualitative issues regarding the estate. He considered the strength of the borrower and guarantor under the matured US Bank Loan, the lack or existence of committed sources of cash to fund debt service and plan obligations in the event of revenue shortfalls, the current condition of the commercial real estate industry, and TJ Plaza's unwillingness to provide common covenants and other assurances that they would perform their obligations under the plan after confirmation. The Court finds Mr. Brungardt's testimony on this issue to be credible. His expert opinion that an upward adjustment of 0.50% above the Prime Rate was warranted due to the risk presented by the circumstances of TJ Plaza's estate is both supported by and consistent with the record developed at the Confirmation Hearing.[306]

In support of US Bank's position, Mr. Brungardt also testified that, in his opinion, an

---

[306]The Court notes that Dr. Wiles did not present countervailing expert testimony to specifically address what, if any, adjustment to the Prime Rate was warranted due to the risk presented by the circumstances of TJ Plaza's estate.

upward adjustment of 1.00% above the Prime Rate was warranted due to the feasibility and default risk presented by the TJ Plaza Plan.  Again, the Court is aware that Mr. Brungardt's testimony that a 1.00% upward adjustment from the Prime Rate is reasonable due to the feasibility and default risk presented by the TJ Plaza Plan is Mr. Brungardt's expert opinion.  His opinion was not based upon a treatise, a professional text, or any recognized publication that had accumulated data regarding rate adjustments under Till's formula approach.  In expressing his opinion, though, Mr. Brungardt also identified specific concerns regarding TJ Plaza's revenue projections and their impact on plan feasibility, inconsistencies between the Center's historical financial performance and TJ Plaza's projections, and importantly, TJ Plaza's assumption that all tenants would remain at the Center while continually renewing their leases at increased rent rates over the entire ten-year term of the Plan.  It is far from certain on the record developed at confirmation that the Center's anchor tenant, Trader Joe's, will remain in the Center for an extended period of time.  The Court finds Mr. Brungardt's testimony on this issue to be credible.  His expert opinion that an upward adjustment of 1.00% above the Prime Rate was warranted due to the feasibility and default risk presented by the TJ Plaza Plan to be supported by and consistent with the record developed at the Confirmation Hearing.

In support of US Bank's position, Mr. Brungardt also testified that, in his opinion, an additional upward adjustment of 1.50% over the Prime Rate was appropriate due to the ten year duration of the TJ Plaza Plan, and the attendant interest rate risk.  As noted previously, the Court is aware that Mr. Brungardt's testimony that a 1.50% upward adjustment from the Prime Rate is reasonable due to the duration and interest rate risk posed by the ten-year term of the TJ Plaza Plan is Mr. Brungardt's expert opinion.  His opinion was not based upon a treatise, a professional text, or any recognized publication that had accumulated data regarding rate adjustments under Till's formula approach.  In expressing that opinion, though, Mr. Brungardt explained that in reaching that conclusion, he had considered the spread between one-month and ten-year U.S. Treasury yields, which was approximately 2.20%, as well as the spread between

one-year and ten-year U.S. Treasury yields, which was about 1.85%. He stated that he took a more conservative view in assigning a 1.50% additional risk factor for duration risk, without explanation for the downward departure from the 1.85 to 2.20% spread identified through his analysis of U.S. Treasury yields.

The Court finds Mr. Brungardt's testimony on this issue to be credible, to a point. The Court finds that his expert opinion that an upward adjustment of 1.50% above the Prime Rate was warranted due to the duration and interest rate risk presented by the TJ Plaza Plan overstates the risk attendant to the financing contemplated by the TJ Plaza Plan. The ten-year financing term under the TJ Plaza Plan is consistent with the term of the original US Bank Loan. The Court also finds credible Dr. Wiles' countervailing opinion that a 1.50% duration and interest rate risk adjustment is too high, because some of that risk is inherent in the Prime Rate. The Court concludes that under Till's formula approach, an upward adjustment of 1.00% would sufficiently address both the duration and interest rate risk attendant to the ten-year financing under the TJ Plaza Plan, and would do so without "double dipping" as to the portion of that risk already captured in the Prime Rate.

As to the nature of the security risk component of the formula approach, Mr. Brungardt explained that he looked primarily at the current value of the Center in deciding to add an additional 0.50% to the base interest rate. The Court is cognizant that Mr. Brungardt's testimony that a 0.50% upward adjustment from the Prime Rate is reasonable due to the security risk component of the TJ Plaza Plan is his expert opinion. His opinion was not based upon a treatise, a professional text, or any recognized publication that had accumulated data regarding rate adjustments under Till's formula approach. In expressing that opinion, though, he focused on the age of the Center, and the existing loan-to-value ratio for the Center, which he believed exceeded an appropriate loan-to-value parameter for commercial loans under current market conditions.

The Court finds Mr. Brungardt's testimony on this issue to be generally credible, but

notes that the current value of the Center significantly exceeds the amount to be financed under the TJ Plaza Plan.  The impact of that equity on the security risk component of the <u>Till</u> analysis was not fully addressed in Mr. Brungardt's testimony.  The Court concludes that, while there is some risk attendant to the age of the Center and the loan-to-value considerations referenced by Mr. Brungardt, those risks are adequately addressed by US Bank's equity in the Center under the loan contemplated by the TJ Plaza Plan.  As a result, no related upward rate adjustment is warranted.

To summarize, when <u>Till</u>'s formula approach to cramdown interest rate calculation is properly applied to the extensive record developed by the parties at confirmation, the Court concludes that the appropriate cramdown interest rate for the financing contemplated under the TJ Plaza Plan is as follows:

|  |  |
|---|---|
| Prime Rate: | 3.50% |
| Circumstances of the Estate: | 0.50% |
| Feasibility (Default Risk): | 1.00% |
| Duration (Interest Rate Risk): | 1.00% |
| <u>Nature of Security (Security Risk):</u> | <u>N/A%</u> |
| **Appropriate Rate Under the Formula Approach:** | **6.00%** |

The Court further concludes that the 4.58% interest rate contemplated by the TJ Plaza Plan is insufficient to ensure that the deferred plan payments would yield to US Bank the present value of its secured claim.  As a result, the Court concludes that US Bank has established by a preponderance of the evidence that the TJ Plaza Plan is not "fair and equitable" as to dissenting Class 1, and does not satisfy the confirmation standard imposed by Section 1129(b)(2)(A)(i)(II). <u>Linda Vista Cinemas</u>, 442 B.R. at 748 (citing <u>One Times Square</u>, 159 B.R. at 706).

The Class 4 equity interest holders under the US Bank Plan are the only class deemed to have rejected that plan.  As to the holders of Class 4 equity interests, the US Bank Plan provides that impaired Class 4 equity interests "will neither receive nor retain any interests on account of

their Interests" under the Plan, but "will receive net proceeds from the sale of the Property, to the extent any remain after all other Allowed Claims have been satisfied in full."  There are no equity interests that are junior to the holders of Class 4 equity interests under the US Bank Plan.  As a result, no holders of any equity interests that are junior to the interests of the Class 4 equity interest holders will receive or retain any property at all on account of such junior interests under the US Bank Plan.  The Court therefore concludes that the US Bank Plan is fair and equitable as to the dissenting Class 4 equity interest holders by operation of Section 1129(b)(2)(C).  See generally Art & Architecture, 2016 WL 1118743 at *18.

### 9.    Section 1129(a)(9): Priority Claims

Section 1129(a)(9) of the Bankruptcy Code states the rules applicable to payment of those unsecured claims entitled to priority in distribution in chapter 11 cases.  With respect to priority claims of the kind specified in Bankruptcy Code Sections 507(a)(2), (3), or (8), Section 1129(a)(9) constitutes the only essential confirmation requirement.  There is no reason to create a class or classes for Section 507(a)(2), (3) and (8) claims in light of the fact that a majority of such classes cannot bind a minority to less favorable payment terms than those provided under Section 1129(a)(9).  Art & Architecture, 2016 WL 1118743 at *18 (citing In re Perdido Motel Grp., Inc., 101 B.R. 289, 293 (Bankr. N.D. Ala. 1989); see also 7 COLLIER ON BANKRUPTCY ¶ 1129.02[9][a] (Alan N. Resnick & Henry J. Sommer, eds., 16th ed. 2016).  Unless the holder of such a priority claim agrees to less favorable treatment of its claim, Section 1129(a)(9) requires the payment of first (Section 507(a)(2)) and second (Section 507(a)(3)) priority claims in full in cash on the effective date of the plan.  11 U.S.C. § 1129(a)(9)(A).  Art & Architecture, 2016 WL 1118743 at *18.  There are no "gap" claims against TJ Plaza entitled to priority under Section 502(a)(3), since this is a voluntary case.

Section 1129(a)(9)(B) of the Bankruptcy Code requires that holders of Section 507(a)(1), (4), (5), (6) or (7) priority claims receive: (i) if such class has accepted the plan, deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such

claim; or (ii) if such class has not accepted the plan, cash on the effective date of the plan equal to the allowed amount of such claim.  <u>Art & Architecture</u>, 2016 WL 1118743 at *19.

Section 1129(a)(9)(C) of the Bankruptcy Code requires that holders of Section 507(a)(8) priority claims receive on account of such claims regular installment payments in cash of a total value, as of the effective date of the plan, equal to the allowed amount of such claims over a period not exceeding 5 years after the Petition Date.  <u>Art & Architecture</u>, 2016 WL 1118743 at *18.

The Court concludes that the provisions of the TJ Plaza Plan satisfy the confirmation requirements imposed by Section 1129(a)(9).[307]  US Bank has not advanced an argument to the contrary.  Likewise, the US Bank Plan contains provisions compliant with the confirmation standard imposed by Section 1129(a)(9).[308]  TJ Plaza has not taken a position to the contrary. The Court concludes that both TJ Plaza and US Bank have carried their burden of proving by a preponderance of the evidence that their respective plans satisfy the requirements of Section 1129(a)(9).

### 10.    Section 1129(a)(10): One Consenting Impaired Class

Section 1129(a)(10) of the Bankruptcy Code provides that a court may confirm a plan only if "at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider."  This Section applies to classes of claims, and not to interest holders.  <u>Art & Architecture</u>, 2016 WL 1118743 at *19 (citing <u>In re Coram Healthcare Corp.</u>, 315 B.R. 321 (Bankr. D. Del. 2004) and <u>In re Am. HomePatient, Inc.</u>, 298 B.R. 152, 163 (Bankr. M.D. Tenn. 2003) (stating that "critical among requirements of Section 1129(a) is the condition that the plan be accepted by at least one class of

---

[307]Exhibit 228, ECF No. 691 p. 16 of 43, Sections 2.1 through 2.3, inclusive; <u>id.</u>, pp. 21-22 of 43, Sections 3.5.1 through 3.5.3, inclusive.

[308]ECF No. 696, p. 12 of 27, as amended at Exhibit S; <u>id.</u>, p. 13 of 27, as amended at Exhibit S.

non-insider, impaired creditors."), aff'd 420 F.3d 559 (6th Cir. 2005), cert. denied, 549 U.S. 942 (2006)).

The preponderance of the evidence establishes that the TJ Plaza Plan runs afoul of the confirmation prerequisite imposed by Section 1129(a)(10). The Court has previously concluded that by separately classifying the Sewer Claim as a Class 6 Claim, instead of including it with the substantially similar general unsecured claims comprising Class 4, TJ Plaza had engaged in impermissible gerrymandering for the sole purpose of obtaining plan acceptance from an impaired creditor class. Since separate classification of the Sewer Claim was impermissible gerrymandering, the Class 6 Sewer Claim is actually a Class 4 general unsecured claim; impaired Class 4 voted to reject the TJ Plaza Plan;[309] and no impaired class of claims has voted to accept the TJ Plaza Plan. TJ Plaza's ballot summary acknowledges that with inclusion of the Sewer Claim in Class 4, no impaired class of creditors has voted to accept the TJ Plaza Plan. As a result, TJ Plaza has failed to prove by a preponderance of the evidence that the confirmation requirement imposed by Section 1129(a)(10) is satisfied by the TJ Plaza Plan.

The US Bank Plan classifies US Bank's Class 1 Secured Claim as an impaired class. Unsurprisingly, the ballot summary regarding the US Bank Plan[310] reveals that US Bank, the holder of the only claim in Class 1, cast its vote to accept the US Bank Plan. Because US Bank is the only holder of an impaired Class 1 claim, and voted in favor of the US Bank Plan, the Court concludes that the US Bank Plan does satisfy the confirmation requirement imposed by Section 1129(a)(10).

### 11.    Section 1129(a)(11): Feasibility

As a predicate to confirmation, Section 1129(a)(11) of the Bankruptcy Code requires a bankruptcy court to determine that a proposed chapter 11 plan is feasible. Specifically, the court

---

[309] See generally ECF No. 891.

[310] ECF No. 804.

170

must determine that the plan proponent has established that "[c]onfirmation of the plan is not

likely to be followed by the liquidation, or the need for further financial reorganization, of the

debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is

proposed in the plan."  11 U.S.C. § 1129(a)(11).  The feasibility test under Section 1129(a)(11)

requires the court to determine whether the plan is workable and has a reasonable likelihood of

success. United States v. Energy Res. Co., 495 U.S. 545, 549 (1990); Sherman v. Harbin (*In re*

Harbin), 486 F.3d 510, 517 (9th Cir. 2007) ("To confirm a plan, a bankruptcy court must find

that the plan is feasible, meaning that '[c]onfirmation of the plan is not likely to be followed by

the liquidation, or the need for further financial reorganization, of the debtor.'"); Acequia, Inc. v.

Clinton (*In re* Acequia, Inc.), 787 F.2d 1352, 1364 (9th Cir. 1986) (finding that plan met

feasibility requirement under Section 1129(a)(11) where the debtor presented evidence

demonstrating that the plan had a reasonable probability of success); Beal Bank USA v.

Windmill Durango Office, LLC (*In re* Windmill Durango Office, LLC), 481 B.R. 51, 67 (9th

Cir. BAP 2012) (citing Harbin, and noting that "[t]o confirm a plan, a bankruptcy court must find

that the plan is feasible, meaning that confirmation of the plan is not likely to be followed by the

liquidation, or the need for further financial reorganization, of the debtor.").

The focus of the court's inquiry in determining whether the feasibility standard of

Section 1129(a)(1) has been met is whether the plan offers a reasonable assurance of success.

Post-confirmation success need not be guaranteed.  The court is not required to determine that

the future success of the post-confirmation debtor is inevitable in order to find that the plan is

feasible. See Johns-Manville, 843 F.2d at 649; In re The Prudential Energy Co., 58 B.R. 857,

862 (Bankr. S.D.N.Y. 1986). As summarized succinctly by the Prudential Energy court:

> Guaranteed success in the stiff winds of commerce without the protection of the
> Code is not the standard under section 1129(a)(11).  Most debtors emerge from
> reorganization with a significant handicap. But a plan based on impractical or
> visionary expectations cannot be confirmed. . . .  All that is required is that there
> be reasonable assurance of commercial viability.

Art & Architecture, 2016 WL 1118743 at *20, quoting Prudential Energy, 58 B.R. at 862 (other

internal citations omitted); see also Acequia, Inc., 787 F.2d at 1365 (citing Pizza of Hawaii, Inc.

v. Shakey's, Inc. (*In re* Pizza of Hawaii), 761 F.2d 1374, 1382 (9th Cir.1985) ("The purpose of

[S]ection 1129(a)(11) is to prevent confirmation of visionary schemes which promise creditors

and equity security holders more under a proposed plan than the debtor can possibly attain after

confirmation.")); Trans Max, 349 B.R. at 91-92 (same); In re Sagewood Manor Assoc. Ltd.

P'ship, 223 B.R. 756, 762-63 (Bankr. D. Nev. 1998) ("While a reviewing court must examine

'the totality of the circumstances' in order to determine whether the plan fulfills the requirements

of section 1129(a)(11) . . . only a relatively low threshold of proof is necessary to satisfy the

feasibility requirement.").

        In considering whether a particular plan is feasible, courts have considered a variety of

factors, including:

> (1)    the adequacy of the debtor's capital structure;
> (2)    the earning power of its business;
> (3)    economic conditions;
> (4)    the ability of the debtor's management;
> (5)    the probability of the continuation of the same management; and
> (6)    any related matters which determine the prospects of a sufficiently successful
>          operation to enable performance of the provisions of the plan.

Trans Max, 349 B.R. at 92 (citing In re Greate Bay Hotel & Casino, Inc., 251 B.R. 213, 226-27

(Bankr. D.N.J. 2000) (other internal citations omitted)).

        Particularly important in the feasibility calculus is evidence demonstrating that any

necessary financing or funding has been obtained, or is likely to be obtained.  Trans Max, 349

B.R. at 92 (citing Crestar Bank v. Walker (*In re* Walker), 165 B.R. 994, 1004-05 (E.D. Va.

1994); In re Made in Detroit, Inc., 299 B.R. 170, 176 (Bankr. E.D. Mich. 2003), aff'd, 414 F.3d

576 (6th Cir. 2005); In re Hoffman, 52 B.R. 212, 215 (Bankr. D.N.D. 1985)).  Section

1129(a)(11) requires a plan proponent to show concrete evidence of a sufficient cash flow to

fund and maintain both its operations and obligations under the plan.  Trans Max at 92 (citing

cases).  In short, "[t]he [plan proponent] must offer more than speculation about the source of

funding for the plan."  Trans Max at 92 (citing Walker, 165 B.R. at 1003, and Made in Detroit,

299 B.R. at 176). Ultimately, the inquiry under Section 1129(a)(11) is whether the proponent of a proposed chapter 11 plan has established post-confirmation viability, and the ability to meet its future obligations under the plan, by a preponderance of the evidence.

With respect to the TJ Plaza Plan, the preponderance of the evidence at the Confirmation Hearing showed that TJ Plaza's capital structure is questionable at best. Mr. Susa confirmed that he was the managing member of RAM, and testified that RAM was not obligated to provide funding for the Center if there was a cash flow shortage during the term of the TJ Plaza Plan. He noted that he was a guarantor of the US Bank Loan, along with two other general partners in RAM. While he suggested that the two other general partners in RAM would provide funding if needed to cover a cash flow shortfall for the Plaza, he conceded that neither he nor the other two general partners in RAM had signed any agreement obligating them to do so. Mr. Susa acknowledged that capital expense reserve funds would be retained by TJ Plaza under the terms of the TJ Plaza Plan, instead of being remitted to US Bank as required under the terms of the original US Bank Loan Documents. The result is a shifting of risk to US Bank as to future capital expense outlays needed at the Center. Mr. Susa admitted, too, that TJ Plaza could well need to utilize financing secured by a junior lien on the Center to meet unanticipated operational expenses at the Center, including additional improvements to the Trader Joe's leasehold if requested, at some point during the ten year term of the Plan.

As to the earning power of TJ Plaza's business operations generated by the Center, Mr. Susa testified that from the inception of the US Bank Loan through the Confirmation Hearing, TJ Plaza had made payments on the US Bank Loan totaling $4,757,390.01. He testified further that from the inception of the US Bank Loan until the loan matured ten years later, TJ Plaza had made all required principal, interest, insurance, reserve, impound, and tax payments, as well as post-bankruptcy payments in connection with the US Bank Loan totaling $309,019.92. He stated that the average monthly payment TJ Plaza had made on the US Bank Loan from the inception of the Loan to the Confirmation Hearing was $31,928.79, and that during the ten-year

time period from the inception of the US Bank Loan through its maturity date, the average

monthly payment was $37,697.00.  Mr. Susa said that he believed that, given TJ Plaza's payment

history under the US Bank Loan both pre- and post-petition, TJ Plaza was capable of making the

payments provided for under the terms of TJ Plaza's proposed chapter 11 plan.  What Mr. Susa

did not say, however, was that TJ Plaza could pay the full balance currently due under the

matured US Bank Loan.

To counter Mr. Susa's testimony, US Bank offered the testimony of its feasibility expert,

Mr. Brungardt.  Mr. Brungardt testified that, in his opinion, TJ Plaza's revenue projections for

the Center were not reasonable, because they were both overstated and speculative.  Mr.

Brungardt testified that his revised financial projections, assuming an $18.00 per square foot

lease rate for the Trader Joe's leasehold and TJ Plaza's proposed loan terms (i.e., $5.1 million

US Bank Loan at 4.53%), showed that the Center would generate negative cash flow of -

$228,412.00 in the first year of the plan, and would have a cumulative negative cash flow in the

amount of -$77,055.00 through the end of the second year of the plan.  He testified that his

revised financial projections, coupled with loan terms he considered appropriate (i.e., $6.3

million US Bank Loan at 6.75%), yielded negative cash flow for the Center in the amount of -

$519,711.00 in the first year of the Plan term, negative cash flow in the amount of -$139,942.00

in the second year of the plan term, and negative cash flow for the remainder of the ten-year TJ

Plaza Plan term.

The Court finds Mr. Brungardt's calculations and testimony to be the more credible

evidence as to the earning power of the Center.  In reaching that conclusion, the Court notes first

that the $5.1 million in proposed financing under the TJ Plaza Plan is significantly less than the

unpaid amount TJ Plaza currently owes to US Bank under the terms of the matured US Bank

Loan:  $6,158,351.67, when all amounts for default interest, late charges, and attorney fees are

included, as they must be.  Pacifica L 51, 840 F.3d at 1141-42 ("[T]he borrower does not

effectuate a cure merely by paying past due installments of principal at the pre-default interest

rate.  Rather, the borrower's cure obligations may also include 'late charges, attorneys' and trustee's fees, and publication and court costs. . . .  It is only once these penalties are paid that the debtor can return to pre-default conditions as to the remainder of the loan obligation.").  Next, the interest rate contemplated under the TJ Plaza Plan (4.53%) is significantly lower than the appropriate cramdown interest rate, previously established by the Court to be 6.00%.  There is also significant uncertainty as to the future earning power of the Center given the month-to-month status the Center's anchor tenant, Trader Joe's.  When all of the evidence adduced at the Confirmation Hearing is properly considered, the Court concludes that the assumptions in Mr. Brungardt's calculations and report most accurately represent the earning power of the Center. That evidence shows that the earning power of the Center is not sufficient to meet debt service and operational expenses during the ten-year term of the proposed TJ Plaza Plan, and is certainly insufficient to satisfy the current balance due under the matured US Bank Loan.

The preponderance of the evidence presented at the Confirmation Hearing also demonstrated that economic conditions are not favorable to TJ Plaza.  Testimony showed that newer and larger retail centers had recently been opened in the proximity of the Center, including a new mall in Summerlin which included a Trader Joe's location.  Mr. Anderson testified that another 200,000-square-foot retail mall was poised to open at Durango and Interstate 215 in the near future.  With Trader Joe's in place at the Center, the vacancy rate has hovered at about 24%.  The deposition testimony of Douglas Yokomizo, Trader Joe's Vice President - Real Estate, confirmed that Trader Joe's had opted for a month-to-month tenancy instead of signing an extension of its lease at the Center.  That is the case even though Trader Joe's has several five-year lease renewal options available to it.  Mr. Yokozimo's testimony further showed that Trader Joe's had identified various safety and security concerns regarding its tenancy at the Center, and had made no final decision whether it would sign a lease extension or vacate the Center in the future.  Mr. Anderson acknowledged that if Trader Joe's were to vacate, the Center's occupancy rate would drop to 48.15%.  In addition, the Prime Rate of interest had

increased from 3.25% to 3.50% less than sixty days prior to the commencement of the Confirmation Hearing in this case.

The preponderance of the evidence developed at the Confirmation Hearing established that if the TJ Plaza Plan were confirmed, the Center's existing management is sufficiently capable to carry out the terms of the Plan.  Mr. Susa testified that he had been generally involved in the commercial real estate market for thirty-seven years, has held a Nevada real estate broker's license since 1989, and a property management certificate since 2000, began providing management services for TJ Plaza in 2007, has been the managing member of RAM since 2008, and has continuously provided management services for TJ Plaza through RAM for about a decade.  Mr. Susa testified credibly that, in addition to the management services it provided for TJ Plaza, RAM also provided management services for entities operating other commercial real estate projects that experienced substantial financial difficulty.  Those projects involved secured claims ranging from $7 million to $19 million, and were resolved either through chapter 11 bankruptcy relief, or through voluntary creditor workout agreements.  No countervailing evidence was presented that would tend to indicate that Mr. Susa and RAM would not be competent to carry out the terms of the TJ Plaza Plan if it were confirmed.

There is not only a probability, but a certainty, of the continuation of the Center's existing management through RAM and Mr. Susa if the TJ Plaza Plan were confirmed.  The TJ Plaza Plan is unequivocal in that regard.[311]

There is some evidence of related matters pointing to the prospects of a sufficiently successful operation at the Center to enable TJ Plaza to perform the provisions set forth in the TJ Plaza Plan.  Relatively new leases have reduced the vacancy rate at the Center to 74%, and the rental rates under those leases are either at or slightly above the related market rates established by the evidence.  Those considerations are, however, offset by the significant uncertainty as to

[311]Exhibit 228, ECF No. 691, p. 23 of 43, Section 4.3.

whether Trader Joe's will remain an anchor tenant at the Center, and if so, for how long.

In summary, with respect to the TJ Plaza Plan, the Court has considered all of the evidence and arguments presented by the parties at the Confirmation Hearing, as well as the Section 1129(a)(11) feasibility factors identified in Trans Max, with no single factor controlling the calculus. The Court concludes that TJ Plaza, as the proponent of the TJ Plaza Plan, has not established by a preponderance of the evidence that it will remain viable post-confirmation, nor that it will be able to meet its future obligations under the TJ Plaza Plan. As a result, the Court concludes that TJ Plaza has failed to satisfy the feasibility requirement imposed by Section 1129(a)(11) as a necessary predicate to confirmation of the TJ Plaza Plan.

The confirmation requirement imposed by Section 1129(a)(11) is satisfied where "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." In re Hand, 2009 WL 1306919, *12 (Bankr. D. Mont. 2009) (citing Brotby, 303 B.R. at 191). Liquidation of the Center is proposed in the US Bank Plan and, as noted above, such a liquidation is expressly provided for under Section 1129(a)(11). Id. In view of the preponderance of the evidence developed at the Confirmation Hearing, the Court concludes that the US Bank Plan is viable and has a reasonable likelihood of success. Energy Res. Co., 495 U.S. at 549. As a result, the US Bank Plan satisfies the feasibility requirement imposed under Section 1129(a)(11).

### 12.    Section 1129(a)(12): US Trustee and Bankruptcy Fee Payments

Section 1129(a)(12) of the Bankruptcy Code requires that all Bankruptcy Court fees payable pursuant to 28 U.S.C. § 1930 have been paid, or the plan provides for the payments of all such fees on the effective date of the plan. Art & Architecture, 2016 WL 1118743 at *22. The TJ Plaza Plan provides for payment of those fees on the Effective Date.[312] So, too, does the US Bank

---

[312]Exhibit 228, ECF No. 691, p. 7 of 43, Section 1.1.1(c); id., p. 16 of 43, Section 2.2.1.

Plan.[313]  Both TJ Plaza and US Bank have carried their burden of proving by a preponderance of the evidence that their respective plans satisfy the confirmation requirement of Section 1129(a)(12).

### 13.    Sections 1129(a)(13) through (a)(16) are inapplicable in the confirmation calculus

No evidence was presented by either party at the Confirmation Hearing demonstrating that retiree benefits are involved here, rendering Section 1129(a)(13) inapplicable in the confirmation calculus.  Unsurprisingly, no proof was offered to demonstrate that either TJ Plaza or US Bank is obligated on any domestic support obligation, and neither of those entities is an individual.  As a result, Sections 1129(a)(14) and (15) are inapplicable as well.  Finally, both TJ Plaza and US Bank are monied, business and commercial entities that are not related to a charitable organization, such that Section 1129(a)(16) is also inapplicable.

### F.    Neither the TJ Plaza Plan Nor the US Bank Plan Satisfy All of the Standards Required for Confirmation Under Section 1129

The Court is mindful of its affirmative duty to make sure that all applicable requirements under Section 1129 have been met before confirming a chapter 11 plan of reorganization.  Ambanc La Mesa Ltd. P'ship, 115 F.3d at 653.  Careful review of the entire record developed during the five-day Confirmation Hearing in this case demonstrates that TJ Plaza failed to carry its burden of proving by a preponderance of the evidence that the TJ Plaza Plan satisfies all of the confirmation standards imposed under Section 1129 of the Bankruptcy Code.  US Bank likewise failed to carry its burden of proving by a preponderance of the evidence that the US Bank Plan satisfies all of the confirmation standards imposed under Section 1129 of the Bankruptcy Code.  As a result, neither the TJ Plaza Plan, nor the US Bank Plan is confirmable.  Confirmation of both plans must and will be denied.

---

[313]ECF No. 696, p. 5 of 27, as amended at Exhibit S; id., p. 12 of 27, as amended at Exhibit S; id., p. 13 of 27, as amended at Exhibit S.

## **CONCLUSION**

Based upon the authorities and analysis contained in this Memorandum, the Court concludes that the disclosure statement filed by TJ Plaza as amended to date, and the disclosure statement filed by US Bank as amended to date, each satisfy all applicable approval standards imposed under 11 U.S.C. § 1125. Both disclosure statements will therefore be approved on a final basis.

Based upon the authorities and analysis contained in this Memorandum, neither the TJ Plaza Plan as amended to date, nor the US Bank Plan as amended to date, satisfy all applicable confirmation standards under 11 U.S.C. § 1129(a) and (b). Confirmation of both plans will therefore be denied.

A separate Order incorporating the Court's findings of fact and conclusions of law as set forth in this Memorandum shall be entered.


Notice and copies sent to:

ALL PARTIES VIA BNC MAILING MATRIX.

# # #